*JUDGE BATTS*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 11 CIV 4060



J.T. COLBY & COMPANY, INC. d/b/a
BRICK TOWER PRESS, J. BOYLSTON &
COMPANY, PUBLISHERS LLC and
IPICTUREBOOKS LLC,

Plaintiffs,

-against-

APPLE, INC.,

Defendant.

Case No.

**COMPLAINT
AND JURY DEMAND**

ECF CASE

Plaintiffs J.T. Colby & Company, Inc. d/b/a Brick Tower Press; J. Boylston &

Company, Publishers LLC; and ipicturebooks LLC, for their Complaint against Apple, Inc.

hereby allege as follows:

## NATURE OF THE CASE

1. This is an action for infringement of plaintiffs' common law trademarks "ibooks"

and "ipicturebooks", which have been used for more than eleven years by plaintiffs and

plaintiffs' predecessors as trademarks for a wide range of print and electronic books. Apple's

use of the mark "iBooks" to denote the electronic library that can be accessed via its iPad tablet

computer and its iPhone is likely to overwhelm the good will of plaintiffs' "ibooks" and

"ipicturebooks" marks and render them virtually worthless.

2. Plaintiffs are members of a small family of publishing companies owned by New

York publisher John T. Colby ("Colby"). In a series of transactions in 2006 and 2007, Colby

purchased the assets of various entities owned by New York publisher Byron Preiss ("Preiss").

Beginning in September 1999, Preiss published more than a thousand well-known print books,

both hardcover and paperback, under the "ibooks" mark.  Moreover, Preiss pioneered the development and sale of electronic books, which he sold through a variety of entities under the marks "ibooks" and "ipicturebooks".  Beginning in January 2000, Preiss published thousands of electronic books bearing the "ibooks" and "ipicturebooks" trademarks, many of which are by well-known authors and/or feature well-known fictional characters.

3.    Following his purchase of the "ibooks" and "ipicturebooks" business from Preiss, Colby has continued to publish a wide range of books from well-known authors under both the "ibooks" and "ipicturebooks" marks.  Plaintiffs' "ibooks" and "ipicturebooks" marks have, however, been overwhelmed by Apple's use of the "iBooks" mark to identify the electronic books available to users of its iPad as well as the application ("app") that allows these books to be displayed on the iPad screen.  Apple has also begun offering "iBooks" to users of its iPhone and to consumers who visit its iTunes store.

4.    While Apple has long held a trademark on the name IBOOK for computers, and at one time sold a portable computer known as the "iBook", Apple never utilized this mark as a designation for electronic books, or an application for the delivery of electronic books, until April 2010 when it launched the iPad and began using the name "iBooks".  Moreover, Apple never protested Preiss or Colby's use of the marks "ibooks" or "ipicturebooks" throughout the eleven years those marks have been used in connection with the sale of print and electronic books.

5.    Apple well knows that its rights in the IBOOK mark for computers are narrow and do not extend to the mark's use on electronic books, bookstores and libraries, or on apps denoting electronic books.  In 1999, in order to secure registration of the IBOOK trademark from the U.S. Patent and Trademark Office ("PTO"), Apple entered into an agreement with Family Systems, Ltd., a U.K. company that had previously filed for registration of the identical mark for

computer software used to create interactive, user-modifiable electronic books.  Under that agreement, Apple acknowledged that its use of the mark IBOOK for computers was distinguishable from, and not confusingly similar to, Family Systems' use of IBOOK on computer software used to create interactive, user-modifiable electronic books.  In early 2010, Apple purported to purchase the Family Systems IBOOK mark, and to amend that mark's registration to cover the plural form of the mark, viz., IBOOKS.  However, as set forth more fully below, Apple's purchase of the mark was an invalid assignment in gross and thus Apple holds no rights in the Family Systems mark beyond the right to prevent Family Systems from resuming use of the mark.

6.    Apple's April 3, 2010, launch of the iPad was the subject of widespread anticipation and publicity.  During its first day on the market, over 300,000 iPads were sold; after one week, more than 500,000 had been sold.  While Apple projected first-year iPad sales of five million, Apple actually sold over 15 million iPads in the nine months the product was on the market in 2010.  Apple has spent tens of millions of dollars to advertise and promote the iPad and its various apps, including the "iBooks" electronic library app.  This enormous sales volume and the accompanying advertising expenditures is likely to – and in fact already has – overwhelmed the reputation and good will of plaintiffs' "ibooks" and "ipicturebooks" marks.  As a result, Apple's massive sales, advertising and delivery of "iBooks" has forever linked "iBooks" with Apple in the minds of consumers.

## JURISDICTION AND VENUE

7.    This is an action for infringement of a common law trademark and false designation of origin in violation of Section 43 (a)(i)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(i)(A), and for related claims under the common law of New York.

8.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1338(a) and (b).  Venue in this District is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## THE PARTIES

9.   Plaintiff J.T. Colby & Company, Inc. d/b/a Brick Tower Press ("Brick Tower") is a New York corporation owned by John Colby and has its office at 1230 Park Avenue, New York, New York.

10.   Plaintiff J. Boylston & Company, Publishers LLC ("Boylston") is also a New York corporation owned by Colby and also has its offices at 1230 Park Avenue, New York, New York.

11.   Plaintiff ipicturebooks LLC is a Delaware corporation that is wholly-owned by Boylston.  Its offices are also at 1230 Park Avenue, New York, New York.

12.   Defendant Apple, Inc. is a California corporation with its principal place of business at One Infinite Loop, Cupertino, California.  Apple is one of the largest and most successful corporations in the United States and does business in all 50 states, including New York.  Apple's new iPad, with its iBooks application and library, has been extensively advertised, promoted and sold in New York State.

## THE "ibooks" FRANCHISE

13.   In or about September 1999, Preiss founded ibooks, inc.  Between 1999 and November 2006, when Colby purchased the assets of ibooks, inc., the company published more than 1000 hardcover and paperback books under the "ibooks" imprint.  Throughout most of this period, the books were distributed by Simon & Schuster.  In 2006, Publishers Group West ("PGW") succeeded Simon & Schuster as the "ibooks" distributor.  Since 2007, "ibooks" have been distributed by National Book Network ("NBN").  Each book bears the "ibooks" name on

the copyright page. Annexed as Exhibit A is the copyright page of *Arthur C. Clarke's Venus Prime* by Paul Preuss, a paperback published in January 2000 by ibooks, inc., showing the ibooks imprint, corporate name, and website address.

14.   Subsequent to Colby's purchase of the ibooks business, another 35 titles have been published under the "ibooks" imprint. The distribution of "ibooks" is currently handled by NBN in the U.S. and Canada, Gazelle Books Services in the U.K., and Scribo Books in Australia and New Zealand. The rights to all of the more than 1000 hard and soft cover books that have been published under the "ibooks" imprint are now owned or licensed by plaintiff Boylston. These books are available from most booksellers, including Amazon and Barnes & Noble. Barnes & Noble, for example, currently carries 946 "ibooks" print books that are available via its website.

