UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| J.T. COLBY & COMPANY, INC. d/b/a BRICK TOWER PRESS, J. BOYLSTON & COMPANY, PUBLISHERS LLC and IPICTUREBOOKS LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>APPLE INC.,<br><br>Defendant. | Case No. 11-cv-4060 (DLC)<br><br>**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT** |

Plaintiffs J.T. Colby & Co., Inc. d/b/a Brick Tower Press, J. Boylston & Co., Publishers, LLC, and ipicturebooks, LLC ("Plaintiffs") hereby respectfully submit their Statement Pursuant to Local Civil Rule 56.1 in support of their Partial Motion for Summary Judgment.

### Plaintiffs' Statement of Uncontested Facts

1.  On October 8, 1996, Family Systems Ltd. ("FS") submitted an Intent to Use Application to the United States Patent and Trademark Office (the "PTO") for the mark "IBOOK" in connection with "computer hardware and software used to create and support interactive, user modifiable electronic books" in International Class 9; FS was awarded a Registration on April 24, 2001 (the "634 Registration") citing a first use in commerce of October 27, 2000. (See Chattoraj Decl. Ex. 2, Intent to Use Application Serial No. 75/182,820; see also Chattoraj Decl. Ex. 3, U.S. TM Reg. No. 2,446,634)

2.  Two patents for the underlying software used in connection with the mark

covered by the 634 Registration (the "IBOOK Patents"), one filed on February 28, 2004 and awarded to FS founder Brian Reynolds ("Reynolds") and consultant Richard Goldhor on November 4, 2008 (the "748 Patent") (see Chattoraj Decl. Ex. 4, U.S. Patent No. 7,447,748.), and one filed on May 14, 2003 and awarded to Reynolds, and Mark J. Hanover on August 4, 2009 (the "212 Patent"). (See Chattoraj Decl. Ex. 68, U.S. Patent No, 7,571, 212.)

3. The 748 Patent was awarded for the invention of an "[i]nteractive web book system" which is described in the abstract as, "An interactive Web book ("ibook") system is provided that allows material to be contributed to the World Wide Web. An ibook is a self-extending, self-sustaining information-redistributing Web robot, which is resident on a data network such as the Internet or an intranet. Users may enroll with an ibook as viewers or contributors. Viewers may view ibook material, such as text or multimedia content. Contributors may contribute original material to the ibook or may create derivations of existing ibook material. Attribution information that identifies the source of material in a derivation is automatically generated. Information concerning the derivation of each work and its characteristics can be used to help the user navigate through ibook material. The ibook system keeps track of how often users access each work within an ibook. Contributors may be automatically rewarded (e.g., by a monetary distribution) based on the extent to which their contributed material is viewed by the users." (Chattoraj Decl. Ex. 4, U.S. Patent No. 7,447,748.)

4. The 212 Patent was awarded for the invention of "[i]nteractive web collaboration systems and methods" which is described in the Background of the Invention as relating to "the Internet, and more particularly, to techniques for creating and viewing material on the World Wide Web in the form of an interactive website, and to techniques by which multiple individuals

can communicate with each other and work collaboratively on content and materials in an interactive web site." (Chattoraj Decl. Ex. 68, U.S. Patent No, 7,571, 212 (internal quotations omitted).)

    5.    The FS ibook product which bore the IBOOK mark covered by the 634 Registration has been described as follows by one of the listed inventors on the 748 Patent:

> A: Family Systems ibook was a system and architecture for allowing a community to create materials. Including text, but not limited to text, and to publish it using web technologies, but also to make it possible for multiple members of the community to edit that material, comment on it, create their own versions of it and so forth.
> Q: In some ways it sounds like a precursor to Facebook; would that be it?
> A: More like a precursor to Wiki.
> Q: Wikipedia?
> A: Yeah. (Chattoraj Decl. Ex. 5, Goldhor Dep. 20:4-16.)

    6.    The FS ibook product was marketed to businesses as a system to "support individuals and distributed product groups as they work and collaborate wherever they are", allowing "any non-technical user [to] publish their documents and other standard personal and office files to the Web for private or public access." (Chattoraj Decl. Ex. 6, Press Release, dated March 12, 2002, *Family Systems launches the ibook® Family of Software Products for a Better Way of Working Together*, at Golhor Dep. Ex. 5, pp 113-14).

