Dale Cendali
Claudia Ray
Bonnie L. Jarrett
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

Perry J. Viscounty
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025

Jennifer L. Barry
LATHAM & WATKINS LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

*Attorneys for Defendant*
APPLE INC.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

J.T. COLBY & COMPANY, INC. d/b/a BRICK
TOWER PRESS, J. BOYLSTON & COMPANY,
PUBLISHERS LLC and IPICTUREBOOKS LLC,

                    Plaintiffs,

          - against -

APPLE INC.,

                    Defendant.

Case No.  11-CIV-4060 (DLC)

ECF Case

**REDACTED**

**DEFENDANT APPLE INC.'S RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1**
**STATEMENT AND COUNTER-STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rules 56.1(b) and (c), Defendant Apple Inc. ("Apple") by and through its counsel, respectfully submits the following additional material facts and responses to Plaintiffs' Local Civil Rule 56.1 Statement ("Plaintiffs' 56.1 Statement"), as well as a counter-statement of material facts.

## GENERAL OBJECTIONS

1.      Apple objects to Plaintiffs' 56.1 Statement to the extent it is argumentative and consists of legal conclusions as opposed to facts.

2.      Apple also objects to Plaintiffs' 56.1 Statement to the extent it does not comply with Local Civil Rule 56.1(a)'s requirement that the 56.1 Statement consist of numbered paragraphs.  Specifically, certain of Plaintiffs' paragraphs include separate, unnumbered bullet points that should be numbered.  For the Court's convenience, Apple has numbered those bullet points in brackets.

3.      Apple's agreement that a fact is undisputed is not an agreement that Plaintiffs' citations support such fact or that such a fact is relevant or material to the motions at issue.

4.      Even if the Court were to assume *arguendo* that Plaintiffs' various conclusory facts are true, Plaintiffs would still be unable to support a finding that the assignment of the IBOOK mark from Family Systems Ltd. ("Family Systems") to Apple is invalid, that Plaintiffs' alleged marks are protectable, or that there is a likelihood of confusion.

## APPLE'S RESPONSES TO PLAINTIFFS' 56.1 STATEMENT

1.      On October 8, 1996, Family Systems Ltd. ("FS") submitted an Intent to Use Application to the United States Patent and Trademark Office (the "PTO") for the mark "IBOOK" in connection with "computer hardware and software used to create and support interactive, user

1

modifiable electronic books" in International Class 9; FS was awarded a Registration on April 24,

2001 (the "634 Registration") citing a first use in commerce of October 27, 2000.  (See Chattoraj

Decl. Ex. 2, Intent to Use Application Serial No. 75/182,820; see also Chattoraj Decl. Ex. 3, U.S.

TM Reg. No. 2,446,634.)

    **RESPONSE:**  Undisputed, except that Apple notes, for clarity, that the description of

goods and services in the 634 Registration is actually "computer hardware and software used to

*support and create* interactive, user-modifiable electronic books," rather than "computer hardware

and software used to *create and support* interactive, user-modifiable electronic books," as stated

by Plaintiffs.  (*See* Chattoraj Dec., Ex. 3 (emphasis added).)


    2.    Two patents for the underlying software used in connection with the mark covered

by the 634 Registration (the "IBOOK Patents"), one filed on February 28, 2004 and awarded to FS

founder Brian Reynolds ("Reynolds") and consultant Richard Goldhor on November 4, 2008 (the

"748 Patent") (see Chattoraj Decl. Ex. 4, U.S. Patent No. 7,447,748), and one filed on May 14,

2003 and awarded to Reynolds, and Mark J. Hanover on August 4, 2009 (the "212 Patent").  (See

Chattoraj Decl. Ex. 68, U.S. Patent No, 7,571, 212.)

    **RESPONSE:**  Undisputed, except that Apple notes, for clarity, that Paragraph 2 contains

factual inaccuracies.  Specifically, the United States Patent and Trademark Office ("PTO") records

show that the 748 Patent was filed on February 20, 2004, not February 28, 2004 (*see* Chattoraj

Dec., Ex. 4), and the 212 Patent was awarded to Brian Reynolds and Mark J. Conway, not Mark J.

Hanover (*see* Chattoraj Dec., Ex. 68).  Moreover, Apple notes that, although it is not disputed that

patents were issued for Family Systems' ibook software, there is no evidence establishing (i) the

extent to which Family Systems worked those patents and (ii) whether Family Systems owns, or

owned, the 748 Patent, as the PTO's record states that it was assigned by Brian Reynolds and

Richard S. Goldhor (the inventors) to Fasm Network Service, LLC, not Family Systems, in 2007.

*(See* Chattoraj Dec., Ex. 4.)  Neither of these unknown facts is material to the issues addressed in

the parties' respective motions, however.


      3.      The 748 Patent was awarded for the invention of an "[i]nteractive web book

system" which is described in the abstract as, "An interactive Web book ("ibook") system is

provided that allows material to be contributed to the World Wide Web.  An ibook is a self-

extending, self-sustaining information-redistributing Web robot, which is resident on a data

network such as the Internet or an intranet.  Users may enroll with an ibook as viewers or

contributors.  Viewers may view ibook material, such as text or multimedia content.  Contributors

may contribute original material to the ibook or may create derivations of existing ibook material.

Attribution information that identifies the source of material in a derivation is automatically

generated.  Information concerning the derivation of each work and its characteristics can be used

to help the user navigate through ibook material.  The ibook system keeps track of how often users

access each work within an ibook.  Contributors may be automatically rewarded (e.g., by a

monetary distribution) based on the extent to which their contributed material is viewed by the

users."  (Chattoraj Decl. Ex. 4, U.S. Patent No. 7,447,748.)

      **RESPONSE:**  Undisputed.  Apple does not dispute that the 748 Patent contains the quoted

text.

4.      The 212 Patent was awarded for the invention of "[i]nteractive web collaboration systems and methods" which is described in the Background of the Invention as relating to "the Internet, and more particularly, to techniques for creating and viewing material on the World Wide Web in the form of an interactive website, and to techniques by which multiple individuals can communicate with each other and work collaboratively on content and materials in an interactive web site." (Chattoraj Decl. Ex. 68, U.S. Patent No, 7,571, 212 (internal quotations omitted).)

**RESPONSE:** Undisputed.  Apple does not dispute that the 212 Patent contains, in large part, the quoted text, except that Apple notes, for clarity, that Plaintiffs appear to have partially misquoted the 212 Patent as, in the 212 Patent, the word "web" appears in parentheses after the term "World Wide Web" and the word "website" is always written as two separate words, "web site."  *(See* Chattoraj Dec., Ex. 68.)

5.      The FS ibook product which bore the IBOOK mark covered by the 634 Registration has been described as follows by one of the listed inventors on the 748 Patent:

> A:  Family Systems ibook was a system and architecture for allowing a community to create materials.  Including text, but not limited to text, and to publish it using web technologies, but also to make it possible for multiple members of the community to edit that material, comment on it, create their own versions of it and so forth.
> Q:  In some ways it sounds like a precursor to Facebook; would that be it?
> A:  More like a precursor to Wiki.
> Q:  Wikipedia?
> A:  Yeah.  (Chattoraj Decl. Ex. 5, Goldhor Dep. 20:4-16.)

