Dale M. Cendali
Claudia Ray
Bonnie L. Jarrett
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

Perry J. Viscounty
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025

Jennifer L. Barry
LATHAM & WATKINS LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

*Attorneys for Defendant*
APPLE INC.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| J.T. COLBY & COMPANY, INC. d/b/a BRICK TOWER PRESS, J. BOYLSTON & COMPANY, PUBLISHERS LLC and IPICTUREBOOKS LLC, | |
| Plaintiffs, | Case No. 11-CIV-4060 (DLC) |
| - against - | ECF Case |
| APPLE INC., | **REDACTED** |
| Defendant. | |

**MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY,**
**INCLUDING AFFIDAVITS, DECLARATIONS, AND REPORTS, OF**
**(1) DEFENDANT'S EXPERT WITNESS E. DEBORAH JAY AND**
**(2) DEFENDANT'S REBUTTAL EXPERT STEPHEN M. NOWLIS**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................1

LEGAL ARGUMENT.................................................................................................5

I.   THE JAY AND NOWLIS SURVEYS FOLLOWED STANDARD SURVEY
     METHODOLOGY AND SHOULD NOT BE EXCLUDED. .................................5
     A.   The Jay Survey Is Admissible.......................................................................5
          1.   The Jay Survey Used The Proper Universe. ........................................5
          2.   The Jay Survey Used Standard, Widely-Accepted Questions. ...................8
               a.   Dr. Jay Asked An Appropriate Affiliation Question. ....................9
               b.   Dr. Jay Asked An Appropriate Sponsorship Question. .................11
          3.   The Jay Survey Used a Proper Stimulus...............................................12
          4.   The Jay Survey Appropriately Measured Point-Of-Sale Confusion
               Because Post-Sale Confusion Is Not At Issue In This Case. ....................14
     B.   The Nowlis Survey Is Not Flawed And Should Not Be Excluded. ......................17

II.   DR. NOWLIS IS QUALIFIED AS A SURVEY EXPERT. .......................................18

III.   THE NOWLIS SURVEY WAS PROPER REBUTTAL AND WAS
       DISCLOSED TIMELY. .............................................................................................22
       A.   The Scope Of The Nowlis Survey Was Proper Because It Addressed The
            Same Subject Matter As Dr. McDonald's Expert Report....................................22
       B.   Dr. Nowlis' Survey Was Timely Disclosed...........................................................24

CONCLUSION ........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Anheuser-Busch, Inc. v. VIP Prods., LLC*,
   666 F. Supp. 2d 974 (E.D. Mo. 2008) ....................................................................... 5

*Belk, Inc. v. Meyer Corp., U.S.*,
   *U.S.,* 679 F.3d 146 (4th Cir. 2012), *as amended* (May 9, 2012) ...................................... 20, 22

*Bobak Sausage Co. v. A & J Seven Bridges, Inc.*,
   No. 07 Civ. 4718, 2010 WL 1687883 (N.D. Ill. Apr. 26, 2010) ...................................... 20, 22

*Boulet v. National Presto Industries, Inc.*,
   No. 11 Civ. 840, Dkt. No. 54 (W.D. Wis. Dec. 21, 2012) ................................................. 20, 21

*Clinique Labs., Inc. v. Dep Corp.*,
   945 F. Supp. 547 (S.D.N.Y. 1996) .............................................................................. 16

*Conopco, Inc. v. Cosmair, Inc.*,
   49 F. Supp. 2d 242 (S.D.N.Y. 1999) ........................................................................... 12

*Deseret Mgmt. Corp. v. U.S.*,
   97 Fed. Cl. 272 (2011) ............................................................................................. 24

*Ebbert v. Nassau County*,
   No. 05 Civ. 5445, 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) ................................... 23

*Edison Bros. Stores, Inc. v. Cosmair, Inc.*,
   651 F. Supp. 1547 (S.D.N.Y. 1987) ............................................................................ 9, 10

*Fancaster, Inc. v. Comcast Corp.*,
   832 F. Supp. 2d 380 (D.N.J. 2011) .............................................................................. 5

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
   688 F. Supp. 2d 1148 (D. Nev. 2010) ......................................................................... 9, 10, 11

*First Years, Inc. v. Munchkin, Inc.*,
   575 F. Supp. 2d 1002 (W.D. Wis 2008) ....................................................................... 23

*Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*,
   No. 1:08 Civ. 2376, 2010 WL 3075318 (N.D. Ga. Aug. 4, 2010) ................................... 8, 9, 10

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*,
   988 F. Supp. 322 (S.D.N.Y. 1997) .............................................................................. 14

*Gap, Inc. v. G.A.P. Adventures Inc.*,
  No. 07 CIV. 9614, 2011 WL 2946384 (S.D.N.Y. June 24, 2011) ........................................... 23

*Gucci America, Inc. v. Guess?*,
  831 F. Supp. 2d 723 (S.D.N.Y. 2011) .................................................... 10, 15, 16, 17

*Icon Enters. Int'l, Inc. v. Am. Prods. Co.*,
  No. 04 Civ. 1240, 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ................................. 8

*In re Zyprexa Prods. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..................................................... 18

*John H. Harland Co. v. Clarke Checks, Inc.*,
  711 F.2d 966 (11th Cir. 1983) ............................................................. 21

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
  No. 04 Civ. 7369, 2006 WL 2128785 (S.D.N.Y. July 28, 2006) ....................... 18, 19

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  No. 04 Civ. 7203, 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ........................ 13, 14, 17, 18

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
  No. 06 Civ. 550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007).................................. 5

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
  150 F.3d 1042 (9th Cir. 1998)................................................................ 9

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  799 F.2d 867 (2d Cir. 1986) ................................................................ 16

*Lon Tai Shing Co., Ltd. v. Koch+Lowy*,
  No. 90 Civ. 4464, 1992 WL 18806 (S.D.N.Y. Jan. 28, 1992) ................................. 23

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................... 11

*Mareno v. Madison Square Garden, L.P.*,
  No. 98 Civ. 2719, 2000 WL 1401156 (S.D.N.Y. Sept. 26, 2000) ........................... 24

*Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*,
  198 F. Supp. 2d 474 (S.D.N.Y. 2002)..................................................... 8, 10, 12, 13

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
  86 F. Supp. 2d 305 (S.D.N.Y. 2000) ..................................................... 6, 7

*Peaceable Planet v. Ty, Inc.*,
  No. 01 Civ. 750, 2002 WL 33004467 (N.D. Ill. Oct. 8, 2002) ................................ 14

*Pharmacia Corp. v. Alcon Labs., Inc.*,
  201 F. Supp. 2d 335 (D.N.J. 2002) ................................................................. 8, 11

*Plumley v. Mockett*,
  836 F. Supp. 2d 1053 (C.D. Cal. 2010) .............................................................. 23

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*,
  No. 04 Civ. 73923, 2006 WL 20523 (E.D. Mich. Jan. 4, 2006) ................................. 7

*Reebok Int'l Ltd. v. Sung Hwa Int'l Corp.*,
  No. 87 Civ. 7015, 1987 WL 27684 (S.D.N.Y. Dec. 10, 1987) ................................. 16

*Roederer v. J. Garcia Carrion, S.A.*,
  732 F. Supp. 2d 836 (D. Minn. 2010) ................................................................. 7

*Schieffelin & Co. v. Jack Co. of Boca, Inc.*,
  No. 89 Civ. 2941, 1992 WL 156560 (S.D.N.Y. June 28, 1992) ............................. 12

