UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J.T. COLBY & COMPANY, INC. d/b/a/ BRICKTOWER PRESS, J. BOYLSTON & COMPANY, PUBLISHERS LLC and IPICTUREBOOKS LLC,

Plaintiffs,

-against-

APPLE INC.,

Defendant.

Case No. 11 Civ. 4060 (DLC)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS TO EXCLUDE THE TESTIMONY, INCLUDING AFFIDAVITS, DECLARATIONS, AND REPORTS, OF (1) DEFENDANT'S EXPERT WITNESS E. DEBORAH JAY AND (2) DEFENDANT'S REBUTTAL EXPERT STEPHEN M. NOWLIS**

ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 20th Floor
New York, NY 10006
(212) 571-0550

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....1

I. THE JAY AND NOWLIS SURVEYS ARE SUBSTANTIVELY FLAWED....1

A. The Jay And Nowlis Surveys Fail To Provide Insight Into The Perceptions Of Readers Of Digital Books....1

B. The Jay And Nowlis Surveys Do Not Ask Relevant Confusion Questions ....4

1. Respondents Were Never Asked About Source Affiliation ....4

2. The Sponsorship Question Is Ambiguous In The Context Of Books....6

C. Neither Survey Measures Post-Sale Confusion ....7

D. The Jay Survey Used A Distracting And Improper Stimulus....9

II. THE NOWLIS SURVEY CANNOT BE—AND IS NOT—A REBUTTAL STUDY AND IS UNTIMELY ....9

CONCLUSION....10

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anhueser-Busch Inc. v. VIP Prods., LLC*,
666 F. Supp. 2d 974 (E.D. Mo. 2008)....................4, 5

*Boulet v. Nat'l Presto Indus., Inc.*,
No. 11 Civ. 840, Dkt. No. 54 (W.D. Wis. Dec. 21, 2012)....................10

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004)....................1

*Clinique Labs., Inc. v. Dep Corp.*,
945 F. Supp. 547 (S.D.N.Y. 1996)....................8

*Edison Bros. Stores, Inc. v. Cosmair, Inc.*,
651 F. Supp. 1547 (S.D.N.Y. 1987)....................6

*Fancaster, Inc. v. Comcast Corp.*,
832 F. Supp. 2d 380 (D.N.J. 2011)....................4

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
688 F. Supp. 2d 1148 (D. Nev. 2010)....................6, 7

*Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*,
2010 WL 3075318 (N.D. Ga. Aug. 4, 2010)....................5

*Gap, Inc. v. G.A.P. Adventures, Inc.*,
2011 WL 2946384 (S.D.N.Y. June 24, 2011)....................10

*Gucci Am., Inc. v. Guess?, Inc.*,
831 F. Supp. 2d 723 (S.D.N.Y. 2011)....................7

*Icon Enters. Int'l, Inc. v. Am. Prods. Co.*,
2004 WL 5644805 (C.D. Cal. Oct. 7, 2004)....................6

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)....................8

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
799 F.2d 867 (2d Cir. 1986)....................8

*Lon Tai Shing Co., Ltd. v. Koch+Lowy*,
1992 WL 18806 (S.D.N.Y. Jan. 28, 1992)....................10

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................6

*Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*,
198 F. Supp. 2d 474 (S.D.N.Y. 2002)....................6, 7

*Paco Sport, Ltd. v. Paco Rabanne Perfumes*,
86 F. Supp. 2d 305 (S.D.N.Y. 2000)....................4, 5

*Pharmacia Corp. v. Alcon Labs, Inc.*,
201 F. Supp. 2d 335 (D.N.J. 2002)....................6, 7

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*,
2006 WL 20523 (E.D. Mich. Jan. 4, 2009)....................4

*Reebok Int'l Ltd. v. Sung Hwa Int'l Corp.*,
1987 WL 27684 (S.D.N.Y. Dec. 10, 1987)....................8

*Roederer v. J. Garcia Carrion, S.A.*,
732 F. Supp. 2d 836 (D. Minn. 2010)....................4