15.   The "ibooks" print books include a large number of famous books from well-known authors. Many of them focus on history, and include:

(1)   Numerous books on World War II by Stephen W. Sears, including *The Battle of the Bulge*, published to coincide with the 60th anniversary of this famous battle; *The Air War Against Hitler's Germany*, published to coincide with the 60th anniversary of the Allies' victory; and Desert War in North Africa.

(2)   Various military histories including *Vietnam: A Reader; The World War II Reader; The Civil War Reader: 1862; West Point Blue and Gray*, by Thomas Fleming; and *The Battle for Jerusalem*, by Lt. Gen. Mordechai Gur.

(3)   Biographies, such as: *Jefferson: Architect of American* by Page Smith; *Adams: An American Dynasty* by Francis Russell; *Benjamin Franklin: An Intimate Portrait* by Thomas Fleming; and *Einstein: A Relative*

*History* by David Goldsmith and Robert Libbon.

(4)     Books about the ancient world, including *Ancient Greece*; *Ancient Rome*; *Ancient China*; and John Cullen's *A Walk in Ancient Rome*.

(5)     Histories by world famous authors, including *Remember the Alamo*, by Robert Penn Warren; *The American Heritage History of the American Revolution*, by Bruce Lancaster; *The American Heritage New History of World War* II, by Stephen Ambrose; and Notes *From The Warsaw Ghetto*, by Emmanuel Rengelblum, a Polish historian who was executed in 1944.

16. The "ibooks" imprint also features a number of well-known fictional works and annotated versions of classic fictional works, including:

(1)     *Murder Through the Ages – A Bumper Anthology of Historical Mysteries.*

(2)     *The Essential Dracula,* an annotated edition of Bram Stoker's classic novel.

(3)     *The Essential Phantom of the Opera,* an annotated edition of Gaston Leoux's classical novel.

(4)     All seven of Harry Kemelman's Rabbi Small mysteries, including *Friday the Rabbi Slept Late*; *Saturday the Rabbi Went Hungry*; and  *Sunday the Rabbi Stayed Home.*

(5)     Numerous historical novels by the late Howard Fast, including *Bunker Hill; The Crossing; The Jews - Story of A People*; *The Immigrants*; and *My Glorious Brothers.*

(6)     Numerous mysteries by Charlotte MacLeod, known as "America's Agatha Christie", including *The Family Vault*; *Withdrawing Room*; *The Recycled Citizen*; and *The Palace Guard.*

(7)     The republication of numerous books that are best known for their motion

picture and television versions, including *The Prisoner,* by Thomas Disch;

*Midnight Cowboy*, by James L. Herlihy; *The Big Heat*, by William P.

McGivern; *Psycho,* by Robert Bloch; and *The Lady Vanishes*, by Ethel

Lina White.

17.  The "ibooks" line is particularly well-known for its large collection of popular

science fiction and action-adventure novels, many of which are published as "graphic novels" –

fictional works presented in a comic-book-style format.  These works include:

(1)     Mark Tiedemann's famous Isaac Asimov Robot Mysteries, including

*Aurora*; *Mirage*; *Chimera*; and numerous works published in the *iRobot*,

*Robot City* and *Robots in Time* series.

(2)     Richard Hatch's famous *Battlestar Gallatica* series of science fiction

books including *Destiny*; *The Tombs of Kobol*; *The Young Warriors*; and

*The Saga of a Star World.*

(3)     Several science fiction books, including *Alien Factor* and the *Alexa* series

of graphic novels, authored by Stan Lee, the creator of *Spiderman* and the

founder of Marvel Comics.

(4)     Several novels and graphic novels based on the *Terminator* action-

adventure series, including *The New John Conner Chronicles (*a trilogy of

*Terminator* novels); *Hour of the Wolf*; *The Terminator: The Burning

Earth*; *The Terminator: Rewired*; and *Terminator 2: The Official Graphic

Novel Adaptation.*

(5)     Numerous books and anthologies based on the wildly popular X-Men

characters that first appeared in *Marvel Comics,* including *Five Decades of*

*X-Men, An Anthology*; and *X-Men: The Chaos Engine Trilogy,* a three-novel Omnibus Edition.

(6)     Yearly volumes of science fiction published under the title: *The Best of (Year)*, which compile the best science fiction stories published in 2001, 2002, 2003, 2004 and 2005.

(7)     Numerous books by Stephen Leigh in the *Ray Bradbury Presents* time travel adventure series, including: *Dinosaur Tales*; *Dinosaur World; Dinosaur Planet*; *Dinosaur Empire*; *Dinosaur Samurai*; and *Dinosaur Warriors.*

(8)     Several novels by Arthur C. Clark, including *Against the Fall of the Night, Clark's Universe* and *The Sentinel*, as well as six books in the *Arthur C. Clark Venus Prime* series.

18.  The "ibooks" print books also include numerous graphic novel versions of famous novels, such as:

- *Dracula*
- *Frankenstein*
- *Batman*
- *Black Beauty*
- *Sherlock Holmes*
- *The Red Badge of Courage*
- *The Wizard of Oz*

## THE "ipicturebooks" FRANCHISE

19.  Through a joint venture with Time-Warner, Inc., Preiss formed the company now known as ipicturebooks LLC.  This company creates and sells print and electronic picture books targeted largely to children.  The company offers over 1,000 titles from more than 70 different publishers, and holds the electronic rights to thousands of additional titles.  These books have been published under both the "ibooks" and "ipicturebooks" imprints.  Many of the books have been sold as print books by various distributors and a large number are currently available as print books through Amazon.  "ipicturebooks" are also being distributed by several electronic book distributors, including Amazon, Google Editions, For-Side Ltd., Lightning Source Digital and Overdrive; in addition, plaintiffs are in negotiations with Barnes & Noble for distribution of the books via barnes&noble.com.  The books are also available through various school and library channels, such as the *Follett Library Resources* and the Online Computer Library Center ("OCLC").

20.  Since its inception in 2002, "ipicturebooks" has become the largest provider of children's digital books to school districts and library systems.  The books are frequently sold via subscriptions to school districts and public libraries across the country.  They are also available on a direct-to-consumer basis and via distributors such as Amazon and ChildrensELibrary ("CEL").  The "ipicturebooks" have a strong graphic component, and are thus well-suited to electronic display and reading.  Each "ipicturebook" bears the "ipicturebooks" name on the copyright page.  Annexed as Exhibit B is the copyright page of *Coco's Surprise*, an electronic version of a book originally published in Germany in 1998, showing the "ipicturebooks" imprint, address and website.

21.  The "ipicturebooks" library includes a large number of popular children's books, many of which were originally published as print books by other publishers.  These books

include such titles as:

    (1)    Various books in the *Barney*, *Berenstein Bear* and *Shrek* series;

    (2)    *Jane Goodall's Animal World: Gorillas* by Miriam Schlein;

    (3)    *There's a Dragon About* by Roni Schotter;

    (4)    *Dragonworld* by Michael Reaves and Joseph Zucker;

    (5)    *"Not Now!" Said the Cow* by Joanne Oppenheim; and

    (6)    *The Ultimate Dracula* by Byron Preiss.