    7.    Neither the IBOOK mark, nor the underlying technologies covered by the IBOOK Patent, were ever used to allow users to view existing published works of fiction. (See Chattoraj Decl. Ex. 7, Goldhor Dep. 44:17-45:19).

    8.    On April 27, 2007 FS filed a Combined Declaration of Use and Incontestability Under Sections 8 & 15 with regard to the 634 Registration deleting HARDWARE from the list

3

of goods that the IBOOK mark was used in connection with and attaching a specimen of use. (See Chattoraj Decl. Ex. 74.)

9.  Apple announced the iBooks app, an E-book reading software which includes the iBookstore, in connection with the launch of the iPad during a speech by Steve Jobs ("Jobs"), former CEO of Apple, on January 27, 2010. (See Chattoraj Decl. Ex. 8, APPLE-IBOOKS0021840-42.)

10. While two names were being considered for the product that would become the iBooks app ("iBooks" and           ), Jobs ultimately decided that the product would be called iBooks. (See Chattoraj Decl. Ex. 9, La Perle Dep. 45-46; 48:18-19.)

11. In January 2010, it was decided, upon the recommendation of Thomas La Perle, Apple's trademark counsel, that in connection with the planned use of the name "iBooks" for an E-book reading software, Apple should seek to acquire the 634 Registration from FS. (See Chattoraj Decl. Ex. 10, id. at 80:8-18, 83:6-12.)

12. Apple had previously entered into a Consent Agreement with FS in 1999 (the "1999 Consent Agreement") regarding FS' use of the 634 Registration in order to gain a registration for the mark IBOOK in connection with Apple's use of the mark on "Computers, computer hardware, computer peripherals and users manuals sold therewith." (Chattoraj Decl. Ex. 11, U.S. TM Reg. No. 2,470,147, 1999 Consent Agreement; see also Chattoraj Decl. Ex. 47, Lupo Dep. 31:19-22; see also Chattoraj Decl. Ex. 13, Goldhor Dep. 68-71.)

13. Apple's only substantive contact with FS since entering into the 1999 Consent Agreement -- beyond the occasional requests for consents required for trademark applications -- was a single, unanswered email from Reynolds in 2008 where Reynolds informed Apple that FS

was "about to relaunch Ibook Systems V4 and V5 as cooperative projects along with Cooperative License and Verbol, a language framework for talking to objects" which could "potentially reshape how the Ibook trademark is used" and stated:

> I would consider a sale of these trademarks to Apple with a license back to Family Systems. My product intentions will be open and possibly more easily described in a license to Family Systems than Apple's in the [1999 Consent Agreement] to Apple. As I recall the license to Apple is at present limited to notebook computers which a new IBook may be, though perhaps it may be other things too? (Chattoraj Decl. Ex. 14, APPLE-IBOOKS0020321; see also Chattoraj Decl. Ex. 15, La Perle Dep. 108:5-109:9.)

14. Beginning on, or about January 13, 2010, and ending at some time between 2:00 and 3:00 AM on January 27, 2012, the date that the iBooks app was announced, Anthony Lupo ("Lupo"), outside trademark counsel to Apple negotiated the assignment of the 634 Registration from FS to Apple proceeding as follows:

- On January 13, 2010, Lupo contacted FS' outside American trademark counsel, Brewster Taylor ("Taylor") to see if FS was still interested in selling the FS IBOOK mark, and if so, what sort of price they were looking for. (See Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022066.)

- On January 14, Reynolds responded and asked for clarification on a number of issues:

    > It was not clear from talking to Brewster which of Family Systems ibook assets Apple are interested in. There are multiple domain names and trademark registrations as well as software technology and patents which reference ibook systems.
    >
    > I would appreciate an indication of the extent of Apple's interest in our ibook assets, and a rough timescale and price range from Apple's perspective. Also, if we proceed I would appreciate an introduction to a principal of Apple, Inc. (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022065.)

- Lupo responded, without offering a price or introduction to a principal at Apple:

    thanks for the email. <u>Apple is really only interested in the marks and domains associated with IBOOK. they are not trying to purchase any of the underlying goods or services that may be associated with the mark or domain</u>. (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022064 (emphasis added).)