**RESPONSE:** Undisputed.  Apple does not dispute that Dr. Goldhor's testimony contained the quoted text, except that Apple notes, for clarity, that Plaintiffs have partially misquoted that testimony, in that Dr. Goldhor's actual quote was, "Family Systems ibook was a system and *an*

4

architecture for allowing a community to create *material, including* text, but not limited to text, and to publish it using web technologies, but *to also* make it possible for multiple members of the community to edit that material, comment on it, create their own versions of it and so forth." *(See* Chattoraj Dec., Ex. 5 (Goldhor Dep., at 20:4-11) (emphasis added).)  Apple further adds, for clarity, that Dr. Goldhor also described the Family Systems ibook software as follows:

> Q. The ibook technology, including the ibook software, would allow users to read books created by other people, correct?
>
> A. Any kind of content.
>
> Q. Any kind of --
>
> A. If someone had created a novel and put it up in -- using the ibook technology, then people could read that.
>
> Q. The content that could be accessed using the ibook technology would include both text and visual material, correct?
>
> A. Yes, that's correct.
>
> * * *
>
> Q. The ibook technology, including the ibook software, could have been used by individuals to make books they had written available to others, correct?
>
> A. Yes.
>
> Q. The ibook technology, including the ibook software, could be used by commercial publishers to make their books available to others, correct?
>
> A. The technology certainly could be used that way.  As I said, Brian struggled with the whole notion of commercial use, and at various times there were various limitations suggested.  But as far as the technology goes, this was technology that could be used either by an individual or an organization.

Q. And as it was designed and made available, the ibook technology, including the ibook software, could really be used by anybody to make content available to others; is that correct?

A. This is anyone who agreed to the licensing terms --

Q. Assuming –

A. -- and had a computer and access to the Internet.

(Jarrett Dec. ¶ 242 (Goldhor Dep., at 78:4-79:25).)

Dr. Goldhor also testified:

Q. And you said that the ibooks technology -- excuse me, ibook technology, including the ibook software, could be used to support and create user-modifiable electronic books, correct?

A. Yes.

Q. Is it fair to say that a user could read a book or other content using that technology?

A. You mean if someone had created -- let me answer it this way.  If someone had created, let's say, a novel, had written a novel using the ibook technology, then a user could access the ibook and read the novel just using that software.

Q. They could use the ibook software to look for material, find it, decide they wanted to read it and then read it using the software?

A. That's correct, yes.

Q. And if a user, in reading some content that they had found using the ibook software, decided that they wanted to add to or modify that content, for example, by adding a note, they could do that as well, correct?

A. If they had the appropriate permissions, they could, yes.

(Cendali Dec., Goldhor Dep., at 80:19-81:20.)

6.     The FS ibook product was marketed to businesses as a system to "support individuals and distributed product groups as they work and collaborate wherever they are", allowing "any non-technical user [to] publish their documents and other standard personal and office files to the Web for private or public access." (Chattoraj Decl. Ex. 6, Press Release, dated March 12, 2002, *Family Systems launches the ibook® Family of Software Products for a Better Way of Working Together,* at Goldhor Dep. Ex. 5, pp 113-14).

**RESPONSE:** Undisputed.  Apple does not dispute that Family Systems issued a press release containing, in large part, the quoted text, except that Apple notes, for clarity, that Plaintiffs appear to have partially misquoted the press release, in that the actual quote from the Press Release, dated March 12, 2002, states:  "Family Systems has announced the launch of the ibook® family of products, which support individuals and distributed project groups as they work and collaborate *together* wherever they are."  *(See* Chattoraj Dec., Ex. 6 (emphasis added).)  Further, Apple adds that Family Systems' ibook software was marketed to both individuals <u>and</u> businesses, as its mission was to support the needs of "individuals and their communities, whether project teams, affiliation groups, families, or enterprises." *(Id.)*  In addition, according to the press release, the ibook system also "provide[d] interactive Web books for anyone with access to a Web browser, a text editor, and the Internet." *(Id.)*

7.     Neither the IBOOK mark, nor the underlying technologies covered by the IBOOK Patent, were ever used to allow users to view existing published works of fiction.  (<u>See</u> Chattoraj Decl. Ex. 7, Goldhor Dep. 44:17-45:19).

7

**RESPONSE:** Undisputed. Apple does not dispute that Dr. Goldhor did not know of any instances in which users "uploaded existing published works of fiction" using the Family Systems ibook software. (*See* Chattoraj Dec., Ex. 7 (Goldhor Dep., at 45:10-13).) Apple adds for clarity, however, that Dr. Goldhor also testified that the statement that "an electronic version of Moby Dick would not be available through Family Systems ibook products" was not true, because "if someone had the legal right to the content of Moby Dick and had the legal right to use ibook technology to publish it," the Family Systems software could have been used to do so. *(See* Cendali Dec., Goldhor Dep., at 45:20-47:3; *see also* Jarrett Dec., ¶ 242 (Goldhor Dep., at 78:9-79:25).)

8.      On April 27, 2007 FS filed a Combined Declaration of Use and Incontestability Under Sections 8 & 15 with regard to the 634 Registration deleting HARDWARE from the list of goods that the IBOOK mark was used in connection with and attaching a specimen of use. (See Chattoraj Decl. Ex. 74.)

**RESPONSE:** Undisputed but immaterial. Apple notes, for clarity, that the Combined Declaration of Use and Incontestability Under Section 8 & 15 filed by Family Systems is attached as Exhibit 72 to Mr. Chattoraj's Declaration, not Exhibit 74. Apple further states that it does not believe the fact set forth in Paragraph 8 of Plaintiffs' 56.1 Statement is material to the issues addressed in the parties' respective motions, and notes this fact is not cited in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment against Defendant Apple Inc. ("Memo of Law").

9.      Apple announced the iBooks app, an E-book reading software which includes the iBookstore, in connection with the launch of the iPad during a speech by Steve Jobs ("Jobs"), former CEO of Apple, on January 27, 2010.  (See Chattoraj Decl. Ex. 8, APPLE-IBOOKS0021840-42.)

**RESPONSE:**  Undisputed.


10.      While two names were being considered for the product that would become the iBooks app ("iBooks" and "███████"), Jobs ultimately decided that the product would be called iBooks.  (See Chattoraj Decl. Ex. 9, La Perle Dep. 45-46; 48:18-19.)