*Starbucks U.S. Brands, LLC v. Ruben*,
  78 U.S.P.Q. 2d 1741, 2006 WL 402564 (T.T.A.B. Feb 9, 2006) ........................... 10

*Sterling Drug, Inc. v. Bayer AG*,
  14 F.3d 733 (2d Cir. 1994) ................................................................. 5, 10, 14

*Sullivan v. Ford Motor Co.*,
  No. 97 Civ. 0593, 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) ........................... 18

*TC Sys. Inc. v. Town of Colonie*,
  213 F. Supp. 2d 171 (N.D.N.Y. 2002) ................................................................. 24

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) ................................................................. 23

*Troublé v. Wet Seal, Inc.*,
  179 F. supp. 2d 291 (S.D.N.Y. 2001) ................................................................. 21

*Union Carbide Corp. v. Ever-Ready Inc.*,
  531 F.2d 366 (7th Cir. 1976) ................................................................. 2, 9

**Statutes**

15 U.S.C. § 1125(a)(1)(A) ................................................................. 12

**Rules**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ................................................................. 22

Fed. R. Evid. 402 ................................................................................... 1

Fed. R. Evid. 702 ............................................................................. 1, 21

**Other Authorities**

William G. Barber, *The Universe*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEY .......... 6

Defendant Apple Inc. ("Apple") submits this memorandum of law in opposition to Plaintiffs J.T. Colby & Company, Inc. d/b/a Bricktower Press, J. Boylston & Company, Publishers LLC and ipicturebooks, LLC's (collectively, "Plaintiffs") Motion to Exclude the Testimony, including Affidavits, Declarations, and Reports, of (1) Defendant's Expert Witness E. Deborah Jay and (2) Defendant's Rebuttal Expert Stephen M. Nowlis.[1]

## PRELIMINARY STATEMENT

Having submitted a likelihood of confusion survey that deviates from standard procedure in numerous significant respects, including failing to replicate actual market conditions by using a so-called "conceptual," or imaginary, stimulus, Plaintiffs nevertheless seek to exclude the expert reports and surveys by Apple's experts, Dr. E. Deborah Jay and Dr. Stephen M. Nowlis, calling them "peculiar and improperly offbeat." (Pl. Br., at 1.) Unlike Plaintiffs' survey, however, the surveys of Drs. Jay (the "Jay Survey") and Nowlis (the "Nowlis Survey") followed standard, court-approved methodologies for assessing likelihood of confusion, and thus meet the requirements of reliability and relevancy under Federal Rules of Evidence 402 and 702.

Because there is no true basis to criticize, let alone exclude, the Jay and Nowlis Surveys, it appears the real purpose of Plaintiffs' motion is to sufficiently confuse the subject of survey

---

[1] Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion to Exclude the Testimony, including Affidavits, Declarations, and Reports of (1) Defendant's Expert Witness E. Deborah Jay and (2) Defendant's Rebuttal Expert Stephen M. Nowlis is referred to herein as "Pl. Br." The Declaration of Claudia T. Bogdanos submitted by Plaintiffs in support of the Pl. Br. is referred to as the "Bogdanos Dec." Apple will cite to the following declarations, dated December 21, 2012 and submitted in support of its motions: (1) Declaration of Bonnie L. Jarrett in Support of Defendant Apple Inc.'s Motion for Summary Judgment ("Jarrett Dec."); (2) Declaration of Dr. E. Deborah Jay, Ph.D. in Support of Defendant's Motion for Summary Judgment ("Jay Dec."); (3) Declaration of Dr. Stephen M. Nowlis in Support of Defendant's Motion for Summary Judgment ("Nowlis 12/21 Dec."); and (4) Declaration of Mary Mazzello in Support of Defendant's Motion to Exclude the Expert Report and Testimony of Dr. Susan Schwartz McDonald ("Mazzello 12/21 Dec."). Apple also will cite to the following declarations, dated January 25, 2013, and submitted in support of this opposition: (1) Declaration of Mary Mazzello in Opposition to Plaintiffs' Motion to Exclude the Testimony, Including Affidavits, Declarations, and Reports, of (1) Defendant's Expert Witness E. Deborah Jay and (2) Defendant's Rebuttal Expert Stephen M. Nowlis ("Mazzello 1/25 Dec."), and (2) Declaration of Dr. Stephen M. Nowlis in Opposition to Plaintiffs' Motion to Exclude the Testimony, including Affidavits, Declarations, and Reports of (1) Defendant's Expert Witness E. Deborah Jay and (2) Defendant's Rebuttal Expert Stephen M. Nowlis ("Nowlis 1/25 Dec.").

methodology that the Court will overlook the profound defects in the survey of Plaintiffs' expert, Dr. Susan Schwartz McDonald, and simply let all the surveys into evidence.  But, unlike Dr. McDonald's survey, the approaches used by Drs. Jay and Nowlis are wholly consistent with accepted survey methodology.  Plaintiffs' strained arguments for excluding the Jay and Nowlis Surveys are at odds with accepted survey design, the uncontroverted facts of this case, or both.

*First*, Plaintiffs criticize Dr. Jay's survey universe for targeting potential print book purchasers rather than potential e-book purchasers.  This is misguided for three main reasons.  First, a reverse confusion survey's universe should include likely purchasers of the plaintiff's product.  Because ███ of Plaintiffs' sales have been for print books, print book purchasers are the appropriate universe.  Second, Plaintiffs' claim that Dr. Jay failed to account for the opinions of e-book readers simply is not supported by the evidence.  A Pew Research Center study, on which both sides rely, concludes that 88% of e-books readers also read print books—a huge overlap between e-book and print book readers.  Third, Plaintiffs suggest, without support, that the proper universe is e-book readers because confusion is most likely in the "digital space."  But the law is clear that a survey should include potential purchasers of the junior user's product, not skew results to those with aberrational responses.  Nor is there any basis for assuming that confusion would be more likely in the "digital space."  The Barnes & Noble and Amazon.com webpages for print and electronic books are identical and virtually identical, respectively, and Plaintiffs' e-books contain the same source identifying information, including the "ibooks" logo and Plaintiffs' New York address, as do print forms of those books.

*Second*, Plaintiffs claim Dr. Jay did not properly assess confusion as to affiliation or sponsorship.  Dr. Jay, however, used standard, widely accepted questions, including two questions derived directly from the survey in *Union Carbide Corp. v. Ever-Ready Inc.*, widely

recognized as the gold standard for consumer confusion surveys, and a third question to assess

confusion as to sponsorship.  Her series of questions has been recognized by courts as

appropriate, and properly assesses confusion as to source, sponsorship and affiliation.  Indeed,

Dr. Jay has asked similar questions numerous other times, without ever being criticized by a

court.

      *Third*, Plaintiffs criticize Dr. Jay's use of Amazon.com and Barnes & Noble webpages,

rather than actual books, as stimuli because (1) the survey questions asked respondents about the

book rather than the webpage, (2) the webpages contain information that is not found within

Plaintiffs' books, and (3) the webpages depict Plaintiffs' imprint as "ibooks, Incorporated" and

"Ibooks, Inc." rather than "ibooks" or "iBooks."  But, unlike Dr. McDonald, Dr. Jay showed

respondents *actual webpages* from Amazon.com and Barnesandnoble.com and, therefore,

depicted Plaintiffs' imprint *exactly* as it appears in the real-world marketplace.  Because the

stimuli accurately reflected marketplace conditions, they cannot form a basis for excluding Dr.