*Shieffelin & Co. v. Jack Co. of Boca, Inc.*,
1992 WL 156560 (S.D.N.Y. June 28, 1992)....................7

*Starbucks U.S. Brands, LLC v. Ruben*,
78 U.S.P.Q. 2d 1741 (T.T.A.B. Feb. 9, 2006)....................5

*Sterling Drug, Inc. v. Bayer AG*,
14 F.3d 733 (2d Cir. 1994)....................1

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010)....................10

**Statutes**

15 U.S.C. § 1125(a)(1)(A)....................5

**Miscellaneous**

Tiffany Hsu, “A Third of Barnes & Noble Stores May Close In Next Decade, Report Says,” *L.A. Times*, Jan.. 28, 2012....................2

Leslie Kaufman, “Barnes & Noble Faces Steep Challenge as Holiday Nook Sales Decline,” *N.Y. Times*, Jan. 3, 2012....................2

6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 32:174, 32:175....................5

Lee Rainie et al., *The Rise of E-Reading* (Pew Research Ctr. 2012)....................2

Jerre B. Swann, *Likelihood of Confusion, in Trademark and Deceptive Advertising Surveys: Law, Science and Design* 57-58 (Diamond & Swann, eds. 2012)....................5

## PRELIMINARY STATEMENT

Notable in Apple's Opposition ("Opp."), and indeed in its entire case, is what remains unsaid.[1] While Apple superficially references Plaintiffs' position that the Jay and Nowlis Surveys were not constructed properly to measure trademark confusion arising from a publishing imprint, Apple does not even attempt to challenge the substance of Plaintiffs' arguments on the merits. Instead, Apple repeatedly recites a generic *Ever-ready* "gold standard," parroting this mantra as though blind adherence to a stock survey methodology can save any study, no matter the context or the facts.[2] In doing so, however, Apple ignores the cornerstone of Plaintiffs' position: that the very nature of books requires a different approach. At base, Apple fails to answer Plaintiffs' criticisms, resorting instead to robotic recitation of the *Ever-ready* formula. But because the Jay and Nowlis Surveys are so ill-suited to the facts of the case as to be irrelevant and prejudicial, the testimony of Drs. Jay and Nowlis should be excluded.

## I. THE JAY AND NOWLIS SURVEYS ARE SUBSTANTIVELY FLAWED

### A. The Jay And Nowlis Surveys Fail To Provide Insight Into The Perceptions Of Readers Of Digital Books

In selecting their universes, Apple's experts improperly ignored digital-book readers and focused exclusively on readers of print books. As a result, both surveys are fatally flawed because they fail to measure confusion among a key "segment of the population whose perceptions and state of mind are relevant to the issues in this case": potential purchasers of Plaintiffs' digital books. *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d

[1] Plaintiffs respectfully direct the Court to their Memorandum of Law In Support of Plaintiffs' Motions to Exclude the Testimony, Including Affidavits, Declarations, and Reports, of (1) Defendant's Expert Witness E. Deborah Jay and (2) Defendant's Rebuttal Expert Stephen M. Nowlis ("Motions" or "Mot.") for all terms defined therein, as well as to the Exhibits to the Dec. 21, 2012 Bogdanos Declaration ("Bogdanos Decl.") in support of these Motions.

[2] The anonymous-source concept of *Ever-ready* is the literal inverse of Apple's pervasive fame, and the *Ever-ready* lamp and light-bulb products are far more straightforward than books in terms of affiliation or permission issues.

110, 118-19 (3d Cir. 2004); *see also Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994). E-reading is the wave of the future, rising exponentially (in fact, ***more than quadrupling*** in less than two years),[3] and Plaintiffs—like any book publisher with hopes of remaining in business—are riding it. (*See* Declaration of John T. Colby, Jr. ("Colby Decl.") ¶ 2.) Digital-book readers thus represent a critical segment of Plaintiffs' consumers, and at the projected rate of expansion, that customer universe will come to dominate the reading world. There is no greater testament to the power of that trend than the decision of Barnes & Noble to "shut up to a third of its brick-and-mortar bookstores over the next decade ***as reading habits change and digital publications evolve***."[4] Those who read e-books are thus properly Plaintiffs' prospective purchasers and part of the relevant universe for this case. The Jay and Nowlis Surveys' failure explicitly to sample digital-book readers leaves them under-represented. And inasmuch as Apple uses the mark IBOOKS for software that enables ***digital reading*** and Plaintiffs' IBOOKS mark is on both print and ***electronic books***,[5] it does not take a great stretch of the imagination or leap of faith to conclude that the most acute market overlap between these products is the digital world.[6]