22. The "ipicturebooks" imprint is particularly well known for its numerous series of children's books. These series include:

    (1)    The *Mortimer's Fun with Words* series by Karen Bryant-Mole and Zul Mukhida;

    (2)    The *Mortimer's Math* series by Karen Bryant-Mole;

    (3)    The *101 Facts about Pets* series by Sarah Williams;

    (4)    The *Real Kids Readers* series by Marcia Leonard and Dorothy Handelman;

    (5)    The *Blue Tortoise*, *Green Bear*, *Red Rhino* and *Yellow Hippo* series by Alan Rogers;

    (6)    The *I Wish I Were a . . .* series by Ivan Bulloch and Diane James; and

    (7)    The *Zoo Animals* series by Caroline Arnold and Richard Hewitt.

23. Other "ipicturebooks" are targeted to older schoolchildren and are frequently used in classrooms as teaching aids. These books include titles such as:

    (1)    *A Caribou Journey* by Debbie Miller and John Von Zyle;

    (2)    *My Life with the Chimpanzees* by Jane Goodall;

    (3)    Book about famous historical figures, such as *Alexander the Great*, *Amelia Earhart*, *Cleopatra*, *Thomas Edison*, *Henry Ford*, *Galileo*, *Gandhi* and *Pablo*

*Picasso*;

(4)     Books about history, such as *Ancient Rome*, *Saudi Arabia*, the *Time Machine*

series, *Instant European History* and *Instant English Literature*; and

(5)     Books about recent historical leaders and events such as *All American Boys:*

*An Insider's Look at the U.S. Space Program*; *Civil Rights Leaders*; and *The*

*Last Souvenir: Okinawa.*

## THE "ibooks" AND "ipicturebooks" ELECTRONIC BOOKS

24. Preiss was a pioneer of electronic books, and foresaw their emergence and growth

long before other publishers.  There were several components to Preiss' electronic books

business.  First, as set forth above, ipicturebooks LLC was formed for the very purpose of

creating and selling children's electronic picture books.  During the company's early stage,

"ipicturebooks" electronic books were promoted and sold by AOL and Microsoft.  The books are

currently available from a number of electronic publishers including Amazon.com.  Annexed as

Exhibit C are the first five pages of the more than 350 "ipicturebooks" currently available from

Amazon.

25. Second, Preiss produced electronic versions of most of the "ibooks" titles and sold

them as ebooks under the "ibooks" imprint.  Initially, Preiss partnered with Microsoft in

connection with Microsoft's launch of its ebooks "reader" software, and the books were

available from Microsoft.com.  Over time they also became available from other electronic

sources, including Amazon.com, Palm.com, Overdrive.com, Fictionwise.com, Motricity.com

and LightningSource.com.

26. Third, one of the Preiss businesses was known as Byron Preiss Visual Publications,

Inc. ("BPVP").  This entity – the assets of which were also purchased by Colby – created

thousands of so-called "packaged" books under contract with other publishers.  Preiss writers,

editors and illustrators would create a book for a publisher that would be sold under the publisher's own imprint, and under the name of the publisher's "author". These books include children's books, parent's books, textbooks, and books "authored" by celebrities. While print versions of these books are sold under another publisher's imprint, BPVP – not the various publishers - holds the rights to the electronic versions of these books.

27.   Unlike many competitors in the ebooks business, Preiss – and now plaintiffs – own or license the electronic publication rights to virtually all of the books they publish electronically.  Acting largely through ipicturebooks LLC, Preiss purchased or licensed electronic rights to thousands of mainstream books published by the major publishing companies.  Since 1999, Preiss published over 3,000 electronic titles; he also purchased or licensed the electronic rights to thousands more.  Today, these electronic rights are owned by Boylston.  Over the years, "ipicturebooks" electronic books have been promoted and sold through various distributors, including the ipicturebooks website (ipicturebooks.com), which was active from approximately August 2000 to April 2008.  Annexed as Exhibit D are screenshots from the "ipicturebooks" website for April 8, 2001 and March 7, 2006.

28.   Virtually all of the "ibooks" print books are available electronically.  Like the print versions of theses books, the electronic  versions are sold under the "ibooks" mark.  In addition to the titles referred to in paragraphs 15 through 18 above, plaintiffs also hold the electronic rights to books by John Steinbeck (*The Grapes of Wrath*), Raymond Chandler (*Philip Marlow* and others), Arthur C. Clark and Irving Wallace.  Other titles available electronically under the "ibooks" mark include *The Hitchhiker's Guide to The Galaxy*, a graphic novel by John Camell, and *The Ultimate Einstein,* by Robert Libbon.

29.   In addition, thousands of well-known titles that originated with BPVP are now owned by plaintiffs and are, or could be made available, electronically.  These include:

- *Halloween*, a children's electronic Halloween book read by Jerry Seinfeld and published by Little Brown;

- Titles by various celebrity authors including Miles Davis, Paul Simon and Joni Mitchell;

- *The Bank Street Library*, Ready to Read series, a major source of children's readers, the print versions of which are sold by Reader's Digest; and

- A series of art ebooks created by Preiss under an agreement with Scala Group SpA.

30.  Most of plaintiffs' graphic novels are sold electronically under the "ibooks" imprint. They include:

- Volumes 1 and 2 of *Dead Samurai,* by Aron Lusen;

- *The Skeleton Family*, by Anne Baraou and Vincent Sardon;

- *Swords of Rome, Volume 1: The Conquerors*, by Jean DuFaux and Philippe Delaby;

- *Magnus, Robot Fighter: Volume 1*, by Louise Simonson and Jim Steranko;

- Numerous volumes of *The Terminator*, by Russell Blackford;

- *The Best of Ray Bradbury*, a collection of science fiction stores by this famous author.

- The three-volume collection of *Mister X* graphic novels by Dean Motler and Paul Rivoche;

- The three-volume collection of the highly popular European fantasy epic series *The Quest for Aberzen*, by N. Guessan and Gibelin;  and

- Over ten titles from the Alfred Bester Library, including *The Deceivers,*

-13-

*Psychoshop*, *The Stars My Destination* and *The Computer Connection*.

## PLAINTIFFS' RIGHTS IN THE "ibooks" AND "ipicturebooks" MARKS

31.   Throughout the past eleven years, plaintiffs and their predecessors have promoted "ibooks" and "ipicturebooks" within the publishing industry.  At least twelve "ibooks" catalogues were published between September 2001 and December 2006.  Each of these catalogues contained hundreds of "ibooks" titles and many of them are more than 70 pages long. Copies of the covers of these catalogues are annexed as Exhibit E.  From 2007 to date, "ibooks" have been listed in the catalogue of the company's distributor, NBN.  Attached as Exhibit F are excerpts from the NBN catalogues for 2008, 2009 and 2010 showing portions of the "ibooks" list.  Attached as Exhibit G is the cover of a 2005 catalogue of "ibooks" graphic novels.

32.   Plaintiffs and their predecessors have advertised "ibooks" and "ipicturebooks" from time to time in both the publishing trade press and the mainstream press, and have also promoted the books at publishing fairs held throughout the world.  Attached as Exhibit H is an announcement published in *Publishers Weekly* regarding "ibooks" acquisition of the entire backlist of the well-known author Howard Fast.  The "ibooks" graphic novels received considerable publicity; annexed as Exhibit I are two announcements published in the trade press about Preiss' launch of various graphic novels, including novels featuring the legendary Harvey Comics characters.  From 2007 through 2010, the "ibooks" titles were listed in the Book Expo America ("BEA") catalogue issued in connection with the annual BEA publishing trade show. Excerpts from this catalogue are attached as Exhibit J.  In 2004, "ibooks" was named by Publisher's Weekly as one of the ten outstanding small publishers of the year.