- On January 15, with Lupo refusing to make an offer Reynolds stated, "I would have preferred that Apple make us an offer, and without any information about Apple's intentions and timescales or any opportunity to take advice, I can indicate that an offer of          would most likely be accepted and include a full transfer of rights and our conversion costs." (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022063.)

- Lupo responded on January 18 that          was not within "Apple's realm of reality" and later made a counteroffer of          (          for the mark and          for the domain name registrations) on January 20. (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022062.)

- The parties arranged to discuss the matter by phone on January 22, after which Reynolds offered to reduce his expectation to "an Apple offer price of          ." (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022059.)

- Lupo countered at 11:01PM on January 22 with an offer of          , noting that "the timing is very tight" and asking that Reynolds "let me know if this is acceptable and I can work with Brewster to finalize an agreement on Monday." (Id.)

- On January 25, Reynolds suggested that the parties close at          the (APPLE-IBOOKS0023745), and Lupo subsequently informed Reynolds that he had "been authorized to make a new offer to you of          (Chattoraj Decl. Ex. 18, APPLE-IBOOKS0023658.)

- At about 2 AM on January 27, 2010, Apple's attorneys received a copy of the Assignment Agreement executed by FS, with a negotiated price of          (See Chattoraj Decl. Ex. 45, Lupo Dep. 117-19; see also Chattoraj Decl. Ex. 20, Gundersen Dep. 153:10-14; see also Chattoraj Decl. Ex. 21, APPLE-IBOOKS0033421-32.)

6

- While the documents were executed prior to the announcement of the iBooks app on January 27, 2010, payment was not made from Apple to FS until February 4, 2010. (See Chattoraj Decl. Ex. 22, APPLE-IBOOKS0023912-15.)

15. Under the terms of the Assignment Agreement, only the following specific trademark registrations were transferred from Family Systems to Apple:

- The domain name registrations for IBOOK.COM, IBOOK.NET, IBOOK.ORG, I-BOOK.COM, I-BOOK.NET, and I-BOOK.ORG (Chattoraj Decl. Ex. 21, APPLE-IBOOKS0033421-31),

- The United States registration for the mark IBOOK, Registration No. 2,446,634, covering the following goods in international class 9, "[c]omputer software used to support and create interactive, user-modifiable electronic books" (id. at APPLE-IBOOKS0033428),

- The Japanese registration for the mark IBOOK, Registration No. 4510994 for goods in the following classes: "[e]lectronic machines, instruments, and parts" in National Class 11C01, and "[c]omputer programs to be downloaded via computer networks; computers (including central processing units, and electronic circuits, magnetic tapes in which computer programs are recorded and other peripherals); and other electronic machines and instruments and parts thereof" in International Class 9 (id. at APPLE-IBOOKS0033428), and

- The Jamaican registration for the mark IBOOK, Registration No. 33,723, covering the following goods in international class 9, "[c]omputer software used to support and create interactive, user-modifiable electronic books." (Id. at APPLE-IBOOKS0033428.)

16. The Assignment Agreement also required that Reynolds execute and return to Apple a Trademark Assignment, attached in blank the Assignment Agreement at Exhibit B, stating, FS "hereby irrevocably transfers and assigns to [Apple] all right, title and interest in and to the [634] Registration, and other rights or registrations that [FS] may have or may claim in the mark and trade name IBOOK, including without limitation any common law rights, and the goodwill of the business pertaining thereto." (Id. at APPLE-IBOOKS0033429.)

17. Pursuant to the Assignment Agreement, no physical assets, accounts receivable, trade secrets, copyrights, computer software, computer hardware, patents, customer lists, or employment agreements with employees were transferred to Apple from FS. (See Chattoraj Decl. Ex. 23, La Perle Dep. 125:10-126:9.)

18. Under the terms of the Assignment Agreement, FS was granted a phase out period by which FS was given ten days from January 26, 2010 to phase out its use of the IBOOK mark and "its websites under the registered domain name ibook.com and host names containing ibook.com." (Chattoraj Decl. Ex. 21, APPLE-IBOOKS0033424.)