**RESPONSE:**  Undisputed but immaterial.  Apple notes, for clarity, that Mr. La Perle testified that Mr. Jobs "made the decision to look into 'iBooks'" and that he believed Mr. Jobs made the decision not to use the name "███████" for the e-reader application.  (*See* Chattoraj Dec., Ex. 9 (La Perle Dep., at 48:18-19).)  Mr. La Perle, however, did not know if Mr. Jobs made the decision to use the iBooks mark (Cendali Dec., La Perle Dep., at 82:22-83:5), although Mr. La Perle "assume[d] that Steve Jobs was the person that made the decision . . . ."  (Cendali Dec., La Perle Dep., at 82:22-83:5).  Apple adds, for clarity, that it told Family Systems that it would not use "iBooks" unless it could acquire the rights to IBOOK from Family Systems, and prior to Apple's announcement of the iBooks app a full trademark clearance process was conducted by Apple's outside counsel, Dechert LLP, which process included conducting numerous searches and reviewing more than 1,200 federal and state trademark records, and more than 1,800 website links that were generated by those searches.  *(See* Cendali Dec., La Perle Dep., at 48:21-49:2; *see also*

Defendant's Rule 56.1 Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, dated Dec. 21, 2012 ("Apple SUF"), ¶¶ 217-233.)

11.    In January 2010, it was decided, upon the recommendation of Thomas La Perle, Apple's trademark counsel, that in connection with the planned use of the name "iBooks" for an E-book reading software, Apple should seek to acquire the 634 Registration from FS.  (See Chattoraj Decl. Ex. 10, id. at 80:8-18, 83:6-12.)

**RESPONSE:**  Undisputed.  Apple does not dispute that, in January 2010, Mr. La Perle recommended that Apple acquire Family Systems' rights to the IBOOK mark as part of the trademark clearance for iBooks and that Mr. Jobs then decided to pursue such an acquisition from Family Systems.  (See Cendali Dec., La Perle Dep., at 80:3-81:12; 82:2-21.)  Apple notes, for clarity, that the word "planned" is misleading as it suggests that Apple intended to use the name iBooks for its e-reader software application regardless of whether it could acquire rights in the IBOOK mark from Family Systems, when in fact the record shows that Apple informed Family Systems during their negotiations that unless they could reach an agreement prior to January 27, 2010, which was the date on which Apple intended to announce the launch of its new e-reader app, Apple would have to choose a different name for that app instead of using iBooks.  (See Jarrett Dec., ¶ 246 (Lupo Dep., at 100:14-101:16; 115:18-116:14) and ¶ 243 (Gundersen Dep., at 176:6-178:21).)

12.    Apple had previously entered into a Consent Agreement with FS in 1999 (the "1999 Consent Agreement") regarding FS' use of the 634 Registration in order to gain a

registration for the mark IBOOK in connection with Apple's use of the mark on "Computers, computer hardware, computer peripherals and users manuals sold therewith."  (Chattoraj Decl. Ex. 11, U.S. TM Reg. No. 2,470,147, 1999 Consent Agreement; see also Chattoraj Decl. Ex. 47, Lupo Dep. 31:19-22; see also Chattoraj Decl. Ex. 13, Goldhor Dep. 68-71.)

**RESPONSE:**  Undisputed.  Apple does not dispute that it entered into a Consent Agreement with Family Systems in 1999, except that Apple notes, for clarity, that the Consent Agreement did not concern Family Systems' "use of the 634 Registration," as that registration had not yet issued at the time the parties entered the 1999 Consent Agreement, but, instead, concerned the parties' use of their respective IBOOK marks.

13.     Apple's only substantive contact with FS since entering into the 1999 Consent Agreement -- beyond the occasional requests for consents required for trademark applications -- was a single, unanswered email from Reynolds in 2008 where Reynolds informed Apple that FS was "about to relaunch Ibook Systems V4 and V5 as cooperative projects along with Cooperative License and Verbol, a language framework for talking to objects" which could "potentially reshape how the Ibook trademark is used" and stated:

> I would consider a sale of these trademarks to Apple with a license back to Family Systems.  My product intentions will be open and possibly more easily described in a license to Family Systems than Apple's in the [1999 Consent Agreement] to Apple.  As I recall the license to Apple is at present limited to notebook computers which a new IBook may be, though perhaps it may be other things too? (Chattoraj Decl. Ex. 14, APPLE-IBOOKS0020321; see also Chattoraj Decl. Ex. 15, LaPerle Dep. 108:5-109:9.)

**RESPONSE:**  Undisputed but immaterial.  Apple does not dispute (1) that on October 1, 2008, Brian Reynolds of Family Systems sent the e-mail described in Paragraph 13 of Plaintiffs'

56.1 Statement to Apple, and (2) that between 1999 and January 2010, it also communicated with Family Systems regarding consents for trademark applications.  Apple states that the phrase "substantive contact" is subjective, vague and ambiguous.  In any event, Apple does not believe that the number of communications between it and Family Systems since 1999 is material to Plaintiffs' Motion for Summary Judgment.

14.     Beginning on, or about January 13, 2010, and ending at some time between 2:00 and 3:00 AM on January 27, 2012, the date that the iBooks app was announced, Anthony Lupo ("Lupo"), outside trademark counsel to Apple negotiated the assignment of the 634 Registration from FS to Apple proceeding as follows:.

- [1] On January 13, 2010, Lupo contacted FS' outside American trademark counsel, Brewster Taylor ("Taylor") to see if FS was still interested in selling the FS IBOOK mark, and if so, what sort of price they were looking for.  (See Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022066.)

- [2] On January 14, Reynolds responded and asked for clarification on a number of issues:

  It was not clear from talking to Brewster which of Family Systems ibook assets Apple are interested in.  There are multiple domain names and trademark registrations as well as software technology and patents which reference ibook systems.

  I would appreciate an indication of the extent of Apple's interest in our ibook assets, and a rough timescale and price range from Apple's perspective.  Also, if we proceed I would appreciate an introduction to a principal of Apple, Inc.  (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022065.)

- [3] Lupo responded, without offering a price or introduction to a principal at Apple:

  thanks for the email.  Apple is really only interested in the marks and domains associated with IBOOK.  they are not trying to purchase any of the

underlying goods or services that may be associated with the mark or domain.  (Chattoraj Decl. Ex. 16, APPLE- IBOOKS0022064 (emphasis added).)

- [4] On January 15, with Lupo refusing to make an offer Reynolds stated, "I would have preferred that Apple make us an offer, and without any information about Apple's intentions and timescales or any opportunity to take advice, I can indicate that an offer of ███ would most likely be accepted and include a full transfer of rights and our conversion costs." (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022063.)

- [5] Lupo responded on January 18 that ███ was not within "Apple's realm of reality" and later made a counteroffer of ███ (███ for the mark and ███ for the domain name registrations) on January 20. (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022062.)

- [6] The parties arranged to discuss the matter by phone on January 22, after which Reynolds offered to reduce his expectation to "an Apple offer price of ███."  (Chattoraj Decl. Ex. 16, APPLE-IBOOKS0022059.)

- [7] Lupo countered at 11:01PM on January 22 with an offer of ███, noting that "the timing is very tight" and asking that Reynolds "let me know if this is acceptable and I can work with Brewster to finalize an agreement on Monday."  (Id.)

- [8] On January 25, Reynolds suggested that the parties close at "███" the [sic] (APPLE-IBOOKS0023745), and Lupo subsequently informed Reynolds that he had "been authorized to make a new offer to you of ███."  (Chattoraj Decl. Ex. 18, APPLE-IBOOKS0023658.)