Jay's survey.

      *Fourth*, Dr. Jay properly tested point-of-sale, not post-sale, confusion because that is the

type of confusion presented in Plaintiffs' Amended and Supplemental Complaint ("Complaint").

Plaintiffs never even mentioned the issue of post-sale confusion until *after* they received Dr.

Jay's survey, apparently realizing the damage that survey does to their case.

      In addition to Dr. Jay's survey, Apple submitted a rebuttal report by Dr. Nowlis, the

August A. Busch Jr. Distinguished Professor of Marketing in the Olin Business School at

Washington University in St. Louis.  Dr. Nowlis critiqued the survey conducted by Plaintiffs'

expert, Dr. McDonald (the "McDonald Survey") and also submitted his own survey that

corrected many of the McDonald Survey's errors, including the failure to: (1) use a visual

stimulus; (2) ask standard, court-approved questions; (3) use a proper control; and (4) instruct respondents not to guess. As with Dr. Jay's survey, Plaintiffs claim that Dr. Nowlis' survey is improper because it used the wrong universe and did not ask proper affiliation or sponsorship questions. But Dr. Nowlis surveyed Plaintiffs' primary customers—print book purchasers—and asked the same standard, widely accepted questions for evaluating confusion that Dr. Jay did. Moreover, Dr. Nowlis' survey is applicable to post-sale confusion because his stimulus, a hardcover book, looks exactly the same in the post-sale and pre-sale environments.

In a desperate attempt to discredit Dr. Nowlis, Plaintiffs also claim that he was not qualified as an expert, that his survey was not a proper rebuttal and that he did not timely submit his expert report. Each of these arguments also is unavailing.

*First*, Dr. Nowlis is thoroughly qualified as a market research expert, having conducted and analyzed thousands of surveys, including regularly reviewing survey data in his role as Assistant Editor of both the *Journal of Marketing* and *Journal of Marketing Research*. He has a Ph.D. in marketing with a specialization in consumer behavior from University of California at Berkeley and has taken numerous courses in survey design and statistics. Further, Dr. Nowlis has been a professor of marketing for over 18 years and taught a Ph.D. course in Research Methodology. Moreover, he has conducted approximately seven to nine surveys for litigation and has been retained as a rebuttal expert in at least 30 cases, the majority of which involved litigation surveys. The idea that he is not qualified as a survey expert simply is absurd.

*Second*, it is standard for a defendant to rebut a plaintiff's survey evidence with its own properly conducted survey. Dr. Nowlis critiqued Dr. McDonald's nonconventional likelihood of confusion survey and submitted his own methodologically sound survey (testing actual as opposed to imaginary books) showing no likelihood of confusion. This survey is a quintessential

and proper rebuttal and, as such, was submitted timely on October 26, 2012, the date set by the Court for exchanging rebuttal reports.

## LEGAL ARGUMENT

I.   **THE JAY AND NOWLIS SURVEYS FOLLOWED STANDARD SURVEY METHODOLOGY AND SHOULD NOT BE EXCLUDED.**

  A.   **The Jay Survey Is Admissible.**

    1.   **The Jay Survey Used The Proper Universe.**

Plaintiffs claim that Dr. Jay's survey universe is flawed because it "is not representative of the potential customers who are likely to be confused." (Pl. Br., at 7.) They argue that Dr. Jay should have tried "to identify or survey potential customers of Colby's *electronic books*," rather than hard copy books, because "the real-world marketplace intersection [between purchasers of Plaintiffs' books and Defendant's e-book reader software] lies with people who read digital books." (Pl. Br., at 7 (emphasis in original).) This argument fails for three main reasons.

*First*, it is fundamental that the relevant universe in a likelihood of reverse confusion survey is likely purchasers of the senior user's product. *See Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994); *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550, 2007 WL 2258688, at *3 (S.D.N.Y. Aug. 6, 2007) (survey of prospective purchasers of defendant's product was irrelevant in reverse confusion case). Because ▬▬ of Plaintiffs' sales have been for print books,[2] (*see* Mazzello 12/21 Dec., ¶ 8), Dr. Jay's universe is proper. *See Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 403 (D.N.J. 2011) (survey that included only sports fans was proper where "the vast majority" of content on senior user's website was sports-related); *Anheuser-Busch, Inc. v. VIP Prods., LLC*, 666 F. Supp. 2d 974, 984

---

[2] This percentage reflects electronic books sold by Plaintiffs under both the "ibooks" and "ipicturebooks" imprints. (*See* Mazzello 12/21 Dec., ¶ 8)

(E.D. Mo. 2008) (survey that excluded 6% of the relevant population was probative of confusion); *see also Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 322–23 (S.D.N.Y. 2000) (survey that included potential purchasers of jeans was probative where allegedly infringing products included jeans and casual clothing such as t-shirts), *aff'd sub nom. Paco Sport, Ltd. v Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000); William G. Barber, *The Universe*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEY 27, 44 (Shari Seidman Diamond & Jerre B. Swann eds. 2012) ("[W]here the universe is only slightly underinclusive and includes most of the relevant consumers, the court may accord the survey significant weight . . . ").

*Second*, there is no evidence that Dr. Jay's universe failed to measure the opinions of e-book readers. It included potential print book purchasers and did not exclude e-book purchasers. (*See* Mazzello 1/25 Dec., ("Jay Dep."), at 142:20–24; 144:25–145:3.) Print book purchasers undoubtedly include e-book purchasers because, according to a Pew Research Center study on which both sides have relied (*see* Pl. Br., at 8), 88% of those who read an electronic book in the last 12 months also read a print book. (*See* Bogdanos Dec., Ex. D ("PEW Study"), at 3.) Thus, as depicted below, Dr. Jay's universe of print book readers necessarily includes e-books readers given the huge overlap between e-book readers and print book readers.



In fact, according to the PEW Study, the universe of print book purchasers would include all but the very small percentage of all readers—approximately 3.48%— who exclusively read

electronic books.[3]  Given the extensive overlap between e-book and print book readers, the universe of print book readers is not "overly narrow" as Plaintiffs claim (Pl. Br., at 9), but rather the universe of those who exclusively read e-books is *de minimis*.

*Third*, Plaintiffs suggest that the relevant universe is the narrow subset of Plaintiffs' prospective customers who are likely to be confused, but cite no case law supporting this proposition.  (*See* Pl. Br., at 7.)  In actuality, the law is clear that a survey should not skew results to those most likely to be confused.  *See Paco Sport*, 86 F. Supp. 2d at 322 n.17 (survey was not probative where, *inter alia*, it narrowed the universe to those familiar with the senior user because limiting the universe in this way could increase the reported rate of confusion); *see also Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 874 (D. Minn. 2010) (criticizing survey that excluded respondents who were unaware of senior user's mark because such narrowing of the universe inflated confusion); *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04 Civ. 73923, 2006 WL 20523, at *6 (E.D. Mich. Jan. 4, 2006) (criticizing survey conducted near plaintiff's gym as respondents were more likely to be confused than general population).