Apple engages in creative but flawed mathematics—a game of smoke and mirrors

---

[3] *See* Lee Rainie et al., *The Rise of E-Reading* (Pew Research Ctr. 2012) ("Pew Study") (Bogdanos Decl., Ex. D), at 4-5, 13, 23; Leslie Kaufman, "Barnes & Noble Faces Steep Challenge as Holiday Nook Sales Decline," *N.Y. Times*, Jan. 3, 2012, *available at* http://mediadecoder.blogs.nytimes.com/2013/01/03/barnes-noble-reports-tepid-holiday-sales/ (Declaration of Todd Anten ("Anten Decl."), Ex. A) (reporting a 13% increase in sales of digital content in the 2012 holiday sales period); Expert Report of Mike Shatzkin ("Shatzkin Rep.") (Bogdanos Decl., Ex. F) at 1, 5; Deposition of Mike Shatzkin, December 4, 2012 ("Shatzkin Tr.") (Anten Decl., Ex. B) 46:9-47:4, 147:6.

[4] Tiffany Hsu, "A Third of Barnes & Noble Stores May Close In Next Decade, Report Says," *L.A. Times*, Jan.. 28, 2012, *available at* http://www.latimes.com/business/money/la-fi-mo-up-barnes-noble-stores-close-20130128,0,5751045.story (emphasis added) (Anten Decl., Ex. C); *see supra* note 3.

[5] It does not matter that Plaintiffs' e-books contain the same information as Plaintiffs' printed books nor that both print and digital books are presented in the same way by online retailers. (Opp. at 7-8.) Consumers' perceptions are affected not only by the information within books, but also by the ***context*** in which the books are seen.

[6] Apple challenges Plaintiffs for having "no evidentiary support" for their position that confusion is more heightened in the digital arena, (*id.* at 7), yet the opinions of Plaintiffs' marketing expert Dr. Susan McDonald as well as basic common sense provide this foundational basis. Expert Report of Susan Schwartz McDonald (Anten Decl., Ex. D) at 8; *see id.* at 4; Deposition of Susan Schwartz McDonald, December 12, 2012 (Anten Decl., Ex. E) 75:12-22.

designed to obscure the single critical figure (buried in a footnote of Apple's brief, Opp. at 7 n.3) that ***twenty-nine percent (29%)*** of all adult readers (in February, 2012) read digital books, and instead point to the (plainly larger number) eighty-eight percent (88%) of e-reading individuals who also read print books. While it is true that most readers of e-books also read print books, the reverse is decidedly ***untrue***. Most print readers are ***not*** e-book readers. The mathematical reality—illustrated in Apple's diagram, (Opp. at 6), but misdescribed to obscure the flaws in its experts' syllogistic sampling logic—is that, of the print-book reading individuals represented in the Jay and Nowlis Surveys, many more presumably ***do not*** read digital books than ***do***:[7]

Far from the "huge" and "extensive overlap" between print and digital-book readers or the degree to which ***e-readership*** embraces print readership[8] (Opp. at 2, 6-7), the relevant overlap based on ***print readership*** (the Jay/Nowlis universe) is less than one-third:

In any event, from their data, Drs. Jay and Nowlis have ***no way of isolating and knowing*** the perceptions of any e-reading respondents.[9] Their studies thus miss the mark and lack relevance.