33.   Today, over 4,000 "ibooks" and "ipicturebooks" are available electronically.  They can be purchased from virtually all online booksellers, including Amazon, Barnes & Noble,

Follet, OCLC, Fictionwise, Overdrive, Sony, Lightning Source and For-Side, a Japanese distributor of cell phone systems. The "ibooks" science fiction books, graphic novels and electronic books are particularly popular with, and are well-known to, readers of books in those genres. Amazon, for example, features reviews and reader comments on several of the "ibooks" graphic novels on its website. Similarly, the "ipicturebooks" illustrated children's books are particularly popular with parents, children and children's libraries. Plaintiffs, through their "ibooks", "ipicturebooks" and BPVP imprints, were pioneers in the electronic books field and were known as such within the publishing industry.

34. While ibooks, inc. was the first English language publisher to publish books simultaneously in print and electronically, the "ibooks" mark used by plaintiffs does not and was never intended to denote electronic, or internet-related, books. In fact, the "ibooks" logo, which appears prominently in all the company's catalogues, consists of the letter "i" inside a light bulb. Although the "ibooks" name was initially used in connection with science fiction novels, it has long been applied to numerous different genres of books, and thus does not describe any particular genre of book or any characteristic of the books. Until Apple's misappropriation of the mark, "ibooks" was a unique and distinctive trademark that was used in connection with the books published by plaintiffs and its predecessors, and hence served as a common law trademark for said books. Similarly, "ipicturebooks" is a unique and distinctive trademark that serves as a common law trademark for the illustrated children's books sold by plaintiffs.

35. Until Apple's launch of its iPad, no books other than plaintiffs' had been associated with the "ibooks" name. Plaintiff's "ibooks" and "ipicturebooks" have enjoyed millions of dollars in sales since their launch in 1999 and plaintiffs, Preiss and their distributors have actively promoted the books within the publishing industry. The "ibooks" and "ipicturebooks" marks have thus achieved secondary meaning within the publishing industry. The marks have

also achieved secondary meaning among readers of science fiction, graphic novels and school and library electronic books, and have come to signify the print and electronic books published by plaintiffs.

36. Plaintiff Boylston, via Colby's purchase of the assets of the various Preiss entities, is the owner of all right, title and interest in the "ibooks" and "ipicturebooks" trademarks.  These marks constitute an extremely valuable asset for Boylston.  But for Apple's appropriation of "iBooks" for its own purposes, their value would increase exponentially given the advent of the new ebook readers, such as Amazon's Kindle, Barnes & Noble's Nook, Apple's iPad and Motorola's XOOM.

37. As set forth below, Apple's launch of its iPad tablet, with its heralded "iBooks" application, was carried out in total disregard of plaintiffs' rights in the "ibooks" mark, and in total disregard of the economic consequences for plaintiffs' mark in light of Apple's massive advertising and promotional expenditures.  Despite Apple's ten-year ownership of the mark IBOOK for computers, and despite Apple's sale for several year of an "iBook" portable computer, Apple never protested plaintiffs' use of the "ibooks" mark and never asserted that its rights in the IBOOK mark extended to the sale of print or electronic books or to a means of disseminating electronic books.

### APPLE'S MISAPPROPRIATION OF PLAINTIFFS' "ibooks" MARK

38. On April 3, 2010, Apple launched its iPad tablet computer.  This launch was preceded by an enormous amount of publicity.  The iPad is comparable to the Amazon Kindle reader and the Barnes & Noble Nook reader, but is programmed for a wide variety of applications ("apps"), such as sending and viewing email, sending and viewing photos, playing electronic games, and reading newspapers, magazines and electronic books.  In the days following the iPad's launch, Apple took out full page ads in numerous publications, including

*The New York Times* and *The Wall Street Journal* announcing the product's launch.

39. While Apple has encouraged software manufacturers to generate new apps for use in connection with the iPad, and while several thousand apps are now available, one of the core apps for which the iPad was designed was the reading of electronic books. Attached as Exhibit K is a copy of a full page ad published in *The New York Times* on April 15, 2010; the ad depicts the iPad being used to read an electronic book, in this case a *Winnie-the- Pooh* story. The electronic library app is designated by the "iBooks" icon, which appears along the left-hand side of the iPad screen. Attached as Exhibit L is an ad from Apple's website depicting the "iBooks" and other icons for the various apps available on iPad. The "iBooks" app, although not the individual "iBooks" themselves, can be downloaded free of charge.

40. When an iPad user taps the "iBooks" icon, Apple's "iBookstore" appears on the screen. The iBookstore is a virtual library, and is portrayed by the display of book covers on a library shelf. Until recently, each view of the iBookstore shelf bore the heading "iBooks". Annexed as Exhibit M is a screenshot of the virtual bookshelf showing the name "iBooks" at the top as well as covers of all of the "iBooks" that have been downloaded. During the iPad's first day on the market, users downloaded over 250,000 "iBooks"; during its first two weeks on the market, users downloaded more than 600,000 "iBooks". According to Apple, consumers have downloaded more than 100 million "iBooks" during the first ten moths the iPad has been on the market.

41. In or about July 2010, Apple made "iBooks" available to users of its iPhone. Like iPad users, iPhone users click onto an "iBooks" icon and view a virtual library consisting of book covers arranged on a library shelf. And until recently, each view of the shelf bore the heading "iBooks". Annexed as Exhibit N is a screenshot of the iPhone virtual bookshelf showing the name "iBooks" at the top as well as covers of the individual "iBooks" that have

been downloaded.  More recently, Apple made "iBooks" available to consumers through its

iTunes store.  Annexed as Exhibit O is a screenshot of the iTunes store (accessed via the iPhone)

showing the availability of "iBooks".  Upon information and belief, "iBooks" are also available

to users of Apple's iPad Touch device and its MacBook laptop computer.

42.  In mid-December, 2010, Apple launched an upgraded version of its "iBooks" app.

In this new version, Apple attempted to create an artificial distinction between the underlying

"iBooks" and the app by which they are delivered to consumers; thus Apple replaced the word

"iBooks", which previously appeared at the top of the user's virtual library, with the word

"Books".  Some iPad and iPhone users will continue to use the original "iBooks" software and

thus will still see the word "iBooks" at the top of their "iBookstore" bookshelf.  However,

because the software upgrade is free, over time most iPad and iPhone users will install it and thus

will see "Books" rather than "iBooks" at the top of their virtual bookshelf.  Nevertheless, during

the ten months that the iPad has been on the market, Apple has established "iBooks" as the name

for the electronic books available via the iPad and other Apple devices as well as the system by

which these books are delivered to consumers.  Indeed, the announcement of the software

upgrade depicted in Exhibit P features the display of an open book next to the words "iBooks"

and "Apple" – demonstrating that "iBooks" is now synonymous with electronic books available

from Apple.  Similarly, in a commercial for its iPhone that is being broadcast repeatedly during

the NCAA basketball tournament, Apple claims that "If you don't have an iPhone, you don't

have iBooks, so you don't have your favorite books in your pocket . . . ."