19. Under the terms of the Assignment Agreement, neither FS nor Reynolds is allowed, after January 26, 2010, to "use any IBOOK Mark as the name of any software or other product or service, as a corporate name or business name, or otherwise in connection with the marketing, advertising, offering for sale, or selling of any products or services." (Id. at APPLE-IBOOKS0033424.)

20. On February 4, 2010, Apple filed a Trademark Assignment with regard to the 634 Registration, signed by Brian Reynolds and purporting to assign from FS to Apple, "all right, title and interest in and to the [634] Registration, any other rights or registrations that [FS] may have or may claim in the mark and trade name IBOOK, including without limitation any common law rights, and the goodwill of the business thereto." (Chattoraj Decl. Ex. 73.)

21. On February 5, 2010 a Revocation of Attorney/Domestic Representative and/or Appointment of Attorney/Domestic Representative was filed with regard to the 634 Registration appointing Apple Attorney with respect to the 634 Registration. (See Chattoraj Decl. Ex. 71.)

22. Today, if one attempts to go to any of the domain names conveyed as part of the

Assignment agreement, they are redirected to a page within the Apple website page for iPad that for built-in apps where the iBooks app is shown after scrolling past two other apps.  (See www.ibook.com; www.ibook.net; www.ibook.org; www.i-book.com; www.i-book.net; www.i-book.org; see also http://www.apple.com/ipad/built-in-apps/#ibooks?cid=oas-us-domains-ibook.net, a printout of which is attached as Chattoraj Decl. Ex. 24.)

23.     On April 7, 2010, Apple filed an Application for IBOOKS for a wide variety of goods and services connected to books including "downloadable electronic publications in the nature of books…" (Class 9); "printed matter; printed publications; periodicals; books…" (Class 16); "retail store services in the field of books…" (Class 35); "electronic transmission of streamed and downloadable publications for browsing over computer networks, namely books, magazines, periodicals…" (Class 38).   (Chattoraj Decl. Ex. 27, Application No. 85/008,412.)

24.     On March 6, 2012, Plaintiffs provided Apple's counsel with a draft amended complaint.  (See Chattoraj Decl. Ex. 28, email from Thomas Morrison to Dale Cendali, et al., sent at 10:17 AM on March 6, 2012.)

25.     On March 13, 2012 Apple filed an Amendment to Allege Use pursuant to 15 U.S.C. § 1051(c) deleting Classes 16, 38, and 41 wholesale and substantially reducing the goods listed in Classes 9, 35, and 42, including the deletion of "downloadable electronic publications in the nature of books, plays, pamphlets, brochures, newsletters journals, magazines, and periodicals on a wide range of topics of general interest" from Class 9. (Chattoraj Decl. Ex. 27, Amendment to Allege Use, dated March 13, 2012.)

26.     On March 14, 2012, Bonnie Jarrett, counsel for Apple, responded to Mr. Morrison's March 6 email, stating, "with respect to Apple's ITU for IBOOKS, you should be

aware that Apple recently filed an amendment to allege use. That amendment significantly limits the scope of the goods and services description for that mark, by removing, *inter alia,* downloadable and non-downloadable electronic publications, books and magazines." (Chattoraj Decl. Ex. 28, Email from Bonnie L. Jarrett to Thomas Morrison, sent at 2:23 PM on March 14, 2012.)

27.  Apple filed a § 7 request to amend the mark covered by the 634 Registration from IBOOK to IBOOKS on May 17, 2010, declaring:

> The proposed amendment to the mark does not materially alter the character of the mark in the registration and does not render it sufficiently different to require republication. The new form of the mark has the same meaning as, and contains the essence of, the original mark. The addition of "S" - changing the mark from IBOOK to IBOOKS – creates the impression of being essentially the same mark so that consumers readily understand the mark to be the same. (See Chattoraj Decl. Ex. 29, 634 Registration, § 7 Request Form.)

28.  On June 7, 2010, Apple filed a Combined Declaration of Use and Excusable Nonuse/Application for Renewal of Registration of a Mark under §§ 8 & 9 ("§§ 8 & 9 Declaration"), declaring that "the mark is in use in commerce on or in connection with all goods and services listed in the existing registration", supported by a specimen of use, and made pursuant to a declaration under 18 U.S.C. § 1001 signed by Lisa Widup, counsel for Apple, declaring that "all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true." (See Chattoraj Decl. Ex. 30, 634 Registration, §§ 8 & 9 Declaration.)