- [9] At about 2 AM on January 27, 2010, Apple's attorneys received a copy of the Assignment Agreement executed by FS, with a negotiated price of ███.  (See Chattoraj Decl. Ex. 45, Lupo Dep. 117-19; see also Chattoraj Decl. Ex. 20, Gundersen Dep. 153:10-14; see also Chattoraj Decl. Ex. 21, APPLE-IBOOKS0033421-32.)

- [10] While the documents were executed prior to the announcement of the iBooks app on January 27, 2010, payment was not made from Apple to FS until February 4, 2010.  (See Chattoraj Decl. Ex. 22, APPLE-IBOOKS0023912-15.)

**RESPONSE:**  Undisputed, except that Apple notes, for clarity, that the reference to "January 27, 2012" in the first clause of Paragraph 14 of Plaintiffs' 56.1 Statement appears to be a typographical error, and clarifies that the correct date is January 27, 2010.  Apple's additional responses to each bullet point set forth in Paragraph 14 of Plaintiffs' 56.1 Statement (which Apple has numbered for the Court's convenience) are set forth below.

[1]  Undisputed.  Apple does not dispute that Mr. Lupo sent an e-mail to Family Systems' outside trademark counsel on January 13, 2010, except that Apple adds, for clarity, that Mr. Lupo's e-mail to Mr. Taylor, which is partially quoted in the first bullet point, also stated:  "Your client reached out some time ago to see if we were interested.  I thought they might have an idea of how much they wanted since they were shooping [sic] the portfolio."  (Chattoraj Dec., Ex. 16, at APPLE-IBOOKS0022066.)  In any event, Mr. Lupo's e-mail speaks for itself.

[2]  Undisputed, except that Apple notes, for clarity, that Mr. Reynolds' January 14, 2010 e-mail, which is partially quoted in the second bullet point, correctly referred to Apple as "Apple Inc.," rather than "Apple, Inc."

[3]  Undisputed but immaterial.  Apple does not dispute that Mr. Lupo made the statement described in the third bullet point, but does not believe that it is material to the issues addressed in the parties' respective motions.  Apple adds, for clarity, that Mr. Lupo also stated in his January 14, 2010 e-mail, a portion of which is set forth in the third bullet point, that Apple "would want to own the domains," and that the e-mail speaks for itself.  (*See* Chattoraj Dec., Ex. 16, at APPLE-IBOOKS0022064.)  Apple further clarifies that in a subsequent e-mail dated January 15, 2010, Mr. Lupo informed Mr. Reynolds that that "Apple would want all of these domains and any left over trademark or trademark rights you have."  (Chattoraj Dec., Ex. 16, at APPLE- IBOOKS0022063.)

14

[4]  Undisputed but immaterial.  Apple does not dispute that Mr. Reynolds sent the e-mail that is partially quoted in the fourth bullet point.  Apple notes that it is unclear what Plaintiffs mean by the use of the term "refused" in the fourth bullet point.  Apple adds, for clarity, that Mr. Reynolds's e-mail was sent after Mr. Lupo informed Mr. Reynolds: "We do not have an idea what the value of the marks and domains are to you so we thought you would be in the best position to tell us what it would cost for you to move your goods and services to another domain and mark." (Chattoraj Dec., Ex. 16, at APPLE-IBOOK0022064 (January 14, 2010 e-mail).)  Mr. Reynolds's and Mr. Lupo's statements are immaterial to the issues set forth in the parties' respective motions.

[5] Undisputed but immaterial.

[6] Undisputed but immaterial.  Apple notes, for clarity, that the actual quote from the e-mail described in the sixth bullet point is "[w]e are willing to reduce our expectation of an Apple offer price *to* ███████."  (Chattoraj Dec., Ex. 16, at APPLE-IBOOKS0022059 (emphasis added).)

[7] Undisputed but immaterial.

[8] Undisputed but immaterial.  Apple adds, for clarity, that in Mr. Reynolds' January 25, 2010 e-mail described in the eighth bullet point, he also stated that he understood that Family Systems had active trademark registrations for IBOOK in 24 countries.  (*See* Chattoraj Dec., Ex. 17, at APPLE-IBOOKS0023745.) Apple further clarifies that Mr. Lupo responded on January 25, 2010, stating that the offer "reflects the fact that [Family Systems] has active trademark registrations in only three countries," not 24, as Mr. Reynolds believed.  (*See* Chattoraj Dec., Ex. 18, at APPLE-IBOOKS0023658.)

[9] Undisputed.  Apple notes, for clarity, that Mr. Lupo received a copy of the Assignment Agreement signed by Family Systems on January 27, 2010 at 3:28 A.M. Eastern Standard Time.

15

(*See* Cendali Dec., Ex. 5.)  In addition, while the ninth bullet point indicates that Exhibit 45 to Mr. Chattoraj's Declaration is pages 117-119 of the transcript of Mr. Lupo's deposition testimony, that exhibit is actually certain pages from the Family Systems website.

[10] Undisputed but immaterial.  Apple does not dispute that the Assignment Agreement was effective as of January 26, 2010, executed prior to the announcement of the iBooks app on January 27, 2010, and that Apple paid Family Systems on or before February 3, 2010, days before payment was due under the terms of the Assignment Agreement.  (*See* Chattoraj Dec., Ex. 21, at APPLE-IBOOKS0033421-32; *see also* Chattoraj Dec., Ex. 22, at APPLE- IBOOKS0023912-15.)

15.  Under the terms of the Assignment Agreement, only the following specific trademark registrations were transferred from Family Systems to Apple:

- [1] The domain name registrations for IBOOK.COM, IBOOK.NET, IBOOK.ORG, I-BOOK.COM, I-BOOK.NET, and I-BOOK.ORG (Chattoraj Decl. Ex. 21, APPLE-IBOOKS0033421-31),

- [2] The United States registration for the mark IBOOK, Registration No. 2,446,634, covering the following goods in international class 9, "[c]omputer software used to support and create interactive, user-modifiable electronic books" (id. at APPLE-IBOOKS0033428),

- [3] The Japanese registration for the mark IBOOK, Registration No. 4510994 for goods in the following classes: "[e]lectronic machines, instruments, and parts" in National Class 11C01, and "[c]omputer programs to be downloaded via computer networks; computers (including central processing units, and electronic circuits, magnetic tapes in which computer programs are recorded and other peripherals); and other electronic machines and instruments and parts thereof" in International Class 9 (id. at APPLE-IBOOKS0033428), and

- [4] The Jamaican registration for the mark IBOOK, Registration No. 33,723, covering the following goods in international class 9, "[c]omputer software used to support and create interactive, user-modifiable electronic books." (Id. at APPLE-IBOOKS0033428.)