In any event, Plaintiffs have cited no evidentiary support for their assertion that confusion would be likely among digital book readers.  The Barnesandnoble.com point of purchase webpages for electronic books are identical to those for print books (*see* Jay 12/21 Dec., Ex. 1 ("Jay Rep."), App. B) and the Amazon.com webpages are virtually identical (*compare* Mazzello 1/25 Dec., Ex. 2 *with id.*, Ex. 3).  Moreover, Plaintiffs' electronic books contain the same types

---

[3] According to the PEW Study data from February 2012, 29% of adult book readers had read an e-book in the past 12 months.  (*See* PEW Study, at 8.)  According to December 2011 data, 88% of those age 16 and older who read electronic books also read print books.  (*Id.*, at 3.)  Based on these numbers, which Apple notes were collected two months apart from slightly different age groups, 25.52% of all book readers (*i.e.*, 88% of 29%) read both electronic and print books, and only 3.48% of all book readers (*i.e.*, 12% of 29%) read only electronic books.

of source identifying information as Plaintiffs' print books, such as: (1) the "ibooks" logo; (2)

Plaintiffs' New York address; (3) Plaintiffs' email address; and (4) Plaintiffs' website address.

(*See* Jarrett Dec., ¶¶ 136–38; *compare id.*, Ex. 67 App. E, G, H *with id.*, Ex. 67 App. D, F.)

## 2.    The Jay Survey Used Standard, Widely-Accepted Questions.

Plaintiffs argue that Dr. Jay's survey questions are flawed because she supposedly (1)

failed to test for confusion as to affiliation and (2) improperly asked about sponsorship by asking

respondents if permission was obtained to put out "the book," as opposed to asking about

obtaining permission to use "the mark."  (Pl. Br., at 6–13.)  None of the cases Plaintiffs cite even

criticized an expert for asking the questions posed by Dr. Jay, let alone actually excluded a

survey, nor do those cases indicate that there is only one proper question for testing confusion as

to affiliation or sponsorship.  In fact, the questions used by Dr. Jay are widely accepted for

assessing confusion in the litigation context.[4]  *See, e.g.*, *Flowers Bakeries Brands, Inc. v.*

*Interstate Bakeries Corp.*, No. 1:08 Civ. 2376, 2010 WL 3075318, at *7 (N.D. Ga. Aug. 4, 2010)

(survey asking only two questions, both similar to Dr. Jay's first two questions, was probative of

"more than just source confusion"); *Icon Enters. Int'l, Inc. v. Am. Prods. Co*., No. 04 Civ. 1240,

2004 WL 5644805, at *18 (C.D. Cal. Oct. 7, 2004) (admitting survey that asked questions

similar to the first two posed by Dr. Jay); *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d

335, 366 (D.N.J. 2002) (describing questions similar to Dr. Jay's as "a standard type and format

of questions used to gauge confusion in trademark cases"); *Nat'l Distillers Prods. Co. v.*

*Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 483 (S.D.N.Y. 2002) (survey that used the same

---

[4] Dr. Jay asked respondents three main questions, each of which was followed by a series of follow up questions:
(1) "What company or companies do you think printed, released or put out this book?", (2) "[W]ith respect to the
company or companies that printed, released or put out this book…Do you think…that they [have/have not] made or
put out other things, besides books . . . ?", and (3) "[W]ith respect to the company or companies that printed,
released or put out this book…Do you think…that they [did/did not] receive permission or approval from some
other company to print, release or put out this book . . . ?"  (Jay Rep., at 18–19.)

series of questions as Dr. Jay supported finding of no confusion); *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987) (survey asking questions similar to Dr. Jay's first two questions supported conclusion of no likelihood of confusion).

Indeed, Dr. Jay herself has used the same, or a very similar, series of questions in confusion surveys throughout her career, and her surveys never have been criticized by a court, let alone excluded, for asking them. *See, e.g., Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1052 (9th Cir. 1998) (upholding jury verdict for defendant where defendant relied on a survey by Dr. Jay using questions similar to those used here); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 688 F. Supp. 2d 1148, 1155, 1168 (D. Nev. 2010) (relying on survey by Dr. Jay which asked the same three types of questions as used here).

### a.   Dr. Jay Asked An Appropriate Affiliation Question.

Contrary to Plaintiffs' assertions, Dr. Jay's second question—"[W]ith respect to the company or companies that printed, released or put out this book…Do you think…that they [have/have not] made or put out other things, besides books . . . ?"—in fact tested for confusion as to affiliation.[5]  (Jay Rep., at 18–19; *see also* Jay Dep., at 66:4–67:12); *cf. Flowers*, 2010 WL 3075318, at *7 (survey asking whether company that made bread at issue "made any other brands" tested "more than just source confusion").

The question is derived from the seminal case *Union Carbide Corp. v. Ever-Ready Inc.*, where the expert asked three questions:  (1) "Who do you think puts out the [product] shown here?" (2) "What makes you think so?" and (3) "Please name any other products put out by the same concern which puts out the [product] shown here."  531 F.2d 366, 385, n.11 (7th Cir.

---

[5] By arguing that this is not a proper test for affiliation, Plaintiffs tacitly admit that Dr. Jay's survey is relevant to source confusion and thus admissible.  *See Flowers*, 2010 WL 3075318, at *7 (even if expert should have asked explicitly about affiliation or sponsorship, survey was still admissible because it was relevant and reliable as to source confusion).

1976).  Courts have routinely accepted these questions, and derivatives thereof, for evaluating confusion.  *See, e.g.*, *Flowers*, 2010 WL 3075318, at *7; *Fifty-Six,* 688 F. Supp. 2d at 1155; *Nat'l Distillers*, 198 F. Supp. 2d at 483; *Edison Bros. Store*, 651 F. Supp. at 1560.

In fact, in *Sterling Drug Inc. v. Bayer AG*, one of the few cases Plaintiffs cite in support of their attack on Dr. Jay's question, the court actually *accepted* a survey that, much like Dr. Jay's survey, asked respondents "what products were made by the companies shown" in the stimulus.  792 F. Supp. 1357, 1372–73 (S.D.N.Y. 1992), *aff'd in part, remanded in part sub nom. Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994).  Notably, the Court of Appeals in that case held for the plaintiff, who alleged confusion as to affiliation and origin, sponsorship, or other association, based in part on the strength of the survey.  14 F.3d at 740, 743.

The other cases Plaintiffs cite are equally unpersuasive.  In *Starbucks U.S. Brands, LLC v. Ruben*, the court accepted a survey that tested affiliation, sponsorship, permission and approval confusion by asking "[d]o you think the company that owns this retail establishment is connected or affiliated with any other company?" and "[d]o you think the company that owns this retail establishment has authorization, permission or approval from another company to use this name?" 78 U.S.P.Q. 2d 1741, 2006 WL 402564, at *10 n.32 (T.T.A.B. Feb 9, 2006).  It did not, however, say these were the only proper questions for testing affiliation, nor did it consider the affiliation question used by Dr. Jay.  *Gucci America, Inc. v. Guess?, Inc.* is even less useful as the issue there was whether a point-of-sale confusion survey was admissible when plaintiffs clearly had alleged that they were *only* claiming post-sale confusion, *not* whether a survey used proper questions for testing affiliation confusion.  *See* 831 F. Supp. 2d 723, 746 (S.D.N.Y. 2011).

It also is important to note that a question very similar to the one Plaintiffs' expert Dr. Jacob Jacoby recommended was criticized as confusing in and of itself.  He opined that the

"typical" affiliation question is "Do you think the company that printed, released or put out this book [does/does not] have a business connection, association, or affiliation with another company; or do you have no opinion?"  (Mazzello 1/25 Dec., Ex. 1 ("Jacoby Rebuttal Report"), ¶ 17.)  In *Malletier v. Dooney & Bourke, Inc.*, Dr. Jacoby conducted his own survey, asking "do you think the company that put out this bag is not part of and has no business relationship with the company whose bags were shown in the ad, or do you think the company that put out this bag is part of, or does have some business relationship with the company whose bags were shown in the ad?"  525 F. Supp. 2d 558, 604 (S.D.N.Y. 2007).  Judge Scheindlin excluded the survey because, *inter alia*, the phrase "some business relationship" is "highly ambiguous" and the survey failed to ask follow-up question to evaluate respondent's understanding of the term "business relationship."  *Id.  Malletier* suggests that Plaintiffs' preferred question would be no more appropriate in this case and that, at the very least, it was not improper to omit it.