---

7 And the screening data include no information to provide reassurance to the contrary. (*See* Mot. at 7-8.)

8 Plaintiffs do not claim the relevant universe to be those who read e-books ***exclusively***. (*See* Opp. at 7.)

9 Apple deceptively asserts that the law is "clear" that a universe should ***never*** be limited to those consumers most likely to be confused—here, e-book readers—and that such a universe would "skew" results. (Opp. at 7.) The question of whether a universe should be ***restricted*** to likely-confused consumers, however, should not be confused with the question of whether those consumers should be ***ignored***. As the above diagrams illustrate, doing as the Jay and Nowlis Surveys did and selecting a universe from the larger circle of print readers results in a ***very low proportion*** of e-reading individuals—a clear ***minority***. By contrast, constructing a universe from the smaller e-reading circle would lead to a ***majority*** of respondents who read both print and digital books.

While survey universes may sometimes omit a small portion of relevant potential purchasers, they may not ***ignore*** potential consumers in the market where the two marks compete or intersect. Indeed, Apple has not cited a single case admitting a survey that, like its experts' surveys, made ***no*** attempt to represent those consumers in the market of intersection.[10] Including the impressions of persons who read e-books—which both the Jay and Nowlis Surveys overlooked—does not improperly skew the survey results, as Apple suggests. (Opp. at 7.) To include this critical segment of potential purchasers in the survey universe is not the same as limiting a survey universe to those who are ***actually aware*** of stronger mark, as was the case with the criticized surveys in *Paco Sport*, 86 F. Supp. 2d at 322 n.17, and *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 874 (D. Minn. 2010). Nor does it restrict the universe to those more likely to be familiar with the stronger mark but not any more likely to be in the market for the products bearing the weaker mark, as in *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, 2006 WL 20523, at *6 (E.D. Mich. Jan. 4, 2009). Rather, it is valid and ***necessary*** recognition of the fact that Plaintiffs' prospective consumers include digital-book purchasers.

### B. The Jay And Nowlis Surveys Do Not Ask Relevant Confusion Questions

#### *1. Respondents Were Never Asked About Source Affiliation*

Skirting the real problems between the parties' identical IBOOKS marks and instead intoning the *Ever-ready* gold-standard mantra as if it were a protective shield against all methodological criticism, Apple and its survey experts have failed to garner relevant confusion

[10] The survey in *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 403 (D.N.J. 2011), tested a universe of sports fans, where parties' marks were both used in connection with online sports video content. *Id.* at 390-93. Similarly, *Anhueser-Busch Inc. v. VIP Prods., LLC*, 666 F. Supp. 2d 974, 983-84 (E.D. Mo. 2008), involved confusion between alcoholic beverages and dog toys, and properly surveyed adults over 21 years of age who were likely to buy dog toys. The survey found probative in *Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 86 F. Supp. 2d 305, 322-23 (S.D.N.Y. 2000), was actually limited to consumers ***most likely*** to be confused: it focused on buyers of denim, and not buyers of other casual clothing produced by the junior-user plaintiff, where the senior-user defendant argued that many designers market both jeans and fragrances under the designer brand name, *see id.* at 317-19.

data.[11] None of Jay's and Nowlis's questions measured company-level affiliation confusion.[12] (*See* Mot. at 9-10.) Notably, Apple makes no mention of the plain language of the Lanham Act,[13] nor Jerre Swann's studied formulation of a proper, full confusion question series, which includes asking about affiliation among companies, not products: "a business affiliation or connection ***with another company***." Jerre B. Swann, *Likelihood of Confusion, in Trademark and Deceptive Advertising Surveys: Law, Science and Design* 57-58 (Diamond & Swann, eds. 2012) (Anten Decl. Ex. F) (emphasis added); *see also* 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 32:174, 32:175; *Paco Sport*, 86 F .Supp. 2d at 321 (praising survey that asked ***separate*** product-affiliation and company-affiliation questions; *Anheuser-Busch*, 666 F. Supp. 2d at 983 (similar); *Starbucks U.S. Brands, LLC v. Ruben*, 78 U.S.P.Q.2d 1741, 1753, n.32. (T.T.A.B. Feb. 9, 2006) (noting an appropriate addition to the *Eveready* format to test for company-level affiliation).[14]