43.  While Apple owns a valid registration for IBOOK for computers, and while it once

sold a portable computer under the iBook name, it is not using the "iBooks" mark to describe

either the iPad or iPhone computer devices.  Rather, Apple is using "iBooks" to describe the

electronic library available on the iPad and iPhone as well as the underlying books that constitute

that library.  As of mid-December 2010, every iPad and iPhone user who had downloaded a book

onto their iPad or iPhone had that book pictured in a bookshelf display entitled "iBooks".  As the

user added more books to the collection, each subsequent bookshelf bore the "iBooks" label for

the newly added books.  While the bookshelf no longer displays the word "iBooks", the books

themselves remain accessible only via an app entitled "iBooks".

44.  Since Apple's launch of the iPad, consumers, bloggers and the media have come to

view "iBooks" as not only the name of Apple's electronic library app but also the designation for

the underlying books available via the iPad and iPhone.  Descriptions of the underlying books as

"iBooks" have appeared in, *inter alia, Computer Weekly News* (May 6, 2010); *Penton Insight*

(May 10, 2010); *Canberra Times* (May 11, 2010); *The Arizona Republic* (May 16, 2010); *The*

*Wall Street Journal* (May 27, 2010); *CNET.com* (June 2, 2010); *Chicago Sun-Times* (December

10, 2010); *Wired.com* (January 13, 2011); and *Wikipedia* (March 10, 2011).

45.  Numerous comments posted on Apple's own discussion boards show that iPad users

refer to the books in Apple's electronic library as "iBooks".  In fact, Apple itself recommends

that iPad users utilize a book entitled "iPad:  The Missing Manual".  This book, which serves as

an introduction to the many features and functions of the iPad, was authored by J.D. Biersdorfer,

who writes on computer issues for, *inter* alia, *The New York Times*.  This book contains a

chapter entitled "iBooks & ePeriodicals", and covers such topics as "Find Free iBooks", "Read

an iBook", "Search an iBook" and "Delete an iBook" (see the excerpt annexed as Exhibit Q).

Similar references can be found in statements by Apple itself, including statements on its iPad

and iTunes websites and a statement by Apple's CEO Steve Jobs in a *Time* magazine cover story

on April 12, 2010.  Accordingly, while "ibooks" previously connoted a line of books sold by

plaintiffs, Apple has turned it into the name of its electronic library, denoting both the underlying

books in that library as well as the means by which these books can be accessed through the use

of Apple's iPad, iPhone and other devices.

46.  In recent months Apple has substantially enhanced both its iPad product and its "iBooks" franchise.  On March 3, 2011, Apple introduced its iPad 2, an upgraded version of the original iPad tablet.  At the launch ceremony for the iPad 2, Apple announced that it had sold 14.8 million iPads globally as of December 31, 2010, and that those sales had generated $9.5 billion in revenue.  Apple also boasted that it had become a major force in the publishing world, that 2500 book publishers were now selling their books through Apple's iBookstore, and that more than 100 million books had been downloaded via the "iBooks' app.

47.  A day earlier, Apple also announced that it had added Random House, the world's largest book publisher, to its "iBooks" app.  Random House joined other major publishers – including HarperCollins, Penguin, Macmillan and Simon & Schuster – in selling their imprints electronically via the "iBooks" app.  This development was discussed in articles published on February 28th and March 2nd in *Apple Insider*, a blog that carries up-to-the-minute articles about Apple and that is widely followed by users of Apple products.  In the February 28th article (Exhibit R) about the imminent Random House deal, *Apple Insider* displayed a picture of the iPad tablet being used to read an "iBook" together with a picture of the iBookstore bookshelf. This picture continues to show the name "iBooks" at the top of the bookshelf, and further reinforces the fact that the public understands that "iBooks" is the name for the books available electronically via Apple's iPad and iPhone.

48.  Apple launched its "iBooks" app, its "iBooks" library and its "iBookstore" in total disregard of plaintiffs' rights in the "ibooks" mark and in total disregard of the impact its actions would have on the value of plaintiff's mark.  At the time Apple launched the iPad, it knew or should have known of plaintiffs' rights in the "ibooks" mark.  For example, a simple internet search of "ibooks" would have readily turned up plaintiffs' "ibooks" imprint.  Similarly, a search

of publishing industry records would have turned up the "ibooks" imprint. Likewise, a search of

the PTO files would have turned up an application by Preiss to register the "ibooks" mark for

books as well as the fact that the PTO advised Preiss that this application would be denied based

on the Family Systems IBOOK registration.

49. Moreover, Apple has had actual knowledge of plaintiffs' rights since on or about

May 13, 2010, when it received a copy of the draft complaint in this action. Since that date,

Apple has expanded its use of plaintiffs ibooks mark, such as by adding "iBooks" as an app on

its iPhone, iTunes and iPad Touch products, launching an upgraded version of its iPad, and

arranging for the world's largest publisher to publish its books as "iBooks" via the "iBooks" app.

Moreover, after receiving notice of plaintiffs claims in this matter, Apple attempted to procure

registration of the mark "IBOOKS" by filing the false and misleading PTO documents discussed

in paragraphs 65 through 72 below. And, as previously noted, in mid-December Apple

attempted to ameliorate the consequences of its wrongful use of plaintiffs' "ibooks" mark by

creating an artificial distinction between the "iBooks" electronic library delivery system and the

underlying books in that library, which Apple now calls "Books" rather than "iBooks". Not only

is this action of no consequence in light of the vast consumer recognition that "iBooks" is the

name for electronic books available from Apple, but it also demonstrates Apple's recognition

that it is wrongfully using plaintiffs' "ibooks" mark in connection with its iBookstore library.

**APPLE'S ACQUIESCENCE, ESTOPPEL AND LACHES**
**REGARDING PLAINTIFFS' "ibooks" AND "ipicturebooks" RIGHTS**

50. On November 5, 1998, Apple filed an application to register the mark IBOOK with

the U.S. Patent and Trademark Office ("PTO"). The application was filed as an Intent-to-Use

("ITU") application under 15 U.S.C. § 1051(1)(b)(1), and was for use in connection with

"computers, computer hardware, computer peripherals and users manuals sold therewith" in

Class 9.  Approximately two years earlier, on October 8, 1996, Family Systems, Ltd., a U.K. company, had filed a similar ITU application for the identical mark for use in connection with "computer hardware and software used to support and create interactive, user-modifiable electronic books".  This application was also for goods in Class 9.

51.  On or about June 23, 1999, the PTO suspended prosecution of Apple's application due to the prior application filed by Family Systems, for which a Notice of Allowance had been issued.  On or about July 28, 1999, Apple filed a response to the PTO's suspension, entitled "Response to Office Action".  This Response consisted of a Consent Agreement (the "Agreement") dated as of May 7, 1999, between Apple and Family Systems whereby the companies agreed on conditions surrounding their respective use of the IBOOK mark.  Specifically, Apple and Family Systems agreed, that:

(1) Apple's use of the mark would be confined to computer hardware, namely "notebook computers";

(2) Family Systems' use of the mark would be confined to computer hardware and software "used to support and create interactive, user-modifiable electronic books"; and

(3) Apple's stylization of the mark would be limited to either (i) "iBook" or (ii) "iBOOK".