29.  The specimen of use submitted to the PTO in support of Apple's §§ 8 & 9 Declaration is screen shot of the iBooks page in Apple's iTunes store which states, "iBooks is an

amazing way to download and read books, <u>designed exclusively for iPad</u>. iBooks includes the iBookstore, where you can download the latest best-selling books or your favorite classics -- day or night. Browse your library on a beautiful bookshelf, tap a book to open it, flip through pages with a swipe or a tap, and bookmark your favorite pages." (Chattoraj Decl. Ex. 30, §§ 8 & 9 Declaration (emphasis added).)

30. Also on June 7, 2010, Apple presented the iPhone 4, announcing the availability of the iBooks app on the iPhone and iPod touch. (See Chattoraj Decl. Ex. 31, APPLE-IBOOKS0021101.)

31. The iBooks app allows users to purchase books through the iBookstore and download them to their iBooks enabled devices (e.g., their mobile device or computer) to be read using the iBooks app. (See Chattoraj Decl. Ex. 31, APPLE-IBOOKS0021101; see also Chattoraj Decl. Ex. 32, Gedikian Dep. 110:8-12.)

32. Once a user has downloaded a book to their iBooks enabled device or computer, they can manipulate certain environmental factors of that book such as:

- change the font and point size (see Chattoraj Decl. Ex. 33, Gedikian Dep. 106:22-109:3);

- change the theme and background color (see id. at 109:8-12);

- bookmark, annotate, and highlight passages (see Chattoraj Decl. Ex. 35, Gedikian Dep. 114:8-115:2); and

- share the title of a book and their highlights or annotations by email. (See Chattoraj Decl. Ex. 36, Gedikian Dep. 221:1-7).

33. While these environmental changes will be reflected in a book no matter which iBooks enabled device a user chooses to read their book on, provided they have chosen to sync

their iBooks account across all enabled devices (see Chattoraj Decl. Ex. 35, Gedikian Dep. 114:17-115:14), no other user accessing the same book will see these changes unless they are accessing the same book through the same account as the original user. (See Chattoraj Decl. Ex. 37, Gedikian Dep. 219-220.)

34.  None of these visual changes, highlighting or annotations in any way modify the actual digital file of the actual book that was downloaded from the iBookstore and stored on the device using the iBooks app; they are instead kept in a separate metadata file that does not actually modify the digital book. (See Chattoraj Decl. Ex. 12, Gedikian Dep. 110:24-111:17.)

35.  The terms of use of the iBooks app do not allow users to share accounts. (See Chattoraj Decl. Ex. 38, iBooks License Agreement § 2(A).)

36.  Apple does not encourage the sharing of iTunes accounts between more than one user either implicitly or explicitly through its marketing communications with the public. (See Chattoraj Decl. Ex. 37, Gedikian Dep. 220:8-13; Chattoraj Decl. Ex. 59, Kvamme Dep. 45:16-17.)

37.  No Apple deposition witness offered any specific details, based on personal knowledge, about the FS ibook software or system. (See Chattoraj Decl. Ex. 62, Gedikian Dep. 204:14-23; see also Chattoraj Decl. Ex. 61, La Perle Dep. 246:5-8; see also Chattoraj Decl. Ex. 62, Widup Dep. 72-73; see also Chattoraj Decl. Ex. 64, Taylor Dep. 60: 16-22; see also Chattoraj Decl. Ex. 65, Kvamme Dep. 61-62:8; see also Chattoraj Decl. Ex. 66, Borden Dep. 140:15-141:2; see also Chattoraj Decl. Ex. 67, Gundersen Dep. 144:5-145:15.)

Dated: New York, New York
      December 21, 2012

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP

By: _____
    Partha P. Chattoraj
    David A. Shaiman
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

Attorneys for Plaintiffs J.T. Colby & Co., Inc. d/b/a Brick Tower Press, J. Boylston & Co., Publishers, LLC, and ipicturebooks, LLC

*Of counsel:*

Robert L. Raskopf
Claudia T. Bogdanos
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile:  (212) 849-7100