**RESPONSE:**  Undisputed, except that Apple adds, for clarity, that in addition to the trademark registrations and domain names set forth in Paragraph 15 of Plaintiffs' 56.1 Statement, Family Systems also transferred to Apple "any common law rights [in IBOOK], and all goodwill associated" with the trademark IBOOK.  *(See* Chattoraj Dec., Ex. 21, at APPLE-IBOOKS0033421-32.)  Apple notes that it is not clear what Plaintiffs mean by the term "only the following specific trademark registrations" and further clarifies that the trademark registrations listed in Paragraph 15 of Plaintiffs' 56.1 Statement were all of the trademark registrations for IBOOK that Family Systems owned when the Assignment Agreement was executed, and therefore, Family Systems transferred to Apple all of its trademark registrations for IBOOK, as required by the terms of the Assignment Agreement.  *(See* Chattoraj Dec., Ex. 21, at APPLE-IBOOKS0033421-32.)  Apple's additional responses to each bullet point set forth in Paragraph 14 of Plaintiffs' 56.1 Statement (which Apple has numbered for the Court's convenience) are set forth below.

[1] Undisputed, except that Apple notes, for clarity, that, contrary to Plaintiffs' description, the domain name registrations that were transferred from Family Systems to Apple are not "trademark registrations," as stated in the first clause of Paragraph 15 of Plaintiffs' 56.1 Statement.

[2] Undisputed.

[3] Undisputed, except that Apple adds, for clarity, that the registration number for the Japanese trademark registration for IBOOK is 4510995, however, not 4510994, as stated in the third bullet point.  (*See* Chattoraj Dec., Ex. 21, at APPLE-IBOOKS0033428.)  In addition, the goods and services for which the trademark is registered are "[e]lectronic machines, instruments, and parts" in National Class 11C01, and "[c]omputer programs to be downloaded via computer

networks; computers (including central processing units, and electronic circuits, *magnetic discs and* magnetic tapes in which computer programs are recorded and other peripherals); and other electronic machines and instruments and parts thereof" in International Class 9.  (*See* Chattoraj Dec., Ex. 21, at APPLE-IBOOKS0033428 (emphasis added).)

[4] Undisputed.


16.     The Assignment Agreement also required that Reynolds execute and return to Apple a Trademark Assignment, attached in blank the [sic] Assignment Agreement at Exhibit B, stating, FS "hereby irrevocably transfers and assigns to [Apple] all right, title and interest in and to the [634] Registration, and other rights or registrations that [FS] may have or may claim in the mark and trade name IBOOK, including without limitation any common law rights, and the goodwill of the business pertaining thereto."  (Id. at APPLE-IBOOKS0033429.)

**RESPONSE:**  Undisputed, except that Apple notes that it is not clear what Plaintiffs mean by the term "in blank the Assignment Agreement," or whether Plaintiffs intended to state "in back of the Assignment Agreement," such that the use of the term "in blank" was a typographical error. If "in blank" was used intentionally, Apple notes that the term "in blank" is vague and ambiguous. In fact, nothing is "blank" in Exhibit B to the Assignment Agreement.  That exhibit includes a line for Mr. Reynolds' signature, and another line for him to indicate the date on which he signed the exhibit (*i.e.,* "January __, 2010"), but all other information in the exhibit is complete.  In any event, Apple adds, for clarity, that the Assignment Agreement actually states that Family Systems "hereby irrevocably transfers and assigns to [Apple] all right, title and interest in and to the [634] Registration, *any* other rights or registrations that [FS] may have or may claim in the mark and

trade name IBOOK, including without limitation any common law rights, and the goodwill of the business pertaining thereto."  (*See* Chattoraj Dec., Ex. 21, at APPLE-IBOOKS0033429 (emphasis added).)

17.     Pursuant to the Assignment Agreement, no physical assets, accounts receivable, trade secrets, copyrights, computer software, computer hardware, patents, customer lists, or employment agreements with employees were transferred to Apple from FS.  (Chattoraj Decl. Ex. 23, La Perle Dep. 125:10-126:9.)

**RESPONSE:**  Undisputed but immaterial.  Apple adds, for clarity, that it did acquire from Family Systems the trademark registrations and domain names set forth in Paragraph 15 of Plaintiffs' 56.1 Statement, as well as "any common law rights [in IBOOK], and all goodwill associated" with the trademark IBOOK and all of the trademark registrations listed in Paragraph 15 of Plaintiffs' 56.1 Statement.  (*See* Chattoraj Dec., Ex. 21, at APPLE-IBOOKS0033421-32.) Apple further states, for clarity, that any customers using those domain names would be redirected to Apple's website, as stated in Paragraph 22 of Plaintiffs' 56.1 Statement.

18.     Under the terms of the Assignment Agreement, FS was granted a phase out period by which FS was given ten days from January 26, 2010 to phase out its use of the IBOOK mark and "its websites under the registered domain name ibook.com and host names containing ibook.com."  (Chattoraj Decl. Ex. 21, APPLE-IBOOKS0033424.)

**RESPONSE:**  Undisputed, except that Apple adds, for clarity, that as required by the Assignment Agreement, Family Systems no longer uses the IBOOK mark, instead offering its e-

reader software under the brand VERBOL, which it started using for its e-reader product after the assignment.  *(See* Apple SUF ¶ 154.)

19.     Under the terms of the Assignment Agreement, neither FS nor Reynolds is allowed, after January 26, 2010, to "use any BOOK Mark as the name of any software or other product or service, as a corporate name or business name, or otherwise in connection with the marketing, advertising, offering for sale, or selling of any products or services."  (Id. at APPLE-IBOOKS0033424.)

**RESPONSE:**  Undisputed, except that Apple adds, for clarity, that as required by the Assignment Agreement, Family Systems no longer uses the IBOOK mark, instead offering its e-reader software under the brand VERBOL, which it started using for its e-reader product after the assignment.  *(See* Apple SUF ¶ 154.)

20.     On February 4, 2010, Apple filed a Trademark Assignment with regard to the 634 Registration, signed by Brian Reynolds and purporting to assign from FS to Apple, "all right, title and interest in and to the [634] Registration, any other rights or registrations that [FS] may have or may claim in the mark and trade name IBOOK, including without limitation any common law rights, and the goodwill of the business thereto."  (Chattoraj Decl. Ex. 73.)

**RESPONSE:**  Undisputed, except that Apple notes, for clarity, that the Trademark Assignment regarding the 634 Registration does not "purport" to assign the registration, common law rights, and goodwill in IBOOK from Family Systems to Apple, but rather states that "[Family Systems] hereby irrevocably transfers and assigns to [Apple] all, right, title and interest in and to

the [634] Registration, any other rights or registrations that [FS] may have or may claim in the

mark and trade name IBOOK, including without limitation any common law rights, and the

goodwill of the business thereto."  *(Chattoraj Dec., Ex. 73.)*

21.     On February 5, 2010 a Revocation of Attorney/Domestic Representative and/or

Appointment of Attorney/Domestic Representative was filed with regard to the 634 Registration

appointing Apple Attorney with respect to the 634 Registration.  (See Chattoraj Decl. Ex. 71.)

**RESPONSE:**  Undisputed.

22.     Today, if one attempts to go to any of the domain names conveyed as part of the

Assignment agreement, they are redirected to a page within the Apple website page for iPad that

for [sic] built-in apps where the iBooks app is shown after scrolling past two other apps.  (See

www.ibook.com; www.ibook.net; www.ibook.org; www.i-book.com; www.i-book.net; www.i-

book.org; see also http://www.apple.com/ipad/built-in-apps/#ibooks?cid=oas-us-domains-

ibook.net, a printout of which is attached as Chattoraj Decl. Ex. 24.)