### b.      Dr. Jay Asked An Appropriate Sponsorship Question.

In addition to asking the two standard *Eveready*-derived questions, Dr. Jay went a step further and asked an additional question designed to assess confusion as to sponsorship: "[W]ith respect to the company or companies that printed, released or put out this book…Do you think…that they [did/did not] receive permission or approval from some other company to print, release or put out this book . . . ?"  (Jay Rep., at 19.)  Plaintiffs claim that this was improper because it could have been interpreted by respondents as inquiring about permissions related to the content of the written work itself.  (*See* Pl. Br., at 12.)

This argument has no merit as courts routinely have upheld surveys asking about permission to put out the product rather than permission to use the name, and Plaintiffs cite no case law to the contrary.  *See, e.g.*,  *Fifty-Six*, 688 F. Supp. 2d at 1155 (survey asked whether the t-shirt maker received permission "to put out the t-shirt"); *Pharmacia*, 201 F. Supp. 2d at 366

(asking whether the company "needs authorization, permission or approval from some other company in order to put out the product advertised" was a "standard type and format of question"); *Nat'l Distillers*, 198 F. Supp. 2d at 483 (survey asking whether company received permission "to put out this product" was probative); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, No. 89 Civ. 2941, 1992 WL 156560, at *10 (S.D.N.Y. June 28, 1992) (survey asking whether a company had to get "permission—from anyone to market this product . . . may be probative of confusion"). Indeed, the Lanham Act itself focuses on whether or not an individual's use of a mark "is likely to cause confusion . . . as to . . . the origin, sponsorship, or approval of *his or her goods*, services, or commercial activities by another person."[6] 15 U.S.C. § 1125(a)(1)(A) (emphasis added). Thus, a question asking whether permission was received to put out the product, with follow-up questions asking from whom permission was received and why respondents believe this, measures the relevant issue, namely, whether consumers believe the goods are sponsored or approved by another person because of the use of the trademark. *Id.*

### 3.    The Jay Survey Used a Proper Stimulus

To be probative of confusion, "a survey must use the proper stimulus, one that tests for confusion by replicating marketplace conditions." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999). Plaintiffs argue that Dr. Jay's point-of-purchase webpage stimuli were improper and that she should have shown actual books (or had respondents imagine actual books) because the questions asked respondents about the book, not the webpage. (*See* Pl. Br., at 13–14.) Plaintiffs also complain that the webpages contained information not found within the books themselves and depicted their imprint as "ibooks, Incorporated" and "Ibooks, Inc., rather

---

[6] Moreover, even if some respondents may have interpreted the permission question as asking about whether or not permission was obtained from the content owner, the vast majority of respondents did not name the content owner in response, suggesting that most respondents were not confused by the question. (*See* Jay Rep., at 28–29.)

than "ibooks" or "iBooks" as it appears within Plaintiffs' books.  (*See* Pl. Br., at 14–15.)

As a preliminary matter, Plaintiffs argue, incredibly, that a "conceptual" or "envision[ed]" (*i.e.*, imaginary) book would be a better stimulus than the actual webpages that consumers see when purchasing Plaintiffs' books.  (Pl. Br., at 13–14.)  This argument presumably is necessitated by Plaintiffs' reliance on Dr. McDonald's wildly irregular survey. But using stimuli that actually exist in the marketplace and not only in the imaginations of respondents unquestionably replicates marketplace conditions.  *See Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203, 2006 WL 1012939, at *25–7 (S.D.N.Y. Apr. 19, 2006) (survey that replicated marketplace was probative but survey that failed to replicate the marketplace was not); *Nat'l Distillers*, 198 F. Supp. 2d at 483 (same).  Here, Dr. Jay's stimuli were the *actual pages* that consumers would see when purchasing *Murder Through the Ages* from the Amazon.com website or *The Stars My Destination* from the Barnesandnoble.com website.  (*See* Jay Rep., at 2 and App. B; Jay Dep., at 132:12–21.)  Respondents viewed these pages on a computer screen and could scroll through them as they would when purchasing a book in the actual marketplace.  (*See* Jay Rep., at 17–18.)  Dr. Jay selected these stimuli specifically because Plaintiffs allege that their books are sold through the Amazon.com and Barnes & Noble websites.  (*See* Jay Dep., at 130:6–14; Am. Compl., ¶ 14.)  Dr. Jay did not alter the webpages, showing respondents exactly what they would see in the real-world when purchasing Plaintiffs' books from these websites.  (*See* Jay Dep., at 130:6–132:21.)

Thus, the fact that Plaintiffs' purported mark appears on these webpages surrounded by additional information not found within the book is not a flaw in the Jay Survey, but rather evidence that she displayed Plaintiffs' imprint exactly as it appears in commerce, surrounded by

the contextual information that consumers would see when purchasing a book.[7]  Similarly, that

the "ibooks" imprint appears as "ibooks, Incorporated" or "Ibooks, Inc." on these webpages,

rather than "ibooks" or "iBooks," is not a flaw in the stimuli, but rather one of many examples of

Plaintiffs' failure to ensure that their purported mark is used in a consistent manner.  In addition,

Dr. Jay did not need to show respondents a physical book as she was testing the point-of-sale

experience and her survey instructions made it abundantly clear that the questions related to "the

book described on the page" from Amazon.com or Barnesandnoble.com.  (Jay Rep., at App. B,

Question J (emphasis added).)  Therefore, as Dr. Jay's survey accurately replicated the Internet

marketplace where consumers purchase Plaintiffs' books, her stimulus was proper and her

survey is admissible.  *See Juicy*, 2006 WL 1012939, at *27 (survey that used as a stimulus

defendant's actual products in their branded boxes was probative); *Sterling Drug*, 792 F. Supp. at

1372–73 (survey that showed respondents pictures of defendant's sign was probative).

### 4.    The Jay Survey Appropriately Measured Point-Of-Sale Confusion Because Post-Sale Confusion Is Not At Issue In This Case.

Plaintiffs' argument that the Jay Survey should be excluded because it did not test post-

sale confusion (*See* Pl. Br., at 16) is just an *ex post* attempt to confuse the issues in the case.

After Apple disclosed Dr. Jay's survey, Plaintiffs tried, through their rebuttal expert Dr.