Instead, Apple primarily relies on *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, 2010 WL 3075318, at *7 (N.D. Ga. Aug. 4, 2010), which held that a survey containing an

---

[11] Plaintiffs' position, misconstrued by Apple, is not that there is "only one proper question for testing confusion as to affiliation or sponsorship," but rather that "wide[] accept[ance]" of a methodological construct is not a rubber stamp. (Opp. at 8.) Responsible survey design must examine and respond to the facts and context at hand. If this flexibility necessitates a deviation from standard formulations, the research design must so bend. In ignoring the parties' respective businesses and the nature of the stimulus to which respondents were exposed, the Jay and Nowlis Surveys notably failed to adapt to the facts presented. Thus context-blind, they offer nothing of relevance to the finder of fact.

[12] While Apple correctly notes that Plaintiffs do not dispute that the studies employed a proper form of source-confusion question, this limited acknowledgment as to the question formulation in no way amounts to a "tacit[] admi[ssion]" that the Jay and Nowlis Surveys properly measured source confusion. (Opp. at 9 n.5). The problems with the universe and the limitations to on-sale confusion infect the entirety of both surveys (as does, respectively, the Jay Survey's flawed stimulus and the Nowlis Survey's misguided control), including their purported measurements of source confusion.

[13] Section 43(a) prohibits, in part, trademark use that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such ***person*** with another ***person***." 15 U.S.C. § 1125(a)(1)(A) (emphasis added).

[14] At the very least, even while hewing to traditional constructs, responsible survey design must shape itself on relevant developments in the standard construction, rather than, as did the Jay and Nowlis Surveys, remaining oblivious to the particular context and ignoring the available methodology best suited to it.

anonymous-source products-affiliation question measured "more than just source confusion." That study measured whether respondents believed two differently-branded breads were made by the ***same*** parent company—an issue of ***product-level affiliation*** or "co-branding,"—but did ***not*** measure company-level affiliation confusion as described in the Lanham Act. *Id.* Indeed, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007), is the only case Apple cites discussing a survey designed to measure whether respondents perceived an affiliation between two companies.[15] That survey was criticized because its affiliation question failed to ask a follow-up, explanation-seeking question that would have enabled the elimination of affiliation responses that did not derive from the marks (but rather from some other basis for assuming a business connection). *Id.* at 604. It was ***not*** criticized for failing to ask a products-level affiliation question where a company-level affiliation question was appropriate. *Id.* Apple's statements to the contrary are misleading. (*See* Opp. at 11.) The fact remains that the Jay and Nowlis Surveys failed to ask ***any*** question that would gauge confusion as to affiliation between business entities. (*See* Deposition of Stephen M. Nowlis (Bogdanos Decl., Ex. J) 230:7-8, 232:1-5, 247:4-7.)

***2. The Sponsorship Question Is Ambiguous In The Context Of Books***

The Jay and Nowlis Surveys also failed to garner perceptions as to whether Apple had approved of or given its permission for Plaintiffs' imprints. In asking whether the company that

[15] In fact, the surveys in the other cases cited by Apple all measured source or sponsorship confusion. *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 688 F. Supp. 2d 1148, 1155 (D. Nev. 2010) (discussing a survey designed by Dr. Jay, concluding that "there is a likelihood of confusion ***as to the source or sponsor*** of the products at issue") (emphasis added); *Icon Enters. Int'l, Inc. v. Am. Prods. Co.*, 2004 WL 5644805, at *18-20 (C.D. Cal. Oct. 7, 2004) (survey asking *Eveready* questions indicated "a total absence of ***source*** confusion") (emphasis added); *Pharmacia Corp. v. Alcon Labs, Inc.*, 201 F. Supp. 2d 335, 365-66 (D.N.J. 2002) (an *Eveready* survey "tested for ***product source*** confusion") (emphasis added); *Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 482-83 (S.D.N.Y. 2002) (surveys were introduced "to prove actual confusion as to the ***source***" of the products at issue) (emphasis added); *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987) (relevant issue was confusion "with the ***source*** of [defendant's] products") (emphasis added).