52.  The Agreement further provided that, so long as its terms were adhered to, there would be no likelihood of confusion between the parties' respective marks and products.  Thus paragraph 9 of the Agreement states that:

"The parties agree that their respective products and services, as defined in Paragraph 1 and 2 of this Agreement, are distinctly different and, if used in accordance with this Agreement, the parties' use of their respective IBOOK marks are not likely to create a likelihood of confusion.  Should actual confusion arise between the parties' use of their respective marks, the parties agree to cooperate and find ways to eliminate or further reduce the likelihood of confusion."

53. Apple and Family Systems also agreed in paragraph 7 that each would notify the other "of any violation of rights pertaining to the IBOOK marks that comes to such party's attention and which such party deems to be a violation of one or both of the parties' rights in their respective IBOOK marks". A copy of this Agreement is annexed as Exhibit S.

54. Based on the Consent Agreement, the PTO concluded that Apple's IBOOK mark was entitled to registration and issued a Notice of Allowance. On July 17, 2001, the PTO issued a Certificate of Registration. The PTO had previously issued a Certificate of Registration for Family Systems' IBOOK mark on April 24, 2001.

55. This Consent Agreement was crucial to Apple's ability to register its IBOOK mark. Under that Agreement, Apple's IBOOK registration is limited to "computers, computer hardware, computer peripherals and users manuals sold therewith" while the Family Systems registration is limited to "computer hardware and software used to support and create interactive, user-modifiable electronic books". Apple could not have obtained registration of its IBOOK mark but for this Agreement, which acknowledged that Apple's sale of computers and Family Systems' sale of computer software used in connection with electronic books were "distinctly different" products and services and "were not likely to create a likelihood of confusion" despite their use of the identical IBOOK trademark.

56. In or about July 1999, Apple introduced a new portable computer under the name iBook. The product was advertised and promoted as a portable electronic "notebook". In or about January 2002, Apple introduced an updated version of this product under the name "MacBook". Although Apple continued to sell a small number of iBook computers, from early 2002 to date its advertising and promotion has been directed almost exclusively to the MacBook.

57. During the eleven years since Apple's iBook computer was first sold, Apple has

never protested or otherwise contested Preiss or plaintiffs' use of the "ibooks" mark. Nor, upon information and belief, did Apple or Family Systems ever notify the other that the use of the "ibooks" mark by plaintiffs and Preiss infringed either party's rights in their respective IBOOK registrations. Apple has therefore acquiesced in plaintiffs' use of the "ibooks" mark and has acknowledged that said mark does not infringe Apple's rights in its IBOOK mark for computers. Apple is therefore barred by acquiescence, laches and estoppel from contesting plaintiffs' rights in their "ibooks" mark for the sale of print and electronic books.

## THE FAMILY SYSTEMS IBOOK MARK

58. On April 24, 2001, Family System obtained its IBOOK registration. As noted above, this registration covered computer software "used to support and create interactive, user-modifiable electronic books".

59. Family Systems is a small UK corporation founded by two investors/entrepreneurs who own, and assigned to Family Systems, a patent for "an interactive Web book ("ibook") system . . . that allows materials to be contributed to the world wide web." The patent further states that users may "enroll" in the ibook system "as viewers or contributors" and that contributors "may contribute original material to the ibook or may create derivations of existing ibook material." The founder of Family Systems has explained on his website that "our vision was that innovation would occur on the pages of our interactive web site".

60. According to a "Statement of Use" filed by Family Systems in the PTO in November 2000, the company commenced using the IBOOK mark by "at least" October 27, 2000. And according to a "Combined Declaration of Use and Incontestability" filed by Family Systems in the PTO in April 2007, the company used the mark continuously since the date of registration as a trademark for "software used to support and create interactive, user-modifiable electronic books".

61.  Archived materials from the website for ibook.com show that Family Systems did in fact use the IBOOK mark continuously from about March 2000 through December 2007, the last date for which archival records are available.  Upon information and belief, this usage continued throughout 2008, 2009 and January of 2010.  Throughout this ten-year period, Family Systems used the IBOOK mark precisely as it was described in both the U.S. trademark registration and the U.S. patent application, viz:  to identify a software system that allows users to create, modify, view, critique and comment on interactive electronic books.

62.  The IBOOK interactive ebook system promoted by Family Systems had nothing to do with the reading of traditional published books.  Rather, it was a user-based system that allowed subscribers to create a wide range of interactive electronic "book" products, from web-based blogs and diaries to personal audio recorders to web page controllers and file sharing devices.  An IBOOK screenshot from December 23, 2002, is annexed as Exhibit T; this screenshot provides a description of the various IBOOK products and uses.

63.  One example of a typical interactive book that was created via the IBOOK system appeared on the ibook.com website in 1999 and is attached as Exhibit U.  Entitled "Vikram's Travels", it is a travel journal created by contributor Vikram Singh documenting his travels through the world, including recent visits to India and Sri Lanka.  The Vikram's Travels IBOOK was available on the ibook website for several years.  Another example of an interactive book appeared, via a link to the ibook.com website, on February 3, 2001 (Exhibit V); this link displays a "welcome to my world" message from a person identified as Stewart Barr, and provides space for entries about various aspects of Mr. Barr's life.

64.  Throughout the ten years that Family Systems used the IBOOK mark, the underlying IBOOK product was the availability of an internet platform on which subscribers could create their own interactive electronic book products.  Annexed as Exhibit W are IBOOK screenshots

from January 25, 2001, November 27, 2001 and September 30, 2005.  Like typical IBOOK pages throughout this ten-year period, these pages encourage users to enroll in "the Ibook of your choice", "install the Ibook Controller" (software package) and add to or comment on an existing Ibook or use the "Ibook Server" to create a new Ibook.

### APPLE'S FRAUDULENT PURCHASE, USE, AMENDMENT AND RENEWAL OF THE FAMILY SYSTEMS MARK

65.  In late January or early February of 2010, approximately two months prior to its launch of the iPad, Apple entered into an agreement with Family Systems whereby it purportedly purchased the Family Systems' IBOOK mark.  This transaction is reflected, *inter alia*, in a notice Apple filed with the PTO on February 5, 2010, withdrawing Family Systems' attorney as the attorney of record for the Family Systems IBOOK mark and appointing Apple's in-house trademark counsel as the new attorney of record for that mark.  Upon information and belief, the documents relating to this transaction recite that Apple purchased the Family Systems' IBOOK mark and the good will attached to the mark.

66.  Apple has not, however, continued to sell or promote the underlying Family Systems IBOOK product nor has it used the underlying technology previously utilized by Family Systems.  Nor has Apple in any way utilized the good will developed by Family Systems in connection with its ten years of operating its IBOOK system.  Instead, Apple has merely taken the Family Systems IBOOK mark and put it on a completely different product, viz: the app that signifies the library of traditional print books that are now available electronically to iPad and iPhone users, as well as the underlying books themselves.  Apple has therefore divorced the Family Systems IBOOK mark from its underlying product and good will.  Apple's purported purchase of the Family Systems mark is thus invalid as an assignment in gross and gives Apple no rights in the mark vis-à-vis third parties such as plaintiffs.  Even if Apple's purchase of the

mark is not per se invalid, the purchase is ineffective for purposes of transferring Family

Systems' trademark priority to Apple and, thus Apple may not rely on Family Systems' prior

rights in the IBOOK mark.