**RESPONSE:**  Undisputed.

23.     On April 7, 2010, Apple filed an Application for IBOOKS for a wide variety of

goods and services connected to books including "downloadable electronic publications in the

nature of books..."  (Class 9); "printed matter; printed publications; periodicals; books..."  (Class

16); "retail store services in the field of books..."  (Class 35); "electronic transmission of streamed

and downloadable publications for browsing over computer networks, namely books, magazines, periodicals..." (Class 38).  (Chattoraj Decl. Ex. 27, Application No. 85/008,412.)

**RESPONSE:**  Undisputed but immaterial.  Apple notes that the phrase "wide variety" is subjective, vague and ambiguous.  Apple further notes, for clarity, that Exhibit 27 to Mr. Chattoraj's Declaration is not a copy of the application filed by Apple on April 7, 2010, but is a response to an office action regarding the application.  In any event, Apple does not believe the fact set forth in Paragraph 23 of Plaintiffs' 56.1 Statement is material to the issues addressed in the parties' respective motions, and notes that this fact is not cited in Plaintiffs' Memo of Law.

24.     On March 6, 2012, Plaintiffs provided Apple's counsel with a draft amended complaint.  (See Chattoraj Decl. Ex. 28, email from Thomas Morrison to Dale Cendali, et al., sent at 10:17 AM on March 6, 2012.)

**RESPONSE:**  Undisputed but immaterial.  Apple does not believe this fact is material to the issues addressed in the parties' respective motions, and notes that this fact is not cited in Plaintiffs' Memo of Law.

25.     On March 13, 2012 Apple filed an Amendment to Allege Use pursuant to 15 U.S.C. § 1051(c) deleting Classes 16, 38, and 41 wholesale and substantially reducing the goods listed in Classes 9, 35, and 42, including the deletion of "downloadable electronic publications in the nature of books, plays, pamphlets, brochures, newsletters journals, magazines, and periodicals on a wide range of topics of general interest" from Class 9.  (Chattoraj Decl. Ex. 27, Amendment to Allege Use, dated March 13, 2012.)

**RESPONSE:**  Undisputed but immaterial.  Apple notes, for clarity, that it is unclear what

Plaintiffs mean by the term "substantially," which is subjective, vague and ambiguous.  Apple

further clarifies that Exhibit 27 to the Chattoraj Declaration is not a copy of the Amendment to

Allege Use, dated March 13, 2012, but is a copy of a Response to an Office Action.  In any event,

Apple does not believe the fact set forth in Paragraph 25 of Plaintiffs' 56.1 Statement is material to

the issues addressed in the parties' respective motions, and notes that this fact is not cited in

Plaintiffs' Memo of Law.

26.     On March 14, 2012, Bonnie Jarrett, counsel for Apple, responded to Mr.

Morrison's March 6 email, stating, "with respect to Apple's ITU for IBOOKS, you should be

aware that Apple recently filed an amendment to allege use.  That amendment significantly limits

the scope of the goods and services description for that mark, by removing, *inter alia,*

downloadable and non-downloadable electronic publications, books and magazines."  (Chattoraj

Decl. Ex. 28, Email from Bonnie L. Jarrett to Thomas Morrison, sent at 2:23 PM on March 14,

2012.)

**RESPONSE:**  Undisputed.  Apple, however, does not believe that this fact is material to

the issues addressed in the parties' respective motions, and notes that this fact is not cited in

Plaintiffs' Memo of Law.

27.     Apple filed a § 7 request to amend the mark covered by the 634 Registration from

IBOOK to IBOOKS on May 17, 2010, declaring:

> The proposed amendment to the mark does not materially alter the character
> of the mark in the registration and does not render it sufficiently different to

23

require republication.  The new form of the mark has the same meaning as, and contains the essence of, the original mark.  The addition of "S" - changing the mark from IBOOK to IBOOKS- creates the impression of being essentially the same mark so that consumers readily understand the mark to be the same.  (See Chattoraj Decl. Ex. 29, 634 Registration,§ 7 Request Form.)

**RESPONSE:**  Undisputed, except that Apple notes, for clarity, that Plaintiffs appear to have partially misquoted Apple's submission, and that Apple stated in the Section 7 Request Form that:  "[t]he addition of 'S' - changing the mark from IBOOK to IBOOKS - creates the impression of being essentially the same mark, so that consumers *will* readily understand the mark to be same."  (Chattoraj Dec., Ex. 29 (emphasis added).)  In any event, Apple does not believe that the fact set forth in Paragraph 27 of Plaintiffs' 56.1 Statement is material to Plaintiffs' Motion for Summary Judgment, and notes that this fact is not cited in Plaintiffs' Memo of Law.

28.    On June 7, 2010, Apple filed a Combined Declaration of Use and Excusable Nonuse/Application for Renewal of Registration of a Mark under §§ 8 & 9 ("§§ 8 & 9 Declaration"), declaring that "the mark is in use in commerce on or in connection with all goods and services listed in the existing registration", supported by a specimen of use, and made pursuant to a declaration under 18 U.S.C. § 1001 signed by Lisa Widup, counsel for Apple, declaring that "all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true."  (See Chattoraj Decl. Ex. 30, 634 Registration, §§ 8 & 9 Declaration.)

**RESPONSE:**  Undisputed, except that Apple notes, for clarity, that Plaintiffs appear to have partially misquoted Apple's submission, and that in fact it declared that "the mark is in use in commerce on or in connection with all goods *or* services listed in the existing registration."  Apple

further clarifies that the declaration signed by Ms. Widup stated that "all statements made of his/her own knowledge are true and *that* all statements made on information and belief are believed to be true." (Chattoraj Dec., Ex. 30 (emphasis added).)  In any event, Apple does not believe that the fact set forth in Paragraph 28 of Plaintiffs' 56.1 Statement is material to Plaintiffs' Motion for Summary Judgment, and notes that this fact is not cited in Plaintiffs' Memo of Law.

29.     The specimen of use submitted to the PTO in support of Apple's §§ 8 & 9 Declaration is screen shot of the iBooks page in Apple's iTunes store which states, "iBooks is an amazing way to download and read books, <u>designed exclusively for iPad</u>.  iBooks includes the iBookstore, where you can download the latest best-selling books or your favorite classics-- day or night.  Browse your library on a beautiful bookshelf, tap a book to open it, flip through pages with a swipe or a tap, and bookmark your favorite pages." (Chattoraj Decl. Ex. 30, §§ 8 & 9 Declaration (emphasis added).)

**RESPONSE:**  Undisputed, except that Apple notes, for clarity, that it appears that Plaintiffs have partially misquoted the specimen, and that the specimen actually states "iBooks is an amazing way to download and read books, designed exclusively for iPad.  iBooks includes the iBookstore, where you can download the latest best-selling books or your favorite classics -- day or night.  Browse your library on a beautiful bookshelf, tap a book to open it, flip through pages with a swipe or a tap, and bookmark your favorite *passages*." (Chattoraj Dec., Ex. 30 (emphasis added).)