---

[7] Plaintiffs also argue that because of the additional information, the mark was buried in the webpages and that Dr. Jay "did not even attempt to focus respondents on the imprint name, which roughly 75% of respondent may never have noticed." (Pl. Br., at 14 n. 15.)  This argument does not support exclusion of Dr. Jay's survey.  *First*, there is no factual support for Plaintiffs' assertion that "75% of respondents" may not have noticed the name of the publisher as Dr. Jay did not ask people whether they noticed the imprint. (Pl. Br., at 14 n. 15.)  *Second*, Dr. Jay did not point out the mark to respondents because this would not replicate the real world purchasing environment but, instead, "would be leading, would be inappropriate, [and] would be a reading test." (Jay Dep., at 153:13 –155:9.)  "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion." *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) (criticizing survey as mere reading test).  *Third*, Plaintiffs claim that in her survey in *Peaceable Planet v. Ty, Inc.*, No. 01 Civ. 750, 2002 WL 33004467 (N.D. Ill. Oct. 8, 2002), Dr. Jay "directed respondents to particular and relevant product information" (Pl. Br., at 14 n. 15), but she did so only *after* asking the three source, sponsorship and affiliation questions, and did so in order to answer a question not included in the survey at issue here. (*See* Jay Dep., at 164:10–166:10.)  Moreover, Dr. Jay has never directed respondents' attention to the mark when asking the three questions used in this survey for assessing confusion.  (*See id.*)

Jacob Jacoby, to attack Dr. Jay's survey by re-framing the issue in this case as one of post-sale confusion.  (*See* Jacoby Rebuttal Report, ¶ 10.)  Prior to Dr. Jacoby's rebuttal report, however, Plaintiffs never had raised the issue of post-sale confusion.  Their Complaint never mentions post-sale confusion, alleging only that there is a likelihood of reverse confusion (*see* Am. Compl., ¶ 87), and they never raised the issue in their discovery motions or hearings before the Court.  Further, Plaintiffs' 30(b)(6) witness on "[a]ctual or potential confusion on the part of consumers" (Mazzello 1/25 Dec., Ex. 4, ¶ 97), John T. Colby, testified that he has been damaged because he is "getting confusion in the marketplace from [his] agents, [his] authors, [his] iBooks authors, [his] distributors, not understanding a relationship between [him] as the owner of the iBooks mark and Apple's exploitation of iBooks on an iPad platform."  (*Id.*, (Colby 30(b)(6) Dep., at 196:18–23).)  Mr. Colby never claimed any confusion on the part of third parties, or those who have already purchased an "ibooks" book, in the post-sale environment.  This belated argument is an attempt to manufacture a basis for excluding Dr. Jay's survey, which should not be entertained.  *Cf. Gucci Am.*, 831 F. Supp. 2d at 746 (excluding point-of-sale survey where plaintiff "clearly stated" that it was only pursuing a post-sale confusion claim).

Even if Plaintiffs had made this argument sooner, however, it would still be unavailing. Drs. Jacoby and McDonald claimed that post-sale confusion is likely in this case because, after purchasing a book, consumers may return to the book to learn the name of the publisher.  (*See* Mazzello 1/25 Dec., (Jacoby Dep., at 189:14–190:10.); (McDonald Dep., at 137:7–140:16.).) But neither Plaintiffs nor their experts cite any factual basis for the idea that consumers would more closely review the name of the publisher post-sale than they would pre-sale.  One could just as logically argue that consumers would pay more attention at the point-of-purchase when they are analytically making a judgment about the book.  Plaintiffs' criticism, which is based on

15

mere speculation, is not valid for this reason alone.

Plaintiffs' argument also fails because it appears to be based on a misunderstanding as to what post-sale confusion is.  Such confusion occurs when people see goods purchased by others who are wearing or utilizing them and become confused because they do not have the benefit of hang tags, distinctive packaging, or other source-identifying features that would be present in the point-of-sale environment.  *See, e.g.*, *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986) (affirming finding of post-sale confusion where post-sale observers of junior user's jeans would not see the source identifying labels that were removed post-sale); *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 558 (S.D.N.Y. 1996) (granting preliminary injunction based on post-sale confusion because potentially confusion-reducing disclaimers and comparative advertisements would not be seen post-sale); *Reebok Int'l Ltd. v. Sung Hwa Int'l Corp.*, No. 87 Civ. 7015, 1987 WL 27684, at *2 (S.D.N.Y. Dec. 10, 1987) (granting preliminary injunction even though product packaging was distinct because such packaging would not be seen post-sale).  Apple is not aware of any case in which the doctrine of post-sale confusion has been applied to confusion by the very same person who purchased the product.  It is a particularly nonsensical argument here as books look the same before and after purchase, because they do no have any tags or packaging that is removed after sale.

In fact, even in *Gucci America, Inc. v. Guess?, Inc.*, the only case Plaintiffs cite that excluded a survey for failing to test post-sale confusion, the court was concerned that the point-of-sale survey did not show whether the "casual observer in a post-sale environment [would] ever notice [the] ornamentation" identifying GUESS as the source of the handbag, *not* whether or not people who had *already* purchased the Guess handbag would be confused upon further examination of the bag.  831 F. Supp. 2d at 746.  Moreover, *Gucci* is irrelevant here because, in

contrast to Plaintiffs, Guess made it "crystal clear that it was proceeding solely on a theory of post-sale confusion." *Id.* at 739.  Because Plaintiffs' belated assertion of post-sale confusion is not supported by the case law or the pleadings, there is no basis to exclude Dr. Jay's survey.

### B.    The Nowlis Survey Is Not Flawed And Should Not Be Excluded.

Plaintiffs assert that Dr. Nowlis' survey is likewise flawed because he supposedly used "(1) an overly narrow universe, (2) improper affiliation questions, and (3) an inapt measure of permission."  (Pl. Br., at 16.)  As Dr. Nowlis used the same questions as Dr. Jay (*see* Nowlis 12/21 Dec., Ex. 1 ("Nowlis Rep.") App. C, at Q1a-3(e)) and a similar universe, namely, people who would purchase print books of the genres sold by Plaintiffs from brick and mortar locations (*see* Nowlis Rep., ¶ 86), there is no basis for excluding him because, as discussed above, both the universe[8] and questions[9] were proper.  *See supra* Section I(A)(1)–(2).

As for Plaintiffs' claim that Dr. Nowlis' survey ignored the post-sale experience, he testified that, although his survey asked respondents to look at the stimulus, a hardcover book, "'the way you normally do when you are deciding whether to buy a book,'" it nonetheless:

> is applicable to a post-sale confusion situation [because] the type of information that people would have when they saw the book post-sale, would be the exact same kind of information that they would see presale.  For instance, there is no packaging, they don't see the book being used differently post-sale, so the information that they would see in both contexts would be the same.

(Nowlis Dep., at 26:8–29:5; *see also id.* at 201:20–202:25; 317:16–320:19; 322:12–323:6).

Dr. Nowlis sought to distinguish this case from *Juicy Couture, Inc. v. L'Oreal USA, Inc.*,

---

[8] Like Dr. Jay, Dr. Nowlis' universe included potential purchasers of print books and did not exclude potential purchasers of electronic books.  (*See* Mazzello 1/25 Dec., ("Nowlis Dep."), at 208:15–211:6.)

[9] Dr. Nowlis testified that his questions properly tested for affiliation confusion by asking whether the company that puts out the book puts out other products because this question tested whether "the same company that has the, in this case, the iBooks mark [or] imprint . . . is affiliated with Apple" (Nowlis Dep., at 229:16–230:20; *see also id.*, at 257:12–258:12), and for sponsorship confusion by asking if permission was obtained to put out the book because this question would necessarily include permission to use the name iBooks (*see* Nowlis Dep., at 32:18–35:21).

where this Court noted that respondents were asked to consider the survey a point-of-sale survey because they were told the item was something they might see "if [they] were shopping."  2006 WL 1012939, at *26.  Unlike the Nowlis Survey, respondents in *Juicy Couture* were not shown any source-identifying features that would be present post-sale.  *See id.*  Because Dr. Nowlis used an actual book, with all of the source-identifying features available both at the point of sale and post-sale, his survey is relevant to post-sale confusion.  (*See* Nowlis Dep., at 26:8–29:5.)