"printed, released or put out" the book had received permission or approval, the Jay and Nowlis Surveys did not heed the natural copyright/author-rights suggestions behind such a sponsorship question ***in the context of books***.[16] Because respondents were not considering the relevant sponsorship issue,[17] the data generated are likewise neither relevant nor reliable.

**C. Neither Survey Measures Post-Sale Confusion**

Apple's assertion that Plaintiffs are impermissibly framing their case in terms of post-sale confusion is ridiculous. (Opp. at 3, 15.) Post-sale confusion is unquestionably relevant here, and Apple's experts failed to test for it. ***First***, Plaintiffs have not limited the confusion at issue to "point-of-sale." The Amended and Supplemental Complaint in this case simply reads "confusion" and does not specify all types of confusion that exist between Plaintiffs' and Apple's brands.[18] Am. Compl. ¶¶ 56, 85, 87. ***Second***, Apple's own expert Dr. Jay characterized the Nowlis Survey—which was designed, conducted, and served ***before*** Dr. Jacoby's comments on the issue were received—as probative of post-sale confusion. (Jay Tr. (Anten Decl., Ex. H),

[16] Apple ineffectively counters this concern by pointing to data from the Jay Survey as to the number of responses that reflected a focus on the rights of the book owner or the substantive content; Dr. Jay's data is not fully inclusive of content owners, failing to capture, for example, answers relating to "writers," Deposition of E. Deborah Jay, November 30, 2012 (Bogdanos Decl., Ex. C) 190:22-192:10, and not looking to the entirety of respondents' answers, (*see* Mot. at 13 n.14). (Opp. at 12 n.6.) Further, there is no way of determining from the Jay or Nowlis Surveys how many of the respondents that were skipped based on a negative answer to the permission question (and thus their answers not made part of the data set) likewise had answered from a copyright perspective.

[17] Once again, what courts have "routinely" done is neither enlightening nor persuasive on the facts here. (Opp. at 11.) Apple's pointing to the language of the Lanham Act that speaks to permission for goods, (*id.* at 12), is unavailing in view of the subtleties and varied layers of authorization surrounding book products. Because of natural content assumptions, the concept of permission in the book context requires clarification. The cases Apple cites are inapposite because they tested products without copyright implications: t-shirts (*Fifty-Six*, 688 F. Supp. 2d at 1155); vodka (*Nat'l Distillers*, 198 F. Supp. 2d at 483); eye medications (*Pharmacia*, 201 F. Supp. 2d at 365-66); and popcorn (*Shieffelin & Co. v. Jack Co. of Boca, Inc.*, 1992 WL 156560, at *10 (S.D.N.Y. June 28, 1992)).

[18] Similarly, when testifying about "confusion in the marketplace," John T. Colby never stated that "point-of-sale" confusion was the only type of confusion experienced because of Apple's infringement of Plaintiffs' IBOOKS mark. Indeed, Colby's statements ***included*** post-sale confusion experienced by third-party purchasers: in speaking to the harm to Plaintiffs,' he referenced confusion experienced by distributors. (Deposition of John T. Colby, July 18, 2012 (Anten Decl., Ex. G), at 196:18-23.) Their confusion speaks to that of retailers and ultimately third-party consumers —the reading public—and thus embraces confusion broadly, post-sale as well as on-sale. Because there has been no "crystal clear" statement limiting the confusion at issue here, this case is markedly different from *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 739, 746 (S.D.N.Y. 2011), and that case cannot assist Apple in explaining why Jay and Nowlis failed to test for post-sale confusion.

60:18-21, 100:11-13.) Apple thus recognized the concept of post-sale confusion prior to Plaintiffs' specific articulation of it through Dr. Jacoby's criticisms of the Jay and Nowlis Surveys. ***Third***, Apple has not cited any case law or commentary that explicitly limits post-sale confusion to that experienced by non-purchasers viewing goods in a non-sales environment without their packaging.[19] What properly distinguishes ***post***-sale from ***on***-sale confusion is timing: it is confusion that is experienced ***after*** the moment of purchase. While for some products, post-sale confusion may affect non-purchasers more than the actual consumer, for other items, a fading memory of the sales environment or aspects of the product that are not immediately internalized can result in confusion experienced later ***by the purchaser***.