67.  Apple has also committed fraud on the PTO with respect to the Family Systems

IBOOK mark.  On May 17, 2010, less than a week after receiving a copy of the draft complaint

in this action, Apple filed a purported "Amendment" to this registration to add an "s" to the mark

so that the registration now covers the word "IBOOKS".  In its "Section 7 Request Form"

submitted to the PTO in support of this Amendment, Apple declared under penalty of perjury

that:

> "The proposed amendment to the mark does not
> render it sufficiently different to require
> republication.  The new form of the mark has the
> same meaning as, and contains the essence of, the
> original mark.  The addition of "S" – changing the
> mark from IBOOK to IBOOKS – creates the
> impression of being essentially the same mark, so
> that consumers will readily understand the mark to
> be [the] same."

A copy of this PTO filing is annexed as Exhibit X.

68.  This statement was materially false and misleading and was known to Apple to be

false and misleading.  The original registration – IBOOK – was used by Family Systems to

describe its software system, which was a web-based system that allowed users to create

interactive books and/or participate in interactive books generated by other users.  Apple,

however, is using the plural form by the mark – IBOOKS – to designate the app by which the

library of traditional print books are now available electronically via the iPad and iPhone, as well

as the underlying books themselves.  As a result, Apple's statements that the new mark was not

"sufficiently different" from the original mark so as to require republication, and that the new

form of the mark has the "same meaning" and "contains the essence of" the original mark, were

materially false and were known by Apple to be materially false.

69.  While Apple is using the IBOOKS mark to refer, *inter alia*, to the software app that allows iPad and iPhone users to access the iBooks electronic library, that software app is materially different from the software system that Family Systems utilized to allow its customers to generate interactive, user-modifiable ebooks.  As a result, Apple is using the amended form of the Family Systems mark in a way that gives it a totally different meaning from the original version of the mark and in a way that makes no connection between the Family System product and good will and the Apple product and good will in the minds of consumers.  Apple's sworn representations to the PTO in its Section 7 Request were materially false and misleading and were made in an effort to induce the PTO to issue an amend registration covering the mark "IBOOKS".  On April 24, 2010, as a result of Apple's materially misleading statements, the PTO proceeded to issue the amended registration requested by Apple.

70.  On June 6, 2010, Apple committed a further fraud on the PTO.  On that date it filed a Combined "Declaration of Use" of the IBOOKS mark under § 8 of the Lanham Act and a "Renewal of Registration" for that mark under § 9 of the Lanham Act (Exhibit Y).  Apple attached to this application a screenshot of its "iBooks" bookshelf that can be accessed through the iPad.  This filing was necessary in order to support the amended version of the mark (IBOOKS) and to obtain the renewal of the original registration of the mark, which was scheduled to expire in April 2011.  Nowhere in this application did Apple disclose that the "iBooks" mark that it was using in connection with its iPad and iPhone was materially different from the IBOOK mark previously utilized by Family Systems and that Apple was not utilizing the good will of the Family Systems IBOOK product and mark in connection with its new "iBooks" product and mark.  On June 14, 2010, in reliance of Apple's filing, the PTO notified Apple of its acceptance of the Declaration of Use and the renewal of the registration.

71. Upon information and belief, Apple's misleading PTO findings were motivated, at least in part, by Apple's attempt to exploit the Family Systems mark for purposes of the dispute herein. By the time of these two PTO filings, Apple was well aware of plaintiffs' claims regarding their rights in the "ibooks" mark for books. Moreover, the Apple attorneys involved in these fraudulent PTO submissions were well aware that Apple was defending against plaintiffs' claim of trademark infringement on the basis of its rights in the recently purchased Family Systems IBOOK mark.

72. Apple and its attorneys were fully aware that the statements they made to the PTO in connection with the May 17, 2010 and June 6, 2010 filings were false and misleading, that Apple was not utilizing the good will of the Family Systems IBOOK mark  in connection with its own "iBooks" products, and that its purported purchase of the Family Systems IBOOK mark was null and void as against anyone other than Family Systems.

## THE LIKELIHOOD OF CONFUSION AND PLAINTIFFS' INJURY

73. The introduction, sale and use of Apple's new iPad has been a subject of enormous advertising and promotion by Apple, and enormous coverage by the mainstream news media, the financial press and countless writers and bloggers. During its first two weeks on the market, Apple took out almost daily full-page ads in newspapers such as *The New York Times* and *The Wall Street Journal*. The product has been so successful that Apple's executives have been quoted as saying that they were "shocked" by the high level of demand for the product.

74. The iPad, coming on the heels of Amazon's Kindle and Barnes & Noble's Nook, is revolutionizing the way books are sold and read. More than three weeks prior to iPad's launch, five of the country's six largest publishers had already reached arrangements to sell their books electronically through Apple's "iBooks" bookstore. Moreover, Apple's "iBooks" library is now accessible to iPhone users, who can purchase, store and read "iBooks" on their iPhone screen,

and to iTunes and iTouch users.  Virtually overnight, the "ibooks" mark previously associated

with plaintiffs has been transformed into a mark associated with Apple's "iBooks" electronic

library.

74. Until Apple commenced using plaintiffs' "ibooks" mark, plaintiffs were well-

positioned to take advantage of the emergence of electronic books as a way to vastly expand

their "ibooks" and "ipicturebooks" franchise.  Sales of electronic books exploded in 2010 and

reached just under $1 billion by the end of the year; furthermore, the industry projects that e-

book sales will reach $2.8 billion by 2015.  As noted above, plaintiffs' predecessor Preiss was a

pioneer in the e-book field; as a result, most of plaintiffs' "ibooks" titles are available

electronically and thousands more are available under the "ipicturebooks" and BPVP imprints.

76. Plaintiffs' ability to exploit their "ibooks" and "ipicturebooks" marks in the

electronic book market has been doomed by Apple's enormous success with "iBooks".  Apple

has spent tens of millions of dollars promoting the iPad and its "iBooks" feature, as well as lesser

amounts promoting the "iBooks" feature on its iPhone.  In the fourth quarter of 2010 alone,

consumers purchased 7.3 million iPads and 16.2 million iPhones.  With total e-book industry

sales of just under $1 billion in 2010, Apple's approximately 25% share of those sales amounts

to $250 million sales of "iBooks".

77. Apple's use of the "iBooks" mark in connection with the advertising, marketing, sale

and use of its iPad, iPhone and other devices has effectively pre-empted plaintiffs' ability to

exploit its "ibooks" and "ipicturebooks" marks in the electronic book filed.  The name "iBooks"

is now forever linked with Apple.  There is no way that plaintiffs could even attempt to

counteract the view among consumers that "iBooks" belong to, and are associated with, Apple.