30.    Also on June 7, 2010, Apple presented the iPhone 4, announcing the availability of the iBooks app on the iPhone and iPod touch.  (See Chattoraj Decl. Ex. 31, APPLE-IBOOKS0021101.)

**RESPONSE:**  Undisputed but immaterial.  Apple does not believe this fact is material to the issues addressed in the parties' respective motions, and notes that this fact is not cited in Plaintiffs' Memo of Law.

31.    The iBooks app allows users to purchase books through the iBookstore and download them to their iBooks enabled devices (e.g., their mobile device or computer) to be read using the iBooks app.  (See Chattoraj Decl. Ex. 31, APPLE-IBOOKS0021101; see also Chattoraj Decl. Ex. 32, Gedikian Dep. 110:8-12.)

**RESPONSE:**  Undisputed.

32.    Once a user has downloaded a book to their iBooks enabled device or computer, they can manipulate certain environmental factors of that book such as:

- [1] change the font and point size (see Chattoraj Decl. Ex. 33, Gedikian Dep. 106:22-109:3);

- [2] change the theme and background color (see id. at 109:8-12);

- [3] bookmark, annotate, and highlight passages (see Chattoraj Decl. Ex. 35, Gedikian Dep. 114:8-115:2); and

- [4] share the title of a book and their highlights or annotations by email. (See Chattoraj Decl. Ex. 36, Gedikian Dep. 221:1-7).

**RESPONSE:**  Undisputed.  Apple does not dispute that users of the iBooks software can interact with and modify electronic books in various ways.  Apple further notes, for clarity, that it

is unclear what Plaintiffs mean by the phrase "environmental factors," which term is vague and ambiguous.  Apple further adds, for clarity, that when an iBooks user wants to share highlights or annotations (as discussed in the fourth bullet point), the user can do so "directly from inside of iBooks," and that there is no need to open a separate app because an e-mail sheet, pre-populated by the iBooks software, opens on top of the iBooks app such that "iBooks is still visible" after the user sends the message.  (*See* Chattoraj Dec., Ex. 36 (Gedikian Dep. at 221:3-5, 221:13-19).)

33.     While these environmental changes will be reflected in a book no matter which iBooks enabled device a user chooses to read their book on, provided they have chosen to sync their iBooks account across all enabled devices (see Chattoraj Decl. Ex. 35, Gedikian Dep. 114:17-115:14), no other user accessing the same book will see these changes unless they are accessing the same book through the same account as the original user.  (See Chattoraj Decl. Ex. 37, Gedikian Dep. 219-220.)

**RESPONSE:**  Undisputed.  Apple does not dispute that while a user's modifications to a book, such as highlights, notes, commentary, or bookmarks, will be reflected across all of the user's devices that have the iBooks software, provided the user has chosen to activate that preference (*see* Chattoraj Dec., Exs. 31, 35 (Gedikian Dep., at 114:8-21)), other users accessing the same book will not see these changes unless they are accessing the book through the same account as the original user.  (*See* Chattoraj Dec., Ex. 37 (Gedikian Dep., at 219:25-220:4).)  Apple notes, for clarity, that the phrase "environmental changes" is vague and ambiguous.  Apple further adds, for clarity, that Mr. Gedikian testified that the ability of multiple iBooks users to make edits and changes to electronic books that are visible to other users of the same account is

one of the ways in which Apple's iBooks software is an "interactive Web collaboration system." (*See* Chattoraj Dec., Ex. 37 (Gedikian Dep., at 219:25-220:4).)

34.     None of these visual changes, highlighting or annotations in any way modify the actual digital file of the actual book that was downloaded from the iBookstore and stored on the device using the iBooks app; they are instead kept in a separate metadata file that does not actually modify the digital book.  (See Chattoraj Decl. Ex. 12, Gedikian Dep. 110:24-111:17.)

**RESPONSE:**  Undisputed, except that Apple notes, for clarity, that "from a customer's perspective, there is no representation of that separate data file.  From the customer's experience perspective, when they open the document, they are viewing a singular document."  (Cendali Dec., Gedikian Dep., at 112:1-11.)

35.     The terms of use of the iBooks app do not allow users to share accounts.  (See Chattoraj Decl. Ex. 38, iBooks License Agreement § 2(A).)

**RESPONSE:**  Disputed.  The term "accounts" is vague and ambiguous.  Furthermore, the iBooks License Agreement does not address sharing accounts, and thus neither prohibits nor allows users to share accounts.

36.     Apple does not encourage the sharing of iTunes accounts between more than one user either implicitly or explicitly through its marketing communications with the public.  (See Chattoraj Decl. Ex. 37, Gedikian Dep. 220:8-13; Chattoraj Decl. Ex. 59, Kvamme Dep. 45:16-17.)

**RESPONSE:**  Undisputed, except that Apple notes, for clarity, that neither Ms. Kvamme nor Mr. Gedikian were shown the iBooks License Agreement at their depositions.  Instead, Ms. Kvamme, who is responsible for certain marketing of the iBooks software, was asked at her deposition: "Does Apple encourage people to share their iTunes accounts with others so that they can share books through the iBooks application?"  (Chattoraj Dec., Ex. 59 (Kvamme Dep., at 45:12-14).)  Ms. Kvamme responded: "Apple doesn't encourage sharing of accounts."  (Chattoraj Dec., Ex. 59 (Kvamme Dep., at 45:16-17).  Mr. Gedikian, who is also responsible for certain marketing of the iBooks software, was asked at his deposition: "Are you and your wife permitted by Apple's terms of use to share the same account?"  (Chattoraj Dec., Ex. 37 (Gedikian Dep., at 220:5-6).  Mr. Gedikian responded that he did not know.  (*See* Chattoraj Dec., Ex. 37 (Gedikian Dep., at 220:7).)  Mr. Gedikian was then asked: "Is it part of Apple's marketing communications to the general public that they should share iTunes accounts?"  (Chattoraj Dec., Ex. 37 (Gedikian Dep., at 220:8-10).)  Mr. Gedikian testified, "In my experience, when we talk about 'accounts,' we talk about them in the context of one account per person."  (Chattoraj Dec., Ex. 37 (Gedikian Dep., at 220:11-13).)  Apple further notes, for clarity, that it allows consumers to link multiple devices to a single iTunes or iBookstore account and promotes this functionality as follows: "So you can read one of your favorites on your iPhone during your morning commute and pick up right where you left off on your iPad at bedtime."  (Cendali Dec., Ex. 6.)  Furthermore, as noted above, the iBooks License Agreement does not address sharing accounts, and thus neither prohibits nor allows users to share accounts.