## II.    <u>DR. NOWLIS IS QUALIFIED AS A SURVEY EXPERT.</u>

Plaintiffs contend that Dr. Nowlis is not qualified to conduct or critique confusion surveys.  (*See* Pl. Br., at 19.)  But this grossly mischaracterizes Dr. Nowlis' qualifications and deposition testimony, as well as the Second Circuit's requirements for qualifying experts.

An expert must possess specialized knowledge, skill, experience, training or education that may be helpful to a jury.  *See Sullivan v. Ford Motor Co.*, No. 97 Civ. 0593, 2000 WL 343777, *4–5 (S.D.N.Y. Mar. 31, 2000) (expert qualified where, *inter alia*, he had investigated 15,000 accidents, even though only three or four of them involved passenger-side airbags).  The Second Circuit's "test for exclusion is a strict one [and] [a] witness' qualifications to render an expert opinion are liberally judged."  *Id.* at 3–4 (citation omitted).  "[T]he only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."  *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (citation omitted).  Furthermore, "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (admitting experts based on their education and/or experience).  "An expert

should not be required to satisfy an overly narrow test of his own qualifications." *Johnson*, 2006 WL 2128785, at *5 (citation omitted).

Here, Dr. Nowlis received his M.B.A. in 1990 and a Ph.D. in marketing with a specialty in consumer behavior in 1994 from the Haas School of Business at the University of California at Berkeley.  (*See* Nowlis Rep. App. A, at 1; Nowlis Dep., at 261:12–262:9.)  Since receiving his Ph.D., Dr. Nowlis has worked as a professor of marketing, currently serving as the August A. Busch, Jr. Distinguished Professor of Marketing at Olin Business School at Washington University in St. Louis, where he teaches brand management, marketing management, and consumer behavior.  (*See* Nowlis Rep., App A, at 1.)

Dr. Nowlis has considerable experience in survey methodology.  As part of his Ph.D. program, Dr. Nowlis took numerous advanced courses in statistical analysis and survey design. (*See* Nowlis 1/25 Dec., ¶ 3.)  At Washington State University, he taught a Ph.D. level course in Research Methodology.  (*See Id.*, ¶ 4.)  Dr. Nowlis currently is an Associate Editor for *Journal of Marketing* and the *Journal of Marketing Research* and is on the editorial review board for *Journal of Marketing, Journal of Consumer Psychology, Marketing Letters*, and *Journal of Consumer Research*.  (*See* Nowlis Rep. Appendix A, at 1.)  As Associate Editor, he routinely reviews survey research done by others to determine whether the surveys were properly conducted.  (*See* Nowlis 1/25 Dec., ¶ 5.)  Indeed, he reviews surveys "on a nearly daily basis" and has conducted and analyzed thousands of litigation and non-litigation surveys.  (*Id.*, ¶ 2.)

Dr. Nowlis has been retained as an expert in at least 50 cases, many of which involved survey design.  (*See Id.*, ¶ 6.)  He has been deposed as an expert witness 20 to 25 times (*See* Nowlis Dep., at 5:25–6:2) and has conducted approximately seven to nine surveys for litigation, about half of which were likelihood of confusion surveys (*See* Nowlis 1/25 Dec., ¶ 7; *see also*

19

Nowlis Dep., at 19:13–21:12.)  He also has prepared approximately 30 rebuttal reports (*see* Nowlis Dep., at 52:23–53:5), most of which involved rebutting litigation surveys.  (*See* Nowlis 1/25 Dec., ¶ 8).  Numerous courts have relied on his expert reports and testimony.  (See *Id.*, ¶ 9.)  In fact, the Western District of Wisconsin recently relied on his survey in denying a motion for class certification.  *See Boulet v. National Presto Industries, Inc.*, No. 11 Civ. 840, Dkt. No. 54, at 20 (W.D. Wis. Dec. 21, 2012).

Given Dr. Nowlis' ample experience in survey research, he is qualified to conduct and critique a likelihood of confusion survey, and his rebuttal testimony undoubtedly would assist a trier of fact to analyze the merits of Dr. McDonald's survey and assess the likelihood of confusion.  *See Belk, Inc. v. Meyer Corp., U.S.,* 679 F.3d 146, 162–63 (4th Cir. 2012), *as amended* (May 9, 2012) (expert in marketing, consumer behavior, and evaluative studies was qualified to conduct a trademark confusion survey even though he had never conducted one previously); *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, No. 07 Civ. 4718, 2010 WL 1687883, at *3–4 (N.D. Ill. Apr. 26, 2010) (expert qualified to conduct a confusion survey even though he had not conducted one previously because he had conducted over 100 non-litigation surveys and had relevant education, including a Ph.D. in business administration).

Plaintiffs attempt to twist Dr. Nowlis' deposition testimony by arguing that he was "uncertain" of the term "probability study" and "unaware of the meaning of the phrase 'puts out'" as relates to likelihood of confusion surveys. [10]  (Pl. Br., at 20.)  But in fact he defined both terms during his deposition.  (*See* Nowlis Dep., at 179:14–19 (probability study refers to "[w]here you would try to identify the opinions of people around some confidence error"); at

---

[10] Plaintiffs criticize Dr. Nowlis for expressing uncertainty about the meaning of the phrase "probability study."  (Pl. Br., at 20.)  Notably, however, both of the academic sources cited by Plaintiffs regarding the meaning of this term use the phrase "probability sample," rather than "probability study."  (*Id.*, at 20.)

48:11–18 ("Puts out would be some sort of an indicator of the source of the book. They have something to do with the source of the book.").)  As for Plaintiffs' complaint that Dr. Nowlis looked at questions previously used by others, including Dr. Jay, in likelihood of confusion studies before selecting the questions for his study (*see* Pl. Br., at 20), he should be applauded for seeking to select survey questions that conform to standard survey methodology and are "the product of reliable principles and methods."  Fed. R. Evid. 702.

Further, Plaintiffs make much of the fact that none of Dr. Nowlis' prior likelihood of confusion surveys have been offered into evidence and, therefore, none have been "subjected to judicial review or comment."  (Pl. Br., at 20.)  This criticism is fundamentally flawed, however, as every expert must submit a first survey and Dr. Nowlis, in fact, already has had a survey admitted, and relied upon, by a court.  *See Boulet*, No. 11 Civ. 840, at 20.

Plaintiffs have not pointed to a single case in which someone with a Ph.D. in marketing and prior experience both conducting and critiquing surveys has been excluded as unqualified. In *Troublé v. Wet Seal, Inc.*, on which Plaintiffs rely, the alleged expert neither submitted nor evaluated a survey, nor did he have any prior experience related to assessing likelihood of confusion.  *See* 179 F. Supp. 2d 291, 302–03 (S.D.N.Y. 2001).  Similarly, in *John H. Harland Co. v. Clarke Checks, Inc.*, the alleged experts had *no* marketing experience—with one being president of a bank where the products in issue were sold and the other a trademark attorney— nor did they conduct trademark surveys or know of instances of actual confusion.  *See* 711 F.2d 966, 979 n.23 (11th Cir. 1983).  Here, by contrast, Dr. Nowlis conducted a survey on which his opinion is based, has prior experience conducting likelihood of confusion surveys, and has an advanced degree in marketing that qualifies him to conduct this analysis.  He is qualified by virtue of both education and experience to rebut Dr. McDonald's survey and opine on the

likelihood of confusion between Apple's iBooks mark and Plaintiffs' alleged "ibooks" imprint.