Not only is post-sale confusion applicable to this case, but it is also supremely relevant given the manner in which books are experienced by readers, especially in a niche genre such as Plaintiffs' science-fiction imprint. Books are the type of product whose source-identifying information can be apprehended later, in the post-sale environment, where it can become far more pertinent than before purchase. The interaction between a reader and a book is an ongoing one.[20] Post-sale confusion speaks squarely to this relationship. The Jay and Nowlis Surveys, with their undue focus on the purchasing environment, ignore it.[21]

---

[19] *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986) (noting that, in an earlier case, the Second Circuit had "declin[ed] to hold … that actual or potential confusion ***at the time of purchase*** necessarily must be demonstrated to establish trademark infringement") (emphasis in original, citation omitted); *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547 (S.D.N.Y. 1996) (not defining the broad concept of post-sale confusion); *Reebok Int'l Ltd. v. Sung Hwa Int'l Corp.*, 1987 WL 27684, at *2 (S.D.N.Y. Dec. 10, 1987) (same).

[20] *See* Shatzkin Rep. (Bogdanos Decl., Ex. F) at 5-6; Shatzkin Tr. (Bogdanos Decl., Ex. E) 202:15-20, *see also id.* 93:8-12, 97:6-12; Freese Tr. (Bogdanos Decl., Ex. G), 92:5-93:19, 102:7-107:2.

[21] To the extent Dr. Nowlis has tried, belatedly, to present his survey as informing post-sale confusion, such *post-hoc* maneuvering is belied by his instruction to respondents to look at the stimulus "the way you normally do when you are ***deciding whether to buy*** a book." Nowlis Rep., App. C (Question D) (emphasis added). Such a clear directive to respondents reveals the Nowlis Survey for what it is, and more importantly for what it is ***not***—namely, any measure of post-sale confusion. *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006), is simply irrelevant here. There, a survey was found to be ***not probative*** of either post-sale or point-of-sale confusion, despite giving a point-of-sale instruction. *Id.* at *26. Contrary to Apple's claim (Opp. at 16), it is

***(footnote continued)***

### D. The Jay Survey Used A Distracting And Improper Stimulus

As with Apple's other expert evidence, the Jay Survey wholly skirts the issue of how consumers would experientially react to the mark IBOOKS ***within*** a book—print or digital. Jay's choice of stimulus—a webpage for an IBOOKS-branded book that both buries and misrepresents the imprint name—renders her survey wholly irrelevant because it did not test respondents' consideration of the IBOOKS mark ***as part of*** a book. Indeed, consumers are not likely even to notice a book's imprint on an Amazon.com or a BarnesandNoble.com page. Thus, by testing reactions to the plethora of text on a retailer's web page, the Jay Survey is stringently limited in significance to those encountering the IBOOKS imprint ***in that particular way—***and thus tests confusion among consumers who likely have not noticed the mark, much less derived a source-related impression from it. The survey's relevance is subsequently eviscerated by its failure to direct respondents to the IBOOKS name, buried within a pages-long website, and thus even to attempt to glean their perceptions of the mark.[22]

## II. THE NOWLIS SURVEY CANNOT BE—AND IS NOT—A REBUTTAL STUDY AND IS UNTIMELY

Apple implausibly and disingenuously seeks to paint as a "rebuttal study" a survey that was fielded ***before*** the service date of the report and survey to which the "rebuttal" allegedly responds.[23] The Nowlis Survey, which began fielding on September 14 and thus was designed well before then, ***pre-dates*** Dr. McDonald's expert report, which Apple (and presumably Dr.

---

not simply additional information from the product packaging or the sales environment, but also respondents' mindset throughout a survey, that defines the nature of the study.

[22] Focusing respondents' attention in this manner is not, as Apple would have it, a "reading test," (Opp. at 14 n.7), but rather a reasonable means of gathering targeted and relevant information. Without this focus, and given the complex and convoluted stimulus the Jay Survey employed, the resulting data shed no light on the issue at bar.