78. Apple's vast "iBooks" marketing effort has also substantially damaged plaintiffs'

ability to exploit their "ipicturebooks" mark.  As noted above, plaintiffs' "ipicturebooks" imprint

is devoted primarily to the production and sale of electronic, picture-oriented books for children. Yet Apple has recently begun an "iBooks" promotion for "Children's Picture Books". A recent screenshot from Apple's iBookstore (Exhibit Z) features electronic versions of numerous favorite picture books for young readers; these "iBooks" "Children's Picture Books" are comparable to the vast collection of children's picture books sold by plaintiffs as "ipicturebooks".

79. Apple's use of the "iBooks" mark in connection with the advertising, marketing, sale and delivery of electronic books is likely to cause reverse confusion with plaintiffs' "ibooks" and "ipicturebooks" print and electronic books, and has led to the virtual destruction of the value of those marks. As a result of Apple's wrongful appropriation of the "ibooks" mark, consumers are likely to be confused into believing that plaintiffs' "ibooks" and "ipicturebooks" are merely part of the electronic books available from Apple, or that "ibooks" and "ipicturebooks" are otherwise associated with Apple, or that "ibooks" is merely the generic name for electronic books available from Apple. Apple's use of the "iBooks" mark in connection with its iPad, iPhone and other devices is without the consent or approval of plaintiffs and is likely to cause irreparable injury for which plaintiffs have no adequate remedy at law.

## APPLE'S PATTERN OF
## WILLFUL TRADEMARK INFRINGEMENT

80. This is not the first time that Apple has knowingly and willfully infringed another company's trademark. In fact, Apple's practice of appropriating other companies' trademarks stretches back to its very formation. In the 1970s, Apple Corp., the Beatles-founded record label, sued Apple for trademark infringement. The case settled, but was conditioned upon Apple not entering the music business. Apple Corp. sued Apple again in the 1990s when Apple nonetheless expanded its business and that litigation was only recently resolved.

81.  Similarly, Apple did not own the mark "iPhone" before it publicly announced the launch of its new "iPhone" device.  Cisco Systems, Inc. was the owner of that mark.  Despite the fact that Apple had been in discussions with Cisco to license its registered "iPhone" trademark, Apple ultimately ignored Cisco's intellectual property rights and publicly announced, without Cisco's permission, Apple's new "iPhone" at a widely publicized press conference.

82.  Additionally, Apple filed a trademark application for the mark "iPhone" in a foreign country (Australia), in an effort to claim priority for the mark in the United States.  As a result of Apple's conduct, on January 10, 2007, Cisco sued Apple for trademark infringement.

83.  Similarly, Apple also rolled out the "iPad" product before attempting to license or obtain assignment of the "iPad" mark from Fujitsu Frontech North America, Inc., which had an application for the mark pending with the PTO.

84.  Similarly, in April 2010, Apple announced at a press conference its launch of "iAd", an advertising platform that is available as an app on its iPhone, iTunes and iPad.  This announcement was made despite the fact that Innovate Media Group, LLC held a federal trademark registration for the mark "iAds" for use in connection with online video advertising.  As a result of Apple's misappropriation of  the iAds mark, Innovate Media sued Apple for trademark infringement.

## AS AND FOR A FIRST CLAIM FOR RELIEF

85.  Plaintiffs respect and reallege the allegations in paragraphs 1 through 84 with the same force and effect as if set forth herein at length.

86.  Apple's use of the mark "iBooks" as set forth herein constitutes false designation of origin in violation of § 43(a)(i)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(i)(A).

## AS AND FOR A SECOND CLAIM FOR RELIEF

87.   Plaintiffs respect and reallege the allegations in paragraphs 1 through 84 with the same force and effect as if set forth herein at length.

88.   Apple's use of the mark "iBooks" as set forth herein constitutes infringement of plaintiffs' common law trademark "ibooks" and unfair competition under the Common Law of New York.

## AS AND FOR A THIRD CLAIM FOR RELIEF

89.   Plaintiffs respect and reallege the allegations in paragraphs 1 through 84 with the same force and effect as if set forth herein at length.

90.   Apple's use of the mark "iBooks" as set forth herein constitutes wrongful misappropriation in violation of the common law of New York.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

91.   Plaintiffs respect and reallege the allegations in paragraphs 1 through 84 with the same force and effect as if set forth herein at length.

92.   Apple's use of the mark "iBooks" as set forth herein constitutes unjust enrichment at plaintiffs' expense, in violation of the common law of New York.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

93.   Plaintiffs respect and reallege the allegations in paragraphs 1 through 84 with the same force and effect as if set forth herein at length.

94.   Apple's use of the mark "iBooks" as set forth herein constitutes conversion in violation of the common law of New York.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

(1)     For permanent injunctive relief enjoining Apple from using the term "iBooks", or any variation thereof, to denote the electronic library, the electronic bookstore app and the underlying electronic books available via its iPad, iPhone and other devices and products;

(2)     For a declaration that Apple's purchase of the Family Systems IBOOK mark was an invalid assignment in gross, and gives Apple no rights in the Family Systems mark vis-à-vis plaintiffs or other third parties or, alternatively, that the purchase was ineffective for purposes of transferring Family Systems' trademark priority to Apple;

(3)     For a declaration that Apple's May 17, 2010 and June 29, 2010 filings in the PTO were fraudulent, misleading and deceptive and constitute inequitable conduct before the PTO and that the amendment to, and renewal of, the Family Systems IBOOK mark obtained as a result of these filings are null and void;

(4)     For an award of damages based on the fair market value of the iBooks mark to Apple as a result of Apple's misappropriation, conversion, and pervasive ongoing infringement of plaintiff's ibooks mark;

(5)     For an award of damages based on a reasonable royalty for Apple's ongoing use of plaintiffs' mark to describe (i) its electronic library app on its iPad, iPhone and other devices and products, and (ii) each electronic book that is downloaded by an iPad, iPhone, iPad Touch, iTunes or MacBook user;

(6)     For an award of damages based on Apple's profits in connection with its use of plaintiffs' ibooks mark and/or plaintiffs' damages due to its inability to exploit its "ibooks" and "ipicturebooks" marks in light of Apple's wholesale appropriation of the "ibooks" mark;

(7)     For an award of damages based on plaintiffs' prospective cost of corrective

advertising in order to educate the public that "ibooks" is not the name for electronic books sold by Apple in connection with its iPad, iPhone, iTunes and other products but rather is a publishing imprint for books, including electronic books, published by plaintiffs;

(8)     For a declaration pursuant to § 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), that in light of Apple's willful and deliberate infringement of plaintiffs' mark and its filing of false and misleading statements in the PTO regarding the Family Systems "IBOOK" mark, this is an "exceptional case" and awarding plaintiff its attorneys' fees;

(9)     For an award of punitive damages on the common law claims herein due to Apple's deliberate and willful misconduct; and

(10)     For such other, further and different relief as the Court deems just and proper, together with the costs and disbursements of this action.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
　　　　June 13, 2011

MANATT PHELPS & PHILLIPS, LLP

By: _____
　　　　Thomas C. Morrison
　　　　Kimo S. Peluso
　　　　Nirav S. Shah
　　　　7 Times Square
　　　　New York, NY  10036
　　　　(212) 790-4500
　　　　Attorneys for Plaintiffs

200019148.4