37.     No Apple deposition witness offered any specific details, based on personal knowledge, about the FS ibook software or system.  (See Chattoraj Decl. Ex. 62, Gedikian Dep. 204:14-23; see also Chattoraj Decl. Ex. 61, La Perle Dep. 246:5-8; see also Chattoraj Decl. Ex. 62, Widup Dep. 72-73; see also Chattoraj Decl. Ex. 64, Taylor Dep. 60: 16-22; see also Chattoraj Decl. Ex. 65, Kvamme Dep. 61-62:8; see also Chattoraj Decl. Ex. 66, Borden Dep. 140:15-141:2; see also Chattoraj Decl. Ex. 67, Gundersen Dep. 144:5-145:15.)

**RESPONSE:**  Disputed but immaterial.  Apple does not believe that Apple witnesses' knowledge about the Family Systems ibook software or system is material to the issues addressed in the parties' respective motions.  The phrase "specific details" is subjective, vague and ambiguous.  Plaintiffs appear to have ignored extensive testimony by Apple's witnesses on this point.  In fact, Apple's witnesses offered testimony about the Family Systems ibook software based on personal knowledge.  First, Mr. La Perle personally viewed Family Systems' website and trademark registrations (*see* Cendali Dec., La Perle Dep., at 95:6-9) and he testified that as part of the clearance process, Apple did additional investigation into Family Systems' business (*see* Cendali Dec., La Perle Dep., at 100:13-24).  Based on his review of the website and trademark registrations and his knowledge of the 1999 Consent Agreement, Mr. La Perle testified that "Family Systems was in the E-book reader software business" and that Family Systems made "[s]oftware that supports and creates user-modifiable electronic books" available for download from its website.  (*See* Cendali Dec., La Perle Dep., at 94:22-98:2.)  Mr. La Perle also testified that he believed the ebooks created using Family Systems' software were "hosted on the Web sites," that a person visiting a book owned by or made available by Family Systems could "make changes to such ibooks," and that "user modifiability was part of the interactiveness."  (Cendali Dec., La

Perle Dep., at 244:16-246:5.)  Second, Glenn Gundersen, one of Apple's outside trademark

counsel, also visited the Family Systems website in January 2010.  (*See* Cendali Dec., Gundersen

Dep., at 140:6-12.)  He testified that Family Systems was "offering [a] software application."

(Chattoraj Dec. Ex. 67 (Gundersen Dep., at 144:15-23).)  Finally, Hal Borden, another of Apple's

outside trademark counsel, testified that he "saw one or more pages from Family Systems' Web

site" and that he "would have some knowledge of [Family Systems'] products based on seeing that

Web site."  (Chattoraj Dec., Ex. 66 (Borden Dep., at 140:18-24).)


## APPLE'S COUNTER-STATEMENT OF MATERIAL FACTS

1.      In the mid-1990s, Family Systems began developing its e-reader software.  (*See*

Cendali Dec., Goldhor Dep., at 13:3-15; 19:12-20:1.)

2.      Dr. Richard Goldhor testified that "everything" Family Systems "did with the

mark" while he worked for the company fell "comfortably under [the] description" of "computer

software used to support and create interactive, user-modifiable, electronic books."  (Cendali Dec.,

Goldhor Dep., at 72:14-73:18.)

3.      Dr. Goldhor testified that the Family Systems ibook technology, including the

ibook software, could be used to support and create user-modifiable electronic books.  (*See*

Cendali Dec., Goldhor Dep., at 80:19-24.)

4.      In the "Frequently Asked Questions" portion of its website, Family Systems

explained that as of February 2006, it had "implemented only about half the functionality in the

actual patent description. . . ."  (Cendali Dec., Ex. 1.)

5.      One of the ibook software patents explained that "demons"—*i.e.,* software apps—would "perform functions such as revenue collection, revenue distribution, and advertising." (Chattoraj Dec., Ex. 4, at 2.)

6.      Dr. Goldhor testified that users did not pay for the ibook software.  (*See* Cendali Dec., Goldhor Dep., at 36:25-37:9.)

7.      In a March 12, 2002 press release, Family Systems stated that its ibook software "provides interactive Web books for anyone with access to a Web browser, a text editor, and the Internet."  (Chattoraj Dec., Ex. 6.)

8.      In May 2006, Family Systems described its ibook software as providing users with the ability to "[c]reate and manage interactive books on private and public webs."  (Cendali Dec., Ex. 2.)

9.      A "Memo To All Users" available on the Family Systems website as of May 2006 explained that "[t]he content in an ibook system typically consists of information on web pages but can also include any electronic document, photograph, or file."  (Cendali Dec., Ex. 3.)

10.     Dr. Goldhor testified that "[t]he hardware technology" for the Family Systems ibook product "was never implemented."  (Cendali Dec., Goldhor Dep., at 62:10-63:18.)

11.     Steve Gedikian, the iBooks software product line manager, testified that Apple's iBooks software "could be interpreted" as "an interactive web collaboration system" because it allows users to interact with the contents of a book, by swiping through pages; changing the background, font and point size; and adding "commentary in the form of notes and highlights." (Cendali Dec., Gedikian Dep., at 219:12-23.)

32

12.     Since the iBooks software was first released, Apple has updated its features and functionality, including by (1) allowing users to share "annotations, notes, comments, [and] passages" that they have added to their electronic books via e-mail and other mechanisms; (2) allowing books to be read aloud from a device; and (3) using iBooks Author to create a work, including formatting its content, and "put it on a Web site if they wish and make it available to anybody."  (Cendali Dec., Gedikian Dep., at 68:9-69:10; 77:22-78:9; 196:19-197:12; 219:12-229:2.)

13.     Thomas La Perle, one of Apple's in-house trademark counsel, testified: "What Family Systems' ibooks was was E-book reading and creation software, and that's exactly what Apple's iBook[s] is."  (Cendali Dec., La Perle Dep., at 147:15-148:2.)

14.     Lisa Widup, another of Apple's in-house trademark counsel, testified that Apple's iBooks software "allows users to take an ePub file or whatever sort of electronic book file, and then create an electronic book that then you can then read on your iPad or on your iPhone through the iBooks software. (Cendali Dec., Widup Dep., at 209:23-211:5.)

15.     Family Systems has complied with its obligations under the Assignment Agreement.  (*See* Cendali Dec., La Perle Dep., at 262:23-263:1.)

16.     Apple's target market for its iBooks software is the population as a whole.  (*See* Cendali Dec., Ex. 7,  at 4–5; Gedikian Dep., at 73:9–13.)

Date: January 25, 2013                        Respectfully submitted,

                                              *s/ Dale M. Cendali*
                                              _____

                                              Dale M. Cendali
                                              Claudia Ray
                                              Bonnie L. Jarrett
                                              KIRKLAND & ELLIS LLP
                                              601 Lexington Avenue
                                              New York, New York 10022
                                              Tel: 212-446-4800
                                              Fax: 212-446-4900

Perry J. Viscounty                            Jennifer L. Barry
LATHAM & WATKINS LLP                          LATHAM & WATKINS LLP
140 Scott Drive                               600 West Broadway, Suite 1800
Menlo Park, CA 94025                          San Diego, CA 92101-3375
Tel: 714-540-1235                             Tel: 619-236-1234
Fax: 714-755-8290                             Fax: 619-696-7419

                                              ATTORNEYS FOR DEFENDANT