*See Belk,* 679 F.3d at 162–63 (4th Cir. 2012); *Bobak Sausage* , 2010 WL 1687883, at *3–4.

III.   **THE NOWLIS SURVEY WAS PROPER REBUTTAL AND WAS DISCLOSED
TIMELY.**

   A.   **The Scope Of The Nowlis Survey Was Proper Because It Addressed The
Same Subject Matter As Dr. McDonald's Expert Report.**

Under Federal Rule of Civil Procedure 26(a)(2)(D)(ii) , expert testimony may be

submitted to "contradict or rebut evidence *on the same subject matter* identified by another party

under Rule 26(a)(2)(B) or (C)."  (Emphasis added.)  Here, Dr. McDonald offered an opinion

regarding "the likely confusion created by Apple's use" of the iBooks mark, based, in part, on a

likelihood of confusion survey she conducted.  (Mazzello 12/21 Dec., Ex. 9 (McDonald Rep. at

1).)  In rebuttal, Dr. Nowlis criticized Dr. McDonald's survey methodology and offered his own

survey on the same subject matter, namely likelihood of confusion, because "[he] thought that

[he] had a better way of doing it."  (Nowlis Dep., at 61:22–62:3.)

Plaintiffs claim Dr. Nowlis' survey is improper rebuttal because it does not "respond to

perceived methodological or linguistic flaws in the McDonald Survey, but rather constitutes an

entirely new survey."  (Pl. Br., at 21.)  The whole point of offering the survey, however, was to

show that when a proper survey is conducted, using an actual stimulus and proper questions, the

results are very different from those Dr. McDonald found when testing an imaginary stimulus,

floating out of context on an imaginary page.  (*See* Nowlis Dep., at 62:4–7.)  To more accurately

assess confusion, the Nowlis Survey: (1) used an actual stimulus that showed respondents the

"ibooks" imprint as it appears in the real-world marketplace; (2) asked widely accepted questions

for assessing confusion, rather than the atypical question "[w]hat company or companies would

you think had made the [product] available?" (McDonald Rep., at 11); (3) used properly

controlled for individuals who associate iBooks with Apple solely because of the letter "i"; and

(4) instructed respondents not to guess.  (*See* Nowlis Rep., ¶¶ 75–103.)  Thus, it does "counter . . . the alleged defects in the McDonald survey."[11]  (Pl. Br., at 22.)

Moreover, it is standard for a plaintiff to submit a survey, and equally standard for a defendant to rebut that survey with one of its own.  *See, e.g., Gap, Inc. v. G.A.P. Adventures Inc.*, No. 07 Civ. 9614, 2011 WL 2946384, at *11 (S.D.N.Y. June 24, 2011) (defendant's survey rebutted plaintiff's dilution survey); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 241 (S.D.N.Y. 2010) (defendant's survey rebutted plaintiff's likelihood of confusion survey); *Lon Tai Shing Co., Ltd. v. Koch+Lowy*, No. 90 Civ. 4464, 1992 WL 18806, at *1 (S.D.N.Y. Jan. 28, 1992) (rebuttal surveys on confusion and secondary meaning).  Apple is not aware of any requirement that would limit the methodology used for a rebuttal confusion survey.

Because the Nowlis Survey addressed the same subject matter as the McDonald Survey—namely, confusion between Apple's iBooks mark and Plaintiffs' alleged "ibooks" imprint—the cases Plaintiffs cite regarding the scope of a rebuttal report are inapposite.  In *Ebbert v. Nassau County*, the rebuttal report raised 16 topics not included in the initial report. *See* No. 05 Civ. 5445, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008).  In *First Years, Inc. v. Munchkin, Inc.*, the rebuttal report responding to a report on the issue of patent infringement was admissible as to infringement, but inadmissible as to topics such as invalidity, which were not discussed in the original report.  *See* 575 F. Supp. 2d 1002, 1008 (W.D. Wis. 2008).  Lastly, in *Plumley v. Mockett*, the court excluded portions of the rebuttal report relating to inequitable conduct and invalidity of a patent because the original report addressed damages only.  *See* 836 F. Supp. 2d 1053, 1065–66 (C.D. Cal. 2010).

Because, unlike those cases, Dr. Nowlis' rebuttal survey focuses exclusively on the issue

---

[11] It is irrelevant that Dr. Nowlis began fielding his survey three days before Apple received Dr. McDonald's survey from Plaintiffs as Apple would not have submitted the Nowlis Survey if there were no need to rebut Dr. McDonald.

of likelihood of confusion addressed by Dr. McDonald, it therefore is admissible as proper

rebuttal.  *See TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 180 (N.D.N.Y. 2002) (expert

report was proper rebuttal even though it used a different methodological approach than the

report it was rebutting because it addressed the same subject matter); *Deseret Mgmt. Corp. v.

U.S.*, 97 Fed. Cl. 272, 274 (2011) (rebuttal report regarding the value a license was admissible

even though rebuttal expert used the discounted cash flow valuation method while the original

report used the residual method).

### B.    Dr. Nowlis' Survey Was Timely Disclosed.

Plaintiffs' claim that the Nowlis Survey was not disclosed timely is nothing more than a

red herring.  Plaintiffs disclosed Dr. McDonald's expert report and survey on September 17,

2012.  Apple disclosed Dr. Nowlis' rebuttal report and survey on October 26, 2012, the Court-

ordered deadline for submitting rebuttal reports.  *See* Pretrial Scheduling Order, dated May 12,

2012, ¶ 4.  As Dr. Nowlis' report constitutes proper rebuttal, it was disclosed timely.  *See

Mareno v. Madison Square Garden, L.P.*, No. 98 Civ. 2719, 2000 WL 1401156, at *1 (S.D.N.Y.

Sept. 26, 2000) (expert witness's testimony was admissible where expert was disclosed timely).

Plaintiffs only make this argument to obfuscate the fact that they submitted Dr. McDonald's

improper sur-rebuttal report and survey on December 6, 2012, after rebuttal reports were due.

As this Court's Pretrial Scheduling Order did not provide for the submission of sur-rebuttals, Dr.

McDonald's sur-rebuttal survey truly was untimely.  Dr. Nowlis' survey, on the other hand, was

served on time, consistent with the schedule set by this Court.

### CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court deny Plaintiffs'

Motion to Exclude the Testimony, including Affidavits, Declarations, and Reports, of (1)

Defendant's Expert Witness E. Deborah Jay and (2) Defendant's Rebuttal Expert Stephen M.

Nowlis.

Date: January 25, 2013                    Respectfully submitted,

                                          *s/ Dale M. Cendali*
                                          _____
                                          Dale M. Cendali
                                          Claudia Ray
                                          Bonnie L. Jarrett
                                          KIRKLAND & ELLIS LLP
                                          601 Lexington Avenue
                                          New York, New York 10022
                                          Tel: 212-446-4800
                                          Fax: 212-446-4900

Perry J. Viscounty                        Jennifer L. Barry
LATHAM & WATKINS LLP                      LATHAM & WATKINS LLP
140 Scott Drive                           600 West Broadway, Suite 1800
Menlo Park, CA 94025                      San Diego, CA 92101-3375
Tel: 714-540-1235                         Tel: 619-236-1234
Fax: 714-755-8290                         Fax: 619-696-7419

                                          ATTORNEYS FOR DEFENDANT