[23] Apple also incredulously characterizes as "irrelevant" the fact that its "rebuttal" study was fielded ***before*** the date of the expert report supposedly being "rebutted." (Opp. at 23 n.11.) Plaintiffs, by contrast, deem it supremely relevant that Apple plays fast and loose with the schedule imposed by the Court and resorts to strategic gamesmanship to circumvent Court-imposed deadlines.

Nowlis) received on September 17. (*See* Mot. at 22.) Characterizing the Nowlis Survey as rebuttal is thus absurd on its face.[24]

Positioned by Apple as what a "proper" survey should look like, the Nowlis Survey should be seen for what it really is: a second bite at the proverbial apple and a last-ditch attempt to try where the Jay Survey—by dint perhaps of insufficient time or unfavorable pre-testing—had failed.[25] Indeed, if the "whole point" of the Nowlis Survey was to show how a survey would be conducted "properly" (Opp. at 22), that lesson is precisely what the Jay Survey should have offered—but did not. Apple was late in the game for this desperate "do-over" endeavor, however, because the September 17 deadline for affirmative-expert reports, as the Nowlis Survey should properly be viewed, had long passed when Dr. Nowlis submitted his report and study on October 26, the date set by the Court for the submission and exchange of rebuttal-expert reports. The Nowlis Report is thus untimely, and the Court should exclude it.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' Motions in their entirety.

---

[24] The Nowlis Survey does not hew to any element of Dr. McDonald's study—indeed, how could it?—such as employing a virtually identical question with a physical book stimulus. And it goes without saying that Apple has not cited a single case admitting a "rebuttal" report that was fielded before receipt of the report it rebuts. Moreover, none of the cases Apple cites stands for the proposition that a rebuttal survey may be different in every respect from the affirmative study and still be given weight. *See Lon Tai Shing Co., Ltd. v. Koch+Lowy*, 1992 WL 18806 (S.D.N.Y. Jan. 28, 1992) (providing absolutely no information about the scope or design of the rebuttal survey). Notably, and contrary to Apple's representation, *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010), did not involve a rebuttal survey at all—rather, both sides offered affirmative surveys, and both submitted rebuttal reports without surveys. *See id.* at 225 (noting that defendant offered a both a rebuttal report to plaintiff's survey by one expert, and a separate affirmative survey on likelihood of confusion by another). Similarly, the court in *Gap, Inc. v. G.A.P. Adventures, Inc.*, 2011 WL 2946384 (S.D.N.Y. June 24, 2011) did not credit a rebuttal survey on the issue of likely confusion, where it was offered to rebut an affirmative confusion study. *Id.* at *11. Apple mistakenly characterizes the affirmative survey in the *Gap* case as a "dilution survey." (Opp. at 23). That survey was clearly a likelihood of confusion survey, and the court refused to credit the rebuttal survey on its rebuttal of that issue. *Gap*, 2011 WL 2946384, at *11.

[25] The Nowlis Survey is effectively identical to the Jay Survey, and this mimicry and lack of independent contribution are perhaps understandable when viewed in light of Dr. Nowlis's inexperience in presenting and defending litigation surveys—his ***single*** recent reception for a non-trademark survey nonwithstanding, (Opp. at 20, 21), *Boulet v. Nat'l Presto Indus., Inc.*, No. 11 Civ. 840, Dkt. No. 54 (W.D. Wis. Dec. 21, 2012). To date, no court has ***ever*** passed comment on any trademark survey that Dr. Nowlis has designed, despite Apple's presenting Dr. Nowlis as having had some degree of interaction with "thousands" of surveys. (Opp. at 19.)

Dated: New York, New York
February 5, 2013

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP

By: /s/ Partha P. Chattoraj

Partha P. Chattoraj
David A. Shaiman
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

*Attorneys for Plaintiffs J.T. Colby & Co., Inc. d/b/a Brick Tower Press, J. Boylston & Co., Publishers, LLC, and ipicturebooks, LLC*

*Of counsel:*

Robert L. Raskopf
Claudia T. Bogdanos
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York